Roland Tellis (SBN 186269)
rtellis@baronbudd.com
Mark Pifko (SBN 228412)
mpifko@baronbudd.com
Isaac Miller (SBN 266459)
imiller@baronbudd.com
**BARON & BUDD, P.C.**
15910 Ventura Boulevard, Suite 1600
Encino, California 91436
Telephone:   (818) 839-2333
Facsimile:   (818) 986-9698

Niall A. Paul (to be admitted *pro hac vice*)
npaul@spilmanlaw.com
**SPILMAN THOMAS & BATTLE, PLLC**
300 Kanawha Boulevard, East (25301)
Post Office Box 273
Charleston, West Virginia 25321
Telephone:   (304) 340-3800
Facsimile:   (304) 340-3801

Nathan B. Atkinson (to be admitted *pro hac vice*)
natkinson@spilmanlaw.com
**SPILMAN THOMAS & BATTLE, PLLC**
110 Oakwood Drive, Suite 500
Winston-Salem, North Carolina 27103
Telephone:   (336) 725-4710
Facsimile:   (336) 725-4476

Adam J. Levitt (to be admitted *pro hac vice*)
alevitt@gelaw.com
John E. Tangren (to be admitted *pro hac vice*)
jtangren@gelaw.com
**GRANT & EISENHOFER P.A.**
30 North LaSalle Street, Suite 1200
Chicago, Illinois 60602
Telephone:   (312) 214-0000
Facsimile:   (312) 214-0001

Justin S. Brooks (to be admitted *pro hac vice*)
jbrooks@gelaw.com
**GRANT & EISENHOFER P.A.**
123 Justison Street
Wilmington, Delaware 19801
Telephone:   (302) 622-7000
Facsimile:   302) 622-7100

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

| | |
|---|---|
| WILLIAM PHILIPS, PHILLIP CLAY CECIL, ROBERT HALSEY, TEMPLE HALSEY, PERFORMANCE FIRE PROTECTION, LLC, and JASON WILKINSON, individually, and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br>   vs.<br><br>FORD MOTOR COMPANY,<br><br>        Defendant. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs William Philips, Phillip Clay Cecil, Robert Halsey, Temple Halsey, Performance Fire Protection, LLC, and Jason Wilkinson (collectively, "Plaintiffs"), individually and on behalf of the other members of the below-defined nationwide class and statewide classes they respectively seek to represent (collectively, the "Class," unless otherwise identified herein), for their Class Action Complaint (the "Complaint") allege against Ford Motor Company ("Defendant" or "Ford"), upon personal knowledge as to themselves and their own acts, and as to all other matters upon information and belief, based upon the investigation made by the undersigned attorneys, as follows:

## NATURE OF THE CASE

1.      Plaintiffs bring this class action seeking redress and remedy from Ford on behalf of themselves and the other Class members, each of whom purchased or leased one or more Ford Fusion vehicles, model years 2010 through 2014, or Ford Focus vehicles, model years 2012 through 2014 (the "Defective Vehicles"), all of which are equipped with a commonly designed and defective Electronic Power Assisted Steering ("EPAS") system.

2.      The EPAS system in the Defective Vehicles replaces the traditional hydraulic-assist power steering pump and is comprised of a power steering control motor, electronic control unit, torque sensor and steering wheel position sensor.  The EPAS system, however, suffers from systemic defects, including, but not limited to: (1) seepage of conformal coating into the EPAS system's ribbon cable, which leads to the loss of connections within the EPAS system; (2) misalignment of ribbon cable pins utilized in the EPAS system, which leads to the breakage of critical wiring and the loss of connections within the EPAS system; (3) manufacturing defects in the contact plating used in the EPAS system, which causes corrosion and an interruption in electrical connections within the EPAS system; (4) defects in EPAS system's sensors; and (5) defects in the gear assembly.  The multitude of defective elements in the EPAS system

1    renders the system prone to sudden and premature failure during ordinary and

2    foreseeable driving situations.

3        3.    As a result of the EPAS defects, drivers of the Defective Vehicles

4    experience significantly increased steering effort and, ultimately, loss of control.

5        4.    The EPAS system was intended to enhance vehicle safety, and had it been

6    properly designed and manufactured, it could have accomplished that goal.  Indeed, Ford

7    advertised its EPAS system as an innovative and positive contributor towards vehicle

8    safety.  Ford touted the ability of its EPAS system's "pull-drift compensation" software-

9    based technology, telling consumers that the system would detect road conditions, such

10   as crowned road surfaces or crosswinds, and adjust the steering system to help drivers

11   compensate for pulling and drifting.  Ford further stated in its marketing materials that

12   "EPAS is a demonstrative example of technology that increases fuel economy while

13   enabling innovation to aid drivers."  Ford also advertised its EPAS system as one of

14   several technological innovations that was "helping drivers stay connected, safer, [and]

15   less stressed."  Ford's marketing materials, including television commercials for some of

16   the Defective Vehicles, lauded the sensors in the EPAS system, claiming that they

17   achieve steering "that feels just right" and "helps keep you firmly planted and in

18   control."

19       5.    Notwithstanding Ford's aspirations for its EPAS system, the company has

20   received hundreds of complaints regarding loss of power steering of the Defective

21   Vehicles.  Unfortunately, however, in the face of such information, Ford failed and

22   continues to fail to disclose to consumers of the Defective Vehicles that the uniformly

23   designed EPAS system is prone to premature failure during ordinary and foreseeable

24   driving situations.  As a result, drivers of the Defective Vehicles experience markedly

25   increased steering effort, leaving them *unable* to control their vehicles.

26       6.    Ford's omissions concerning the EPAS system are material to consumers

27   because of the significant safety concerns presented as a result of the system's defects

28

and premature failures.  When the EPAS system fails while a Defective Vehicle is on the road, the driver is suddenly unable to turn the vehicle.  This exposes occupants of the Defective Vehicles, occupants of surrounding vehicles, and pedestrians, to the risk of collisions and grave bodily harm.  As a result of Ford's omission of material information, Ford has recklessly risked the safety of occupants of the Defective Vehicles and the public at large.

7.     When Plaintiffs and other Class members purchased the Defective Vehicles, they relied on their reasonable expectation that the Vehicles did not pose an unavoidable safety risk and on affirmative representations from Ford touting the quality and safety of its vehicles.  Had Ford timely disclosed to consumers the material fact that the EPAS system was prone to sudden failure, Plaintiff and the other class members would not have purchased or leased those vehicles, or would have paid substantially less for the vehicles than they did.

8.     Upon information and belief, Ford has long been aware that the EPAS system installed in the Defective Vehicles is prone to sudden, premature failure.  Ford acquired exclusive knowledge of this issue as a result of pre-production testing, design failure mode analysis, customer complaints made to dealers, complaints made directly to Ford's Customer Relationship Center ("CRC"), and inquiries made to Ford's technical hotline from technicians -- information that is exclusively in Ford's possession and inaccessible to consumers.  Indeed, internal communications regarding steering defects in the EPAS system of the Ford Explorer reveal that Ford had long been aware of similar problems with the EPAS system of the Defective Vehicles.  For example, in a June 6, 2011 email, a Ford employee, Laura Napoli wrote:

> Talked to the tech below and this loss of assist would always occur in low speed parking lot maneuvers *similar to the Focus* issue and had him check the HC BJB main feed and the 100a fuse connections and the tech found the main battery feed loose to high current battery junction box, he tightened the nut 1 1/2 turns to torque it properly, road test now the vehicle is fixed.

(emphasis added)

9.   In March 23, 2012, Mark Robinson of Ford wrote:

> I need your help. You may have this information at your
> fingertips. Can you tell if the EPAS ribbon cable concern on
> the Fusion is linked to the Explorer U502 [Ford's Fifth
> Generation Explorer]? This concern I believe was resolved at
> the end of Nov. 2011 for the Fusion vehicle line. We are seeing
> concerns on the Explorer U502 EPAS hard to turn
> intermittently.

10.   Hundreds of complaints post-dating Mr. Robinson's email – of which Ford was well aware – reveal that the EPAS problems for the Fusion line were not resolved in 2011. Ford's callous responses to these complaints, described in more detail below, reveal Ford's willful disregard for the EPAS system defects in the Defective Vehicles and the safety risk created by this defective system.

11.   Upon information and belief, Ford has intentionally concealed the fact that the EPAS system is prone to sudden and premature failure, so that the warranty period on the Defective Vehicles will expire before consumers become aware of the problem. Upon information and belief, Ford has been aware of problems with the EPAS system in the Fusion Vehicles since as early as 2010. Upon information and belief Ford knew that any purported fix to the EPAS system of the Defective Vehicles was ineffective. Indeed, Ford recently recalled other models with similarly defective EPAS systems. But, Ford chose to conceal from NHTSA and its customers that the Defective Vehicles were experiencing similar EPAS issues.

12.   As a result of Ford's unfair, deceptive, and fraudulent business practices, and its failure to disclose defects in the EPAS system, owners and lessees of the Defective Vehicles have suffered losses in money or property for which Ford is responsible.

**JURISDICTION AND VENUE**

13.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d), because at least one member is of diverse citizenship from Ford, there are more than 100 class members nationwide, and the aggregate claims of the Class exceed $5,000,000 exclusive of costs and interest.[1]

14.     This Court has personal jurisdiction over Ford because Ford's contacts with the State of California are systematic, continuous, and sufficient to subject it to personal jurisdiction in this Court.  Specifically, Ford purposefully availed itself of the privilege of conducting business in the State of California by advertising and selling its manufactured vehicles (including the Defective Vehicles at issue) within the State of California.  Additionally, Ford has maintained systematic and continuous business contacts within the State of California (including with its authorized dealers in the State) and is registered to conduct business in the State.

15.     Venue is proper in this district under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred within this District, and because Plaintiff Philips is a resident of Royal Oaks, California, which is in this District.

**Intradistrict Assignment**

16.     Consistent with Northern District of California Civil Local Rule 3-5(b), assignment to the San Jose Division is appropriate under Civil Local Rules 3-2(c) and 3-2(e), because acts giving rise to the claims at issue in this Complaint occurred, among other places, in this District, in Monterey County, California.

---

[1] The 2012 Ford Focus was the top-selling car in the world in 2012.  For this model of Defective Vehicle alone, Ford sales totaled over 1,020,410 cars globally in a single year.

# PARTIES

## Plaintiffs

17.     Plaintiff Philips is a citizen of California, and a resident of Royal Oaks, which is in Monterey County, California.

18.     Plaintiff Philips owns a 2011 Ford Fusion, which he purchased from Salinas Valley Ford in late 2012.  At the time Plaintiff Philips purchased the vehicle, it had approximately 26,000 miles on it.

19.     When Plaintiff Philips purchased his 2011 Ford Fusion, he relied on a reasonable expectation that the vehicle's steering system would not suffer from premature failure and that it would not pose an unavoidable safety risk.

20.     Plaintiff Philips reviewed Ford's promotional materials and other information, and had Ford disclosed its knowledge of the EPAS defects and failures, Plaintiff Philips would have seen such disclosures and would have been aware of them. Indeed, Ford's omissions were material to Plaintiff Philips, and he would not have purchased his 2011 Ford Fusion, or would not have paid the purchase price charged had he known that the EPAS system was prone to a dangerous premature failure.

21.     Induced by Ford's fraudulent concealment about the EPAS system, which left him without knowledge of the conditions or the lack of value in a vehicle containing such unremedied defects, Plaintiff Philips purchased his 2011 Ford Fusion, not knowing that, as sold, it was defective.

22.      In late 2013, Plaintiff Philips began having intermittent problems with the steering system in his Fusion, and he experienced difficulty steering.  Plaintiff Philips complained to Ford, but nothing was done.  Plaintiff Philips complained again, but he was told that it was a power steering problem that was not covered by the power train warranty.  Instead, Plaintiff Philips was told that it would cost approximately $2,000 to fix the problem.  Ford offered to pay 50%.

23.     Plaintiff Phillip Clay Cecil is a citizen of West Virginia, and a resident of New Martinsville, which is in Wetzel County, West Virginia.

24.     Plaintiff Cecil owns a 2011 Ford Fusion, which he purchased on or about March 15, 2011 from Jim Robinson Ford located in Wheeling, West Virginia.

25.     When Plaintiff Cecil purchased his 2011 Ford Fusion, he relied on a reasonable expectation that the vehicle's steering system would not suffer from premature failure and that it would not pose an unavoidable safety risk.

26.     Plaintiff Cecil reviewed Ford's promotional materials and other information, and had Ford disclosed its knowledge of the EPAS defects and failures, Plaintiff Cecil would have seen such disclosures and would have been aware of them. Indeed, Ford's omissions were material to Plaintiff Cecil, and he would not have purchased a 2011 Ford Fusion, or would not have paid the purchase price charged by Ford had he known that the EPAS system was prone to a dangerous premature failure.

27.     Induced by Ford's fraudulent concealment about the EPAS system, which left him without knowledge of the conditions or the lack of value in a vehicle containing such unremedied defects, Plaintiff Cecil purchased his 2011 Ford Fusion, not knowing that, as sold, it was defective.

28.     Plaintiffs Robert Halsey and Temple Halsey are citizens of North Carolina, and residents of Winston-Salem, which is in Forsyth County, North Carolina.

29.     Plaintiffs Robert and Temple Halsey own a 2013 Ford Fusion, which they purchased in or about November 2013 from Parkway Ford located in Winston-Salem, North Carolina.

30.     When Plaintiffs Robert and Temple Halsey purchased their 2013 Ford Fusion, they relied on a reasonable expectation that the vehicle's steering system would not suffer from premature failure and that it would not pose an unavoidable safety risk.

31.     Plaintiffs Robert and Temple Halsey reviewed Ford's promotional materials and other information, and had Ford disclosed its knowledge of the EPAS defects and

failures, Plaintiffs Robert and Temple Halsey would have seen such disclosures and would have been aware of them.  Indeed, Ford's omissions were material to Plaintiffs Robert and Temple Halsey, and they would not have purchased a 2013 Ford Fusion, or would not have paid the purchase price charged by Ford had they known that the EPAS system was prone to a dangerous premature failure.

32.   Induced by Ford's fraudulent concealment about the EPAS system, which left them without knowledge of the conditions or the lack of value in a vehicle containing such unremedied defects, Plaintiffs Robert and Temple Halsey purchased their 2013 Ford Fusion, not knowing that, as sold, it was defective.

33.   Plaintiff Performance Fire Protection, LLC (hereinafter "PFP") is a North Carolina corporation located in Mooresville, North Carolina.

34.   Plaintiff PFP owns the following vehicles, which it purchased by and through its President, Edward W. Cook, from Mooresville Ford located in Mooresville, North Carolina:

    a.  2012 Ford Focus, purchased in or about November 2011;

    b.  2012 Ford Focus, purchased in or about November 2011; and

    c.  2013 Ford Fusion, purchased in or about April 2013

35.   When Plaintiff PFP purchased its 2012 Ford Focus and 2013 Ford Fusion vehicles, it relied on a reasonable expectation that the vehicles' steering systems would not suffer from premature failure and would not pose an unavoidable safety risk.

36.   Plaintiff PFP reviewed Ford's promotional materials and other information, and had Ford disclosed its knowledge of the EPAS defects and failures, Plaintiff PFP would have seen such disclosures and would have been aware of them.  Indeed, Ford's omissions were material to Plaintiff PFP, and it would not have purchased the 2012 Ford Focus and 2013 Ford Fusion vehicles, or would not have paid the purchase price charged by Ford had it known that the EPAS system was prone to a dangerous premature failure.

37.     Induced by Ford's fraudulent concealment about the EPAS system, which left it without knowledge of the conditions or the lack of value in a vehicle containing such unremedied defects, Plaintiff PFP purchased the 2012 Ford Focus and 2013 Ford Fusion vehicles, not knowing that, as sold, they were defective.

38.     Plaintiff Jason Wilkinson is a citizen of West Virginia, and a resident of Dunbar, which is in Kanawha County, West Virginia.

39.     Plaintiff Wilkinson owns a 2013 Ford Fusion, which he purchased on or about December 7, 2013 from Marshall Ford Lincoln located in Mayfield Heights, Ohio.

40.     When Plaintiff Wilkinson purchased his 2013 Ford Fusion, he relied on a reasonable expectation that the vehicle's steering system would not suffer from premature failure and that it would not pose an unavoidable safety risk.

41.     Plaintiff Wilkinson reviewed Ford's promotional materials and other information, and had Ford disclosed its knowledge of the EPAS defects and failures, Plaintiff Wilkinson would have seen such disclosures and would have been aware of them.  Indeed, Ford's omissions were material to Plaintiff Wilkinson, and he would not have purchased a 2013 Ford Fusion, or would not have paid the purchase price charged by Ford had he known that the EPAS system was prone to a dangerous premature failure.

42.     Induced by Ford's fraudulent concealment about the EPAS system, which left him without knowledge of the conditions or the lack of value in a vehicle containing such unremedied defects, Plaintiff Wilkinson purchased his 2013 Ford Fusion, not knowing that, as sold, it was defective.

**Defendant**

43.     Defendant Ford Motor Company ("Ford") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at One American Road in Dearborn, Michigan 48126.  Ford is in the business of designing, manufacturing, marketing, and distributing motor vehicles.  Ford is one of the world's

largest such companies and its vehicles include those sold under the Ford, Lincoln, and Mercury brands.

44.     At all times relevant to this action, Ford designed, manufactured, marketed, distributed, and warranted the Defective Vehicles in the State of California and throughout the United States.

## TOLLING OF THE STATUTE OF LIMITATIONS

**Discovery Rule Tolling**

45.     Plaintiffs could not have discovered through the exercise of reasonable diligence that their Defective Vehicles were defective within the time period of any applicable statutes of limitation.

46.     Among other things, Plaintiffs did not know and could not have known that the Defective Vehicles are equipped with defective EPAS systems that are prone to premature failure, resulting in markedly increased steering effort and loss of driver control.

**Fraudulent Concealment Tolling**

47.     Throughout the time period relevant to this action, Ford concealed from and failed to disclose to Plaintiffs and the other Class members vital information about the potentially deadly defect described herein.  Indeed, Ford kept Plaintiffs and the other Class members ignorant of vital information essential to the pursuit of their claims, and as a result, neither Plaintiffs nor the other Class members could have discovered the defects, even upon reasonable exercise of diligence.

48.     Specifically, Ford has been aware since 2010, if not earlier, that the EPAS system it designed, manufactured, and installed in the Defective Vehicles is prone to sudden and premature failure, resulting in marked increases to steering effort and loss of driver control.

49.     Despite its knowledge of these defects, Ford failed to disclose to and concealed, and continues to conceal, this critical information from Plaintiffs and the

members of the Class even though, at any point in time, it could have done so through individual correspondence, media release, or any other means.

50.     Ford also has repeatedly and expressly denied the existence of the defects in the Defective Vehicles.[2]  Indeed, Class Members have contacted Ford directly before or after complaining to NHTSA regarding the sudden steering failure of their Defective Vehicle.  In most cases, Ford did not admit that it had received similar complaints or acknowledged the incidents, accidents, injuries, or deaths that could have been caused by the defect.  Despite Ford's receipt of hundreds of complaints, Ford's customer service department told consumers that the incident likely was a "fluke," and refused to provide any aid or address the problem.

51.     Plaintiffs and the other Class members justifiably relied on Ford to disclose these material defects in the Ford Vehicles they purchased or leased, as such defects were hidden and not discoverable through reasonable efforts by Plaintiffs and other Class members.

52.     Thus, the running of all applicable statutes of limitation have been suspended with respect to any claims that Plaintiffs and the other Class members have sustained as a result of the defects by virtue of the fraudulent concealment doctrine.

**Estoppel**

53.     Ford was under a continuous duty to disclose to Plaintiffs and the other Class members the true character, quality, and nature of the Defective Vehicles.

54.     Ford knowingly failed to disclose or concealed the true nature, quality, and character of the Defective Vehicles from consumers.

55.     Based on the foregoing, Ford is estopped from relying on any statutes of limitation in defense of this action.

---

[2] Even with respect to the Ford Explorer, another vehicle with a similarly defective EPAS system that Ford *did* recall at NHTSA's insistence, Steve Kenner -- Ford's global director of automotive safety -- has acknowledged that the EPAS system is prone to fail, but insists that loss of power steering "does not present an unreasonable safety risk."

## FACTUAL BACKGROUND

56.     Ford designed, manufactured, distributed, marketed, warranted, sold and leased the Defective Vehicles.  Upon information and belief, Ford has sold, directly or indirectly through authorized dealers and other retail outlets, thousands of Defective Vehicles in California and nationwide.

57.     The Defective Vehicles include the following models:  2010-2014 Ford Fusion; 2010-2014 Ford Fusion Hybrid; 2013-2014 Ford Fusion Energi; 2012-2014 Ford Focus; and 2012-2014 Ford Focus Electric.

58.     Ford touted the safety and reliability of the Defective Vehicles, both by promoting the vehicles as safe as a general matter and by lauding the EPAS system specifically.  Ford has made misleading public statements as to its general safety ratings for the Defective Vehicles.  For example, Ford bragged about the fact that the "redesigned 2013 Ford Fusion" received the highest possible crash-test rating from the National Highway Traffic Safety Administration ("NHTSA"), achieving an overall rating of 5 stars.  These communications, however, are misleading.  Ford did not publicize that in a frontal-impact collision, front passenger protection for the 2013 Fusion was given 4 stars.  Nor did it publicize that the 2013 Ford Fusion received a 3-star rating for side-impact collision driver protection.  A NHTSA 3-star rating indicates that "side crash injury risk for this vehicle is average to greater than average."

59.     Ford's communications with respect to the Defective Vehicles' EPAS system have been even more misleading.  For example, in a marketing video about the Ford Focus, Ford touted the EPAS sensors as achieving steering "that feels just right" and "helps keep you planted and in control."  To this day, Ford continues to promote the EPAS as automatically adjusting "to deliver precise feel and control at higher speeds," "the required assistance at slower speeds," and "a comfortable driving experience and responsive steering."  The many problems customers have had with the Defective Vehicles' EPAS system contrasts sharply with these public statements.  Ford has not

13

been forthcoming regarding problems with the EPAS system, including -- still inadequate -- corrective actions it has made to the EPAS.

60.     In addition to misleading statements about the safety and efficacy of the EPAS system, Ford has also ignored, concealed, and failed to adequately address the numerous complaints it has received regarding the Defective Vehicles' steering failures. These complaints began almost immediately upon the release of each model of Defective Vehicle.

61.     Ford's response to complaints presented by customers and posted publicly on automotive forums has been unsatisfactory.  On one occasion, Ford responded to a complaint by stating: "Intermittent issues can be very tough to diagnose, and the codes that were stored may not have pointed to a specific cause. That could be why it needs to be replicated. Be assured though, safety is always kept in mind with all concerns."

62.     Customers have grown increasingly frustrated and questioned Ford's commitment to safety.  One Ford Focus owner wrote:  "Educate me on EXACTLY how SAFETY is a top priority when the code for power steering is being thrown, the tech's are SEEING the code, but then sending the driver on their way because they can't REPLICATE the issue . . .  Educate me on how it is NOT a safety issue when said person gets back out on the road, has a failure, and slams their car into a wall or another car full of children . . .   Please, EDUCATE me.  I'm sure we ALL want to understand your line of thinking here.  Because those cars should NOT be hitting the road again until the problem is SOLVED if safety was really a TOP PRIORITY."

63.     Such customer frustration is appropriate.  As described below, the EPAS system has pervasive underlying defects that Ford is aware of based on its own internal investigation, direct complaints it received regarding steering failures of the Defective Vehicles, and numerous complaints submitted to NHTSA (discussed below).  It nonetheless has declined to publicly acknowledge the defects and failed to take adequate and necessary steps to correct the defects.

**EPAS System**

64.     Power steering systems supplement the torque that the driver applies to the steering wheel.  Hydraulic power steering, used on the majority of cars from the last century, relies on pistons in the steering rack with pressurized fluid.  A pump, which is powered by the vehicle's engine, maintains hydraulic fluid pressure.  With a hydraulic system, the pump is always drawing energy from the engine, regardless of whether the driver of the vehicle is turning the wheel.

65.     Ford's EPAS system does away with the conventional hydraulic pistons and pump.  Instead, the EPAS system uses an electric, power steering control ("PSC") motor attached to the steering rack which assists with steering.  Sensors in the EPAS system detect the position and torque of the steering column, and a computer module applies torque via the PSC motor.

66.     Unlike a hydraulic power steering system that continuously drives a hydraulic pump, the efficiency advantage of an EPAS system (if it were properly designed and manufactured) is that it powers the PSC motor only when necessary.  According to Ford, its EPAS system results in reduced vehicle fuel consumption compared to the same vehicle with a hydraulic power steering system.  Moreover, Ford's EPAS system can be fine-tuned simply by modifying the software controlling the electronic control unit ("ECU").  This provides a unique and cost-effective opportunity to adjust the steering "feel" of the Defective Vehicles.  For safety reasons, it is important that a failure in the electronics never result in a situation where the PSC motor prevents the driver from steering the vehicle.  Unfortunately, however, that is not the case with Ford's Defective Vehicles.

67.     Ford's EPAS system is prone to numerous deficiencies.  ***First,*** the EPAS system's conformal coating is prone to seepage into the EPAS's ribbon cable that leads to loss of connections within the EPAS system.  ***Second,*** the ribbon cable pins utilized in the EPAS system are often misaligned.  This leads to the breakage of critical wiring and

the loss of connections within the EPAS system. **Third,** the EPAS system suffers from manufacturing and/or design defects in the contact plating used in the EPAS system, leading to its corrosion. This, too, causes an interruption in electrical connections within the EPAS system. **Fourth,** the EPAS system's sensors do not function properly leading to a lack of functionality and system failure. **Finally,** the EPAS system suffers from defects in the gear assembly. These defects, individually and collectively, render the EPAS System prone to failure, causing marked difficulty in steering of the car. This can result in loss of driver control. It can and has caused injuries to occupants of the Defective Vehicles. The defect further vitiates the value of the Defective Vehicles.

### Ford's Knowledge of Defects in EPAS System

68.     Upon information and belief, Ford has long been aware that the EPAS system installed in the Defective Vehicles is prone to sudden failure. Ford has been aware of problems with the EPAS system since it was first implemented into the Ford Fusion in 2010.

69.     Ford's knowledge of problems with the EPAS system in the Defective Vehicles was revealed during the course of a NHTSA investigation into steering failures experienced by the Ford Explorer, which suffers from a similarly defective EPAS system.

70.     On June 19, 2012, the NHTSA opened a formal investigation into the steering issue in Ford Explorer vehicles in response to a plethora of complaints it had received regarding the Ford Explorer. NHTSA stated as follows:

> The Office of Defects Investigation (ODI) has received 15 complaints alleging loss of power steering assist and increased steering effort in model year 2011 Ford Explorer vehicles equipped with Electric Power Assisted Steering (EPAS). In addition, ODI has identified field reports provided in Ford's Early Warning Reporting data submissions that relate to the alleged defect. Some of the complaints indicated observing a power steering warning message when the failure occurred. In some cases, the condition was corrected by turning the vehicle off and restarting. However, some reports indicate the condition returned after restart. A Preliminary Evaluation has

16

been opened to assess the cause, scope and frequency of the alleged defect.[3]

71.    In Ford's August 29, 2012 response to the NHTSA's Information Request, Ford describes the operation, and purported failsafes, of the EPAS system:

> The power steering control module (PSCM) is the electronic control unit for the EPAS system. The PSCM monitors all sensor inputs and High Speed CAN messages that relate to the EPAS system and directly controls the output of the EPAS motor. The PSCM is self-monitoring and is capable of setting and storing DTCs. Depending on the fault detected, the PSCM responds by either reducing or removing assist, and the PSCM may also send a request to the instrument panel cluster over the High Speed CAN displaying a message and alerting the driver of a potential EPAS concern.

72.    Ford further identified three quality issues with components of the EPAS system -- all of which were manufactured by different suppliers before being shipped to TRW Automotive for final assembly -- that could result in a loss of power steering assist.  The first quality issue involved the Ribbon Cable Conformal Coating where the conformal coating was seeping into the insulation of the ribbon cable during the manufacturing process.  As Ford explained, if the coating seeped into the ribbon cable, it could cause intermittent loss of connection.  The second quality issue dealt with the Ribbon Cable Pin.  Ford detailed how a misalignment of the Ribbon Cable Pin due to tolerances in the manufacturing equipment could cause one of 12 wires to misalign, which, in turn, would cause one or more of the internal strands within the wire to break, resulting in intermittent loss of connection.  Finally, Ford revealed that the sulfur used in the cleaning process for the Motor Relay Contact Plating could cause corrosion on the contact surface, which, yet again, could cause a loss of connection.

73.    In response to the NHTSA Information Request, Ford also produced a database containing 1,173 complaints (including owner reports, field reports, technical reports, litigation claims, and warranty information) pertaining to loss of power steering

---

[3] As discussed below, NHTSA also has received a hundreds of complaints of steering failure for the Defective Vehicles.

assist on 2011 and 2012 Ford Explorers. Within those complaints, there were nine incidents that resulted in a crash. Ford did not disclose or address any complaints for other vehicles utilizing the defective EPAS System.

74. Ford's internal documents, produced, but not highlighted during NHTSA's investigation, clearly demonstrate that the problems with the EPAS system are not unique to Ford Explorers, but have also impacted the Defective Vehicles. The documents further detail Ford's awareness of this fact. Indeed, in a June 6, 2011 email, a Ford employee, Laura Napoli writes:

> Talked to the tech below and this loss of assist would always occur in low speed parking lot maneuvers *similar to the Focus* issue and had him check the HC BJB main feed and the 100a fuse connections and the tech found the main battery feed loose to high current battery junction box, he tightened the nut 1 1/2 turns to torque it properly, road test now the vehicle is fixed.

(emphasis added)

75. In March 23, 2012, Mark Robinson of Ford writes:

> I need your help. You may have this information at your fingertips. Can you tell if the EPAS ribbon cable concern on the Fusion is linked to the Explorer U502 [Ford's Fifth Generation Explorer]? This concern I believe was resolved at the end of Nov. 2011 for the Fusion vehicle line. We are seeing concerns on the Explorer U502 EPAS hard to turn intermittently.

Although the concern was *not* resolved at the end of the November 2011 Fusion vehicle line – as evidenced by continued complaints of power steering failures for later model Fusion and Focus vehicles – Mr. Robinson's email indicates that Ford was well aware of ribbon cable defects in early model Ford Fusions that caused power steering failures similar to what it was observing in the Ford Explorer. *Notably, Ford has never recalled the 2010 or 2011 Ford Fusion – or any other model of Defective Vehicle – and never disclosed the problems to the customers, NHTSA, or the public.*

76.     Other internal communications indicate that the engineers responsible for the design of the EPAS system were very concerned about failures in Ford's power steering system.  For instance, in a January 21, 2011 e-mail, Robert Mrozek, Electronic Power Steering Supervisor, wrote:

> 1) Why are we replacing these gears? How do you know it is not a wiring issue? Do not replace an intermittent gear until we know 100% for sure it is not wiring. Are these dealers nearby where we can go there to look? 2) WARNING: The world will shit a brick with 4 EPAS claims on U502 and our lives will be hell. ALL these gears need root cause within 48 hours or less.

77.     In response to Mrozek's scathing e-mail, Bradley Jackson states:

> Rob, I agree.  If the word gets out that gear replacements are fixing the concern, we are in trouble.  Need to deep dive these gears when they come back.

78.     Under pressure from NHTSA, Ford recently issued a recall of Ford Explorers.  Ford has publicly acknowledged that the Ford Explorer's EPAS is prone to sudden failure and recently confirmed that it has been aware of the 15 accidents that were caused by a loss of power steering in the Explorer.  Ford's global director of automotive safety, Steve Kenner, nonetheless publicly maintains "that loss of power steering assist in the subject vehicles does not present an unreasonable safety risk for these vehicles."  Kenner predicates this statement on Ford's position that vehicles can still be driven when the power steering fails.  Ford, however, is lying to consumers and the public.

79.     Although the steering system in the Defective Vehicles defaults to manual steering when the EPAS System fails, an unreasonable safety risk remains (both in the Ford Explorer and in the Defective Vehicles), particularly when a vehicle is traveling at high speeds or on unlevel terrain.  The sudden shock of needing to immediately exert great effort to control the vehicle makes the Defective Vehicles extremely susceptible to accidents when EPAS fails.  This is clear from complaints reported to NHTSA about loss of control as a result of failure of the EPAS system.  Moreover, failure of the EPAS

19

COMPLAINT

system also may disable the braking system.  One West Virginia owner reported that she rolled down a hill into a wooded area after the EPAS of her vehicle failed.  In addition to losing the ability to steer the vehicle, the braking system failed to engage and the owner "lost complete control of the vehicle."

**NHTSA Receives a Tremendous Number of Complaints**

80.     To date, NHTSA has received hundreds of complaints regarding power steering failures of the Defective Vehicles.  Complaints include, but are not limited to, the following models:  110 complaints documenting sudden failure of power steering for the 2010 Ford Fusion; 114 complaints documenting sudden failure of power steering for the 2011 Ford Fusion; 102 complaints documenting sudden failure of power steering for the 2012 Ford Fusion; 12 complaints documenting sudden failure of power steering for the 2013 Ford Fusion; 4 complaints in the past several months documenting sudden failure of power steering for the 2014 Ford Fusion; 62 complaints documenting sudden failure of power steering for the 2012 Ford Focus; 15 complaints documenting sudden failure of power steering for the 2013 Ford Focus; at least 8 complaints documenting sudden failure of power steering for the 2014 Ford Focus, and approximately 18 complaints documenting sudden failure of power steering for the 2013 Ford Focus Electric.  These numbers continue to grow as consumers' complaints concerning power steering failures for *all* models continue through the present.  Complaints have been lodged with NHTSA as recently as June 11, 2014.

81.     A number of the incidents reported to NHTSA resulted in crashes and personal injury.  In many instances of steering failure, the vehicle owners or lessees also reported the incident to Ford directly and was rebuffed, generally told that the incident was a "fluke."  A representative sampling of NHTSA complaints is detailed below.

82.     On June 23, 2010, the owner of a 2010 Ford Fusion reported to NHTSA that the steering pulled to the side and that he noticed steering failures since the vehicle was first purchased.

83.     On November 1, 2010 the owner of a 2010 Ford Fusion made the following statements in a report to NHTSA:

> I HAVE A BRAND NEW 2010 FORD FUSION THAT HAS APPROXIMATELY 3000 MILES ON IT.  I HAD A BAD EXPERIENCE WHERE THE POWER STEERING SUDDENLY STOPPED WORKING WHILE PULLING MY CAR OUT OF A PARKING GARAGE. THE VEHICLE CONSOLE DISPLAY SHOWED A 'POWER STEERING ASSIST FAILURE' MESSAGE. I PULLED MY CAR OVER TO THE SIDE WITH CONSIDERABLE EFFORT AND SHUT THE IGNITION OFF.  AFTER A FEW MINUTES WAIT, I RESTARTED THE CAR AND EVERYTHING WAS NORMAL.  WITHIN A FEW MINUTES, A LESS THAN A MILE TRAVELED, THE SAME FAILURE OCCURRED AND THE SAME MESSAGE WAS DISPLAYED WHILE IN A ROUND-ABOUT.  I AGAIN PULLED MY CAR OVER AND SHUT IT OFF.  IT AGAIN RESTARTED AND STEERED FINE AND I DROVE IMMEDIATELY TO MY DEALERSHIP.  THE DEALERSHIP READ THE CODE, CLEARED IT AND INFORMED ME THAT THEY COULD NOT GET THE VEHICLE TO REPRODUCE THE PROBLEM.  THIS IS A VERY SCARY ISSUE AND NO COMPONENTS WERE REPLACED.

84.     On May 22, 2011, the driver of a 2010 Ford Fusion made the following complaint to NHTSA:

> CAR PULLS TO THE LEFT OR SOMETIMES RIGHT. USUALLY WHEN TRAVELING AT LOWER SPEEDS THE STEERING IS TERRIBLE, IT WANTS TO PULL THE WHEEL HARD TO ONE SIDE, ALWAYS HAPPENS ON UNEVEN ROAD SURFACE - SOMETIMES ON EVEN ROADS - EVERY ONE OF MY OTHER CARS DRIVE PERFECT ON THE SAME ROAD.  TOOK MY COMPANY CAR TO THE DEALER TO HAVE IT LOOKED AT - THEY REPLACED ALL 4 TIRES AND DID AN ALIGNMENT - CHARGED MY FLEET $1,200 AND IT STILL DOES THE SAME THING.  SERVICE MANAGER SAID THAT IT IS A CHARACTERISTIC OF THE CAR AND FORD WILL NOT FIX IT - JUST LIVE WITH IT.  PROBLEM IS I AM STUCK WITH IT FOR ANOTHER YEAR AND A HALF.

85.     On December 11, 2012, a vehicle owner reported a crash in a 2010 Ford Fusion.  The Defective Vehicle lost power steering, traction control, and the ability to

brake upon entering a freeway on ramp.  To stop the vehicle and avoid endangering other drivers, the driver was "forced to crash into the concrete wall barrier on the driver's side of the ramp."  The driver and one other individual were injured.

86.     On October 3, 2012, a vehicle owner reported a crash in a 2011 Ford Fusion.  The steering wheel seized while the owner was driving at 35 MPH, causing her to crash into a curb.  After the initial accident, the steering of the vehicle continued to fail.  The vehicle was taken to a Ford dealer three times, and the dealer refused to help her because the failure could not be replicated.  The vehicle owner notified Ford but Ford was unwilling to offer assistance.

87.     On March 3, 2014, NHTSA received a report of a power steering failure concerning a 2010 Ford Fusion.  The vehicle owner was driving home from work on the interstate when the power steering failed.  The power steering failed the next day.  The owner was told it would cost $1,600 to repair.  When the owner called Ford, Ford said that it would not help the owner.

88.     On December 23, 2010, an owner reported driving a 2010 Ford Fusion at 45 MPH when the power steering suddenly failed.  The owner could hardly steer the car and could not drive the vehicle to the side of the road.  The owner stated that this was a safety hazard that could cause a serious accident if someone was not strong enough to handle the car.  The owner noted that the owner's mechanic could not fix the issue and informed NHTSA of plans to file a complaint with Ford but didn't "expect to hear back from them."

89.     On November 9, 2013, a vehicle owner reported driving a 2010 Ford Fusion at approximately 40 MPH when the power steering failed.  A Ford dealer examined the EPAS and stated that the power steering rack would need to be replaced at a cost of $1,830.73.  The owner felt this was "an absurd cost [to] have to incur because [he or she] noticed many people have experienced something familiar in many cases."

90.     On November 30, 2014, a vehicle owner reporting nearly crashing a 2011 Ford Fusion while driving approximately 55 MPH and losing all steering ability when the power steering failed.

91.     On November 13, 2013, a gentleman driving approximately 55 MPH in his 2011 Ford Fusion reported sudden steering failure.  He noted that "if this would have happened to [his] wife, which is her car to drive, she wouldn't be able to steer the vehicle."  It "took [him] all [he] had to get it home. Not very confident on letting her drive this car.  Ford needs to resolve this problem."

92.     On July 18, 2013, a vehicle owner reported sudden steering failure while traveling at approximately 25 MPH.  The vehicle became extremely difficult to steer.  The Ford Dealer would not attempt a repair or further diagnostics after the failure could not be replicated, and Ford refused to address or acknowledge the issue when the owner then contacted Ford.

93.     On August 28, 2013, a woman reported sudden failure of power steering of her 2011 Ford Fusion.  The vehicle nearly hit another vehicle and she reported it took every bit of her 120 pound body's strength to manually steer the vehicle into the parking lot.  This was the fourth occurrence.  The dealer made some kind of repair to the EPAS system, for which he charged her over $1,600.

94.     On August 18, 2013, an 84 year old woman reported sudden steering failure of her 2012 Ford Fusion.  She stated that it was next to impossible to steer.  At the time of the complaint, the dealer had not identified a problem.

95.     On April 18, 2014, a vehicle owner of a 2013 Ford Fusion was driving down a two-lane mountain road downhill with lots of curves when the power steering warning light came on and the power steering suddenly failed.  The owner could not control the car and it had to be towed to a Ford dealer.  The dealer believed the problem was a faulty steering gear in the EPAS system and replaced the gear assembly.

96.     On March 4, 2013, a vehicle owner driving a 2013 Ford Fusion suddenly lost the ability to steer the car.  A test drive by a service representative did not replicate the occurrence.

97.     On May 30, 2014, a vehicle owner reported multiple sudden losses of steering in the owner's 2014 Ford Fusion.  In the most severe instances, the vehicle owner's son was driving the car on the expressway.  After taking 3 days to diagnose the situation, a dealer stated that Ford had changed from a hydraulic module to an electrical module and the part was unavailable and on back order.  The owner remains concerned that the vehicle will remain defective even when the replacement module is implemented.  The vehicle owner is very concerned that "the steering wheel will lock up and cause an accident and injure [the owner's] son or others."

98.     In April of 2014, a vehicle owner of a 2014 Ford Fusion experienced a sudden loss of power steering and traction control.  A Ford dealer determined the power steering needed to be replaced.  The owner contacted Ford about the car, which was only months old, and notified it of the failure, but the vehicle was not repaired by Ford.

99.     On October 4, 2011, the owner of a brand new 2012 Ford Focus experienced power steering failure when making a turn at low speed.  The owner was able, with great difficulty, to steer the vehicle to the side of the road.  The owner was very frustrated given that the car was brand new.

100.    On November 7, 2011, an owner of a 2012 Ford Focus reported several instances of sudden steering failure within 2 weeks of purchasing the car.

101.    On January 20, 2012, an owner of a 2012 Ford Focus reported sudden steering failure and found it extremely difficult to steer without assist.  A tow truck driver also had great difficulty steering the car to get it on the tow truck.  Once at the dealer, the power assist returned to function and the dealer could not replicate the issue.  Upon contacting Ford, the owner was told that the failure was likely a "Fluke," and Ford

refused to offer any further solutions.  The owner expressed frustration to NHTSA because the owner "need[ed] help in getting this fixed."

102.   In May of 2014, a vehicle owner reported four incidents of sudden steering failure for a brand new 2014 Ford Focus.  The owner was in a left turning lane which crosses two sets of railroad tracks.  In mid turn (while accelerating over the tracks), the power steering suddenly failed.  Similar failures occurred on three other occasions.

103.   On March 5, 2013, an owner filed a complaint about two occurrences of sudden loss of steering ability in a 2013 Ford Focus Electric.  On the first occasion, the vehicle function stopped abruptly.  On the second occurrence, the driver also experienced an abrupt stop as if the brakes were slammed forcibly.  As a result, the driver was thrown forward towards the steering wheel.  In both situations, the driver was unable to get the vehicle to a safe spot on the highway.  The driver explained that impact possibilities were "extremely likely" in both cases.  Ford attempted a diagnosis on the first occurrence but was unable to provide a fix.  At the time of the complaint Ford was to again analyze the vehicle as "a final attempt at repair."

104.   The complaints set forth herein detail the extreme difficulty of controlling the Defective Vehicles when power steering fails.  They also illustrate Ford's recalcitrance and refusal to acknowledge and correct these issues even when directly confronted and in the face of hundreds of complaints.  This is further clear based on internal documents uncovered during NHTSA's investigation, which demonstrate that Ford has known about problems with the EPAS system for years (likely since the 2010 Ford Fusion's inception).

## CLASS ACTION ALLEGATIONS

105.   Plaintiffs bring this action as a class action under Federal Rule of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), on behalf of themselves and all others similarly situated.  Plaintiffs seek to represent a class (the "Nationwide Class") initially defined as:

> All current and former owners and lessees of a Defective Vehicle (as defined herein) in the United States.

106.   Additionally, Plaintiffs seek to represent the following statewide classes (the "Statewide Classes") defined as follows:

a.   All current and former owners and lessees of a Defective Vehicle (as defined herein) in California (the "California State Class");

b.   All current and former owners and lessees of a Defective Vehicle (as defined herein) in West Virginia (the "West Virginia State Class");

c.   All current and former owners and lessees of a Defective Vehicle (as defined herein) in North Carolina (the "North Carolina State Class");

d.   All current and former owners and lessees of a Defective Vehicle (as defined herein) in Ohio (the "Ohio State Class").

107.   Excluded from each of the Nationwide and Statewide Classes are Ford, as well as Ford's employees, affiliates, officers, and directors, including franchised dealers, any individuals who experienced physical injuries as a result of the defects at issue in this litigation, and the judge and court staff to whom this case is assigned.  Plaintiffs reserve the right to amend the definition of the class if discovery or further investigation reveals that the class should be expanded or otherwise modified.

108.   **Numerosity and impracticality of joinder.**  The members of the Nationwide and Statewide Classes are so numerous that joinder of all members is

impractical.  Millions of Nationwide and Statewide Class members purchased or leased Defective Vehicles.  The members of the Nationwide and Statewide Classes are easily and readily identifiable from information and records in Ford's possession, custody, or control.

109.  **Commonality and predominance.**  There are common questions of law and fact that predominate over any questions affecting the individual members of the Nationwide and Statewide Classes.  Common legal and factual questions include, but are not limited to:

a.   whether Ford breached the duty of reasonable care it owed to the Nationwide and Statewide Classes;

b.   whether Ford's breach of its duties directly and proximately caused the Nationwide and Statewide Classes' damages;

c.   whether Ford omitted, misrepresented, concealed, or manipulated material facts to/from Plaintiffs and the Nationwide and Statewide Classes regarding the defects, the actions taken to address the defects, and the result of those actions;

d.   whether Ford had a duty to disclose the defects to Plaintiffs and the other Nationwide and Statewide Class members;

e.   whether Ford engaged in fraud, fraudulent concealment, and made fraudulent representations to the public;

f.   whether Plaintiffs and the other Nationwide and Statewide Class members are entitled to damages; and

g.   whether Plaintiffs and the other Nationwide and Statewide Class members are entitled to equitable relief or other relief, and the nature of such relief.

110.   **Typicality.**  Plaintiffs' claims are typical of the claims of the other Nationwide and Statewide Class members because Plaintiffs and the other Nationwide and Statewide Class members purchased Defective Vehicles that contain defective parts. Neither Plaintiffs nor the other Nationwide and Statewide Class members would have purchased the Defective Vehicles had they known of the defects in the vehicles.  Those defects also pose an unreasonable risk of harm to Plaintiffs and the other Nationwide and Statewide Class members.  Plaintiffs and the other Nationwide and Statewide Class members suffered damages as a direct proximate result of the same wrongful practices that Ford engaged in.  Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims of the other Nationwide and Statewide Class members.  Plaintiffs' claims are based upon the same legal theories as the claims of the other Nationwide and Statewide Class members.

111.   **Adequacy.**  Plaintiffs will fully and adequately protect the interests of the other members of the Nationwide and Statewide Classes and have retained class counsel who are experienced and qualified in prosecuting class actions, including consumer class actions and other forms of complex litigation.  Neither Plaintiffs nor their counsel have interests that conflict with the interests of the other Nationwide and Statewide Class members.

112.   **Declaratory and Injunctive Relief.**  Ford has acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Nationwide and Statewide Classes, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Nationwide and Statewide Class members as a whole.

113.   **Superiority.**  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things: it is economically impracticable for members of the Nationwide and Statewide Classes to prosecute individual actions; prosecution as a class action will eliminate the possibility

of repetitious and redundant litigation; and, a class action will enable claims to be handled in an orderly, and expeditious manner.

## CLAIMS FOR RELIEF

### Claims Brought on Behalf of the Nationwide Class

#### FIRST CAUSE OF ACTION
##### Violation of the Magnuson-Moss Warranty Act
##### 15 U.S.C. §§ 2301, *et seq*.
##### (Brought on behalf of the Nationwide Class)

114.   All Plaintiffs ("Plaintiffs," for the purposes of the Nationwide Class's claims) hereby incorporate by reference the allegations contained in Paragraphs 1 through 113 of  this Complaint, as if fully set forth herein

115.   Plaintiffs bring this Count on behalf of the Nationwide Class ("Class," for the purposes of this Count).

116.   This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332 (a)-(d).

117.   Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

118.   Ford is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

119.   The Defective Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

120.   15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

121.   Ford's express warranties are written warranties within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6).  The Class Vehicles' implied warranties are covered under 15 U.S.C. § 2301(7).

122.   Ford breached these warranties as described in more detail above.  Without limitation, the Defective Vehicles share a common design defect in that they are

equipped with defective EPAS systems that are prone to sudden failure during normal operation, leaving occupants of the Defective Vehicles vulnerable to crashes, serious injury, and death.  Ford has admitted that these Defective Vehicles are prone to steering failures but has failed to address the issue as a result of purported difficulty in identifying and replicating the precise issues.

123.   Plaintiffs and each of the other Class members have had sufficient direct dealings with either Ford or its agents (dealerships) to establish privity of contract between Ford, on the one hand, and Plaintiffs and each of the other Class members, on the other hand.  Nonetheless, privity is not required here because Plaintiffs and each of the other Class members are intended third-party beneficiaries of contracts between Ford and its dealers, and specifically, of Ford's implied warranties.  The dealers were not intended to be the ultimate consumers of the Defective Vehicles and have no rights under the warranty agreements provided with the Defective Vehicles; the warranty agreements were designed for and intended to benefit the consumers only.  Finally, privity is also not required because the Defective Vehicles are dangerous instrumentalities due to the aforementioned defects and nonconformities.

124.   Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.  At the time of sale or lease of each Defective Vehicle, Ford knew, should have known, or was reckless in not knowing of its misrepresentations concerning the Defective Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the defective design.  Ford has continued to show its refusal to rectify the situation by recalling certain less profitable vehicles to attempt to address defects in the EPAS system but not extending the recall to the best-selling Defective Vehicles.  Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs resort to an informal dispute resolution procedure and/or

afford Ford a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

125.   Plaintiffs and the other Class members would suffer economic hardship if they returned their Defective Vehicles but did not receive the return of all payments made by them.  Because Ford is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the other Class members have not re-accepted their Defective Vehicles by retaining them.

126.   The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25.  The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit. Plaintiffs, individually and on behalf of the other Class members, seek all damages permitted by law, including diminution in value of their vehicles, in an amount to be proven at trial.

## SECOND CAUSE OF ACTION
### Fraudulent Concealment
### (Brought on behalf of the Nationwide Class)

127.   Plaintiffs hereby incorporate by reference the allegations contained in Paragraphs 1 through 113  of this Complaint, as if fully set forth herein

128.   Plaintiffs bring this Count on behalf of the Nationwide Class ("Class," for purposes of this Count).

129.   Ford intentionally concealed material facts from Plaintiffs, the other Class members, the public, and NHTSA.  Ford has actual knowledge that, because of the way in which the EPAS system was designed and integrated into the Defective Vehicles, the power steering can suddenly fail during normal operation, leaving occupants vulnerable to crashes, serious injuries, and death

130.   Ford knew that the Defective Vehicles were designed and manufactured with EPAS system defects, but they concealed those material facts.  Although the Defective Vehicles contain material safety defects that Ford knew of, or should have

known of, at the time of distribution, Ford recklessly manufactured and distributed those vehicles to consumers in the United States.  Those consumers had no knowledge of the defects.

131.   Ford had a duty to disclose the facts to Plaintiffs, the other Class members, the public, and NHTSA, but failed to do so.

132.   Ford knew that Plaintiffs and the other Class members had no knowledge of those facts and that neither Plaintiffs nor the other Class members had an equal opportunity to discover the facts.  Ford was in a position of superiority over Plaintiffs and the other Class members.  Indeed, Plaintiffs and the other Class members trusted Ford not to sell or lease them vehicles that were defective or that violated federal law governing motor vehicle safety.

133.   By failing to disclose these material facts, Ford intended to induce Plaintiffs and the other Class members to purchase or lease the Defective Vehicles.

134.   Plaintiffs and the other Class members reasonably relied on Ford's nondisclosure.

135.   Plaintiffs and the other Class members would not have purchased or leased the Defective Vehicles had they known of the EPAS system defect, or certainly would not have paid as much as they did.

136.   Ford reaped the benefit of the sales and leases of Defective Vehicles as a result of its nondisclosure.

137.   As a direct and proximate result of Ford's wrongful conduct, Plaintiffs and the other Class members have suffered or will suffer damages, including the cost of repairing or replacing the EPAS system in their vehicles to fully remedy the defects such that the Defective Vehicles can be operated safely, and the diminished value of their Defective Vehicles, as a result of the defects and Ford's wrongful conduct related to same.

138.   Ford's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiffs and the other Class members, such that punitive damages are appropriate.

**Claims Brought on Behalf of the Statewide Classes**

**Claims Brought on Behalf of the California State Class**

**THIRD CAUSE OF ACTION**
**Violation of the California Unfair Competition Law,**
**Cal. Bus. & Prof. Code §§ 17200, *et seq.***
**(Brought on behalf of the California State Class)**

139.   Plaintiffs hereby incorporate by reference the allegations contained in Paragraphs 1 through 113  of this Complaint, as if fully set forth herein.

140.   Plaintiff Philips brings this Count on behalf of the California State Class.

141.   California Business and Professions Code § 17200 prohibits any "unlawful, unfair, or fraudulent business act or practices."

142.   Ford has violated the unlawful and unfair prongs of § 17200 because the Defective Vehicles share a common design defect in that they are equipped with defective EPAS systems that can suddenly fail during normal operation, leaving occupants of the Defective Vehicles vulnerable to crashes, serious injury, and death.

143.   Ford failed to adequately disclose and remedy this issue.

144.   Ford's conduct offends established public policy, as the harm Ford caused to consumers greatly outweighs any benefits associated with those practices.

145.   Plaintiff Philips and the other California State Class members have suffered an injury in fact, including the loss of money or property, as a result of Ford's unfair, unlawful, and/or deceptive practices.

146.   Ford has violated the fraudulent prong of § 17200 because Ford misrepresented the quality, safety, and reliability of the Defective Vehicles and continues to misrepresent the quality, safety, and reliability of the Defective Vehicles.

147.   Plaintiff Philips and the other California State Class members relied on the misrepresentations and/or omissions of Ford with respect to the quality, safety, and reliability of the Defective Vehicles.  Plaintiff Philips and the other California State Class members would not have purchased or leased their Defective Vehicles and/or paid as much for them but for Ford's misrepresentations and/or omissions.

148.   All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Ford's business.  Ford's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated in the State of California.

149.   Plaintiff Philips, individually and on behalf of the other California State Class members, requests that this Court enjoin Ford from continuing their unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs and the other Class members any money acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided in Cal. Bus. & Prof. Code § 17203 and Cal. Civ. Code § 334.

**FOURTH CAUSE OF ACTION**
**Violation of the California False Advertising Law**
**Cal. Civil Code §§ 17500, *et seq*.**
**(Brought on behalf of the California State Class)**

150.   Plaintiffs hereby incorporate by reference the allegations contained in Paragraphs 1 through 113 this Complaint, as if fully set forth herein.

151.   Plaintiff Philips brings this Count on behalf of the California State Class.

152.   California Business and Professions Code § 17500 states:

> It is unlawful for any . . . corporation . . . with intent directly or indirectly to dispose of real or personal property . . . to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated . . . from this state before the public in any state, in any newspaper or other publication, or any advertising device, . . . or in any other manner or means whatever, including over the Internet, any statement . . . which is untrue or misleading, and which is

known, or which by the exercise of reasonable care should be known, to be untrue or misleading.

153.   Through advertising, marketing, and other publications, Ford caused statements to be disseminated that were untrue or misleading, and that were known, or that by the exercise of reasonable care should have been known to Ford, to be untrue and misleading to consumers, including Plaintiff Philips and the other California State Class members.

154.   Ford has violated § 17500 because its misrepresentations and omissions regarding the safety and reliability of its Defective Vehicles were material and likely to deceive a reasonable consumer.

155.   Plaintiff Philips and the other California State Class members have suffered an injury in fact, including the loss of money or property, as a result of Ford's unfair, unlawful, and/or deceptive practices.  In purchasing or leasing their Defective Vehicles, Plaintiff Philips and each of the other California State Class members relied on the misrepresentations and/or omissions of Ford with respect to the safety and reliability of the Defective Vehicles.

156.   Ford's representations turned out to be false because the Defective Vehicles share a common design defect in that they are equipped with defective EPAS systems that can suddenly fail during normal operation, leaving occupants of the Defective Vehicles vulnerable to crashes, serious injury, and death.  Had Plaintiff Philips and the other California State Class members known this, they would not have purchased or leased their Defective Vehicles and/or paid as much for them.

157.   Accordingly, Plaintiff Philips and the other California State Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain.

158.   All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Ford's business.  Ford's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated in the State of California.

159.   Plaintiff Philips, individually and on behalf of the other California State Class members, request that this Court enjoin Ford from continuing its unfair, unlawful, and/or deceptive practices and to restore to Plaintiff Philips and the other California State Class members any money acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for such other relief as is appropriate.

**FIFTH CAUSE OF ACTION**
**Violation of the Song-Beverly Consumer Warranty Act**
**for Breach of Express Warranty**
**Cal. Civ. Code §§ 1790,** *et seq.*
**(Brought on behalf of the California State Class)**

160.   Plaintiffs hereby incorporate by reference the allegations contained in Paragraphs 1 through 113 of  this Complaint, as if fully set forth herein.

161.   Plaintiff Philips brings this Count on behalf of the California State Class.

162.   Plaintiff Philips and the other California State Class members who purchased their Defective Vehicles in California are "buyers" within the meaning of Cal. Civ. Code § 1791.

163.   The Defective Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

164.   Ford is a "manufacturer" of the Defective Vehicles within the meaning of Cal. Civ. Code § 1791(j).

165.   Plaintiff Philips and the other California State Class members bought/leased new motor vehicles manufactured by Ford.

166.   Ford made express warranties to Plaintiff Philips and the other California State Class members within the meaning of Cal. Civ. Code §§ 1791.2 and 1793.2, in its warranty, owner's manual, and advertising, as described above.

167.   The Defective Vehicles share a common design defect in that they are equipped with defective EPAS systems that is prone to sudden failure during normal operation, leaving occupants of the Defective Vehicles vulnerable to crashes, serious injury, and death.

168.   The Defective Vehicles are covered by Ford's express warranties.  The defects described herein substantially impair the use, value, and safety of the Defective Vehicles to reasonable consumers, including Plaintiff Philips and the other California State Class members.

169.   Ford was provided notice of these issues and defects by a letter dated June 25, 2014 to Ford on behalf of Plaintiff Philips and through numerous other complaints filed against it, as well as internal knowledge derived from testing and internal expert analysis.

170.   Ford has had the opportunity to cure the defect in the Defective Vehicles but it has chosen not to do so.  Ford has had ample warning of the defect through various complaints, filed both in court with the NHTSA and directly with Ford, and it has failed to remedy the defect.  Giving Ford a chance to cure the defect is not practicable in this case and would serve only to delay this litigation, and thus is not necessary.

171.   As a result of Ford's breach of its express warranties, Plaintiff Philips and the other California State Class members received goods whose dangerous condition substantially impairs their value to Plaintiff Philips and the other California State Class members.  Plaintiff Philips and the other Class members have been damaged as a result of the diminished value of Ford's products, the products' malfunctioning, and the nonuse of their Defective Vehicles.

172.   Under California Civil Code, sections 1793.2 and 1794, Plaintiff Philips and the other California State Class members are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their vehicles, or the overpayment or diminution in value of their Class Vehicles.

173.   Under California Civil Code, section 1794, Plaintiff Philips and the other California State Class members are entitled to costs and attorneys' fees.

**SIXTH CAUSE OF ACTION**
**Violation of the Song-Beverly Consumer Warranty Act**
**for Breach of Implied Warranty**
**Cal. Civ. Code §§ 1790 *et seq*.**
**(Brought on behalf of the California State Class)**

174.   Plaintiffs hereby incorporate by reference the allegations contained in Paragraphs 1 through 113 of this Complaint, as if fully set forth herein.

175.   Plaintiff Philips brings this Count on behalf of the California State Class.

176.   Plaintiff Philips and the other California State Class members who purchased Defective Vehicles in California are "buyers" within the meaning of Cal. Civ. Code § 1791.

177.   The Defective Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

178.   Ford is a "manufacturer" of the Defective Vehicles within the meaning of Cal. Civ. Code § 1791(j).

179.   Ford impliedly warranted to Plaintiff Philips and the other California State Class members that the Class Vehicles were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) & 1792; however, the Defective Vehicles do not have the quality that a buyer would reasonably expect.

180.   Cal. Civ. Code § 1791.1(a) states:  "Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:

(1)   Pass without objection in the trade under the contract description.

(2)   Are fit for the ordinary purposes for which such goods are used.

(3)   Are adequately contained, packaged, and labeled.

(4)   Conform to the promises or affirmations of fact made on the container or label.

181.   The Defective Vehicles would not pass without objection in the automotive trade because they share a common design defect in that they are equipped with

38

defective EPAS systems that can suddenly fail during normal operation, leaving occupants of the Defective Vehicles vulnerable to crashes, serious injury, and death.

182.   Because of their defective EPAS systems, the Defective Vehicles are not safe to drive and thus not fit for ordinary purposes.

183.   The Defective Vehicles are not adequately labeled because the labeling fails to disclose the defects described herein.

184.   Ford breached the implied warranty of merchantability by manufacturing and selling Defective Vehicles that are defective.  Furthermore, this defect has caused Plaintiff Philips and the other California State Class members to not receive the benefit of their bargain and have caused the Defective Vehicles to depreciate in value.

185.   Ford was provided notice of these issues and defects by a letter dated June 25, 2014 to Ford on behalf of Plaintiff Philips and through numerous other complaints filed against it, as well as internal knowledge derived from testing and internal expert analysis.

186.   As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiff Philips and the other California State Class members received goods whose dangerous condition substantially impairs their value to Plaintiff Philips and the other California State Class members.

187.   Plaintiff Philips and the other California State Class members have been damaged as a result of the diminished value of Ford's products.

188.   Pursuant to Cal. Civ. Code §§ 1791.1(d) & 1794, Plaintiff Philips and the other California State Class members are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Class Vehicles, or the overpayment or diminution in value of their Defective Vehicles.

189.   Pursuant to Cal. Civ. Code § 1794, Plaintiff Philips and the other California State Class members are entitled to costs and attorneys' fees.

### SEVENTH CAUSE OF ACTION
**Violation of the California Consumer Legal Remedies Act**
**Cal. Civ. Code §§ 1750,** *et seq*.
**(Brought on behalf of the California State Class)**

190.   Plaintiffs hereby incorporate by reference the allegations contained in Paragraphs 1 through 113 of this Complaint, as if fully set forth herein.

191.   Plaintiff Philips brings this Count on behalf of the California State Class.

192.   Plaintiff Philips and the other California State Class members were deceived by Ford's failure to disclose that the Defective Vehicles share a common design defect in that they are equipped with defective EPAS systems that can suddenly fail during normal operation, leaving occupants of the Class Vehicles vulnerable to crashes, serious injury, and death.

193.   Ford engaged in unfair or deceptive acts or practices when, in the course of its business it, among other acts and practices:

    a.   Knowingly made false representations as to the characteristics, uses and benefits of the Defective Vehicles;

    b.   Represented that the Defective Vehicles were of a particular standard, quality, or grade, or that they were of a particular style or model, when it knew or should have known that they were of another; and

    c.   Advertised the Defective Vehicles with intent not to sell them as advertised.

194.   Ford failed to disclose material information concerning the Defective Vehicles, which information was known to it at the time of advertising and selling the Defective Vehicles, all of which was intended to induce consumers to purchase the Defective Vehicles.

195.   Ford intended for Plaintiff Philips and the other California State Class members to rely on it to provide safe, adequately designed, and adequately manufactured

automobiles and to honestly and accurately reveal the problems described throughout this Complaint.

196. Ford intentionally failed or refused to disclose the defect to consumers and, instead, allowed consumers to believe the representations it had made about the Class Vehicles.

197. Ford's conduct and deceptive omissions were intended to induce Plaintiff Philips and the other California State Class members to believe that the Defective Vehicles were safe, adequately designed, and adequately manufactured automobiles.

198. Ford's conduct constitutes unfair acts or practices as defined by the California Consumer Legal Remedies Act (the "CLRA").

199. Plaintiff Philips and the other California State Class members have suffered injury in fact and actual damages resulting from Ford's material omissions and misrepresentations because they paid an inflated purchase price for the Defective Vehicles. However, Plaintiff Philips and the other California State Class members reserve any claim for damages under the CLRA and by this Complaint bring only an action for injunctive relief under the CLRA pursuant to § 1782(d) of the Act.

200. Plaintiff Philips and the other California State Class members' injuries were proximately caused by Ford's fraudulent and deceptive business practices. At this time, Plaintiff only seeks injunctive relief under this cause of action. Under Section 1782, of the CLRA, by letter dated June 26, 2014, Plaintiff notified Ford in writing of the particular violations of Section 1770 of the CLRA and demanded that Ford rectify the problems associated with the behavior detailed above, which acts and practices are in violation of California Civil Code section 1770.

201. If Ford fails to adequately respond to Plaintiff's above-described demand within thirty days of Plaintiff's notice, under California Civil Code section 1782(b), Plaintiff will amend the Complaint to request damages and other relief permitted by California Civil Code section 1780.

202.   Ford's conduct described herein is fraudulent, wanton, and malicious.

203.   Under California Civil Code, section 1782(d), Plaintiff Philips, individually and on behalf of the other California State Class members, seeks a Court order enjoining the above-described wrongful acts and practices of Ford.  Plaintiff Philips and the other California State Class members reserve any claim for restitution, disgorgement, or damages under the CLRA under Section 1782(d) of the Act.

204.   Plaintiff will file a Declaration of Venue in accordance with California Civil Code section 1780(d).

**Claims Brought on Behalf of the West Virginia State Class**

**<u>EIGHTH CAUSE OF ACTION</u>**
**Breach of Express Warranty**
**W. Va. Code § 46-2-213**
**(Brought on behalf of the West Virginia State Class)**

205.   Plaintiffs hereby incorporate by reference the allegations contained in Paragraphs 1 through 113 of this Complaint, as if fully set forth herein.

206.   Plaintiff Phillip Clay Cecil brings this Count on behalf of the West Virginia State Class.

207.   Ford is and was at all relevant times a seller of motor vehicles under W. Va. Code § 46-2-313, and is also a "merchant" as the term is used under West Virginia law.

208.   In the course of selling the Defective Vehicles, Ford expressly warranted to repair and adjust to correct defects in materials and workmanship of any part supplied by Ford.  Ford has not repaired or adjusted, and has been unable to repair or adjust, the Defective Vehicles' materials and workmanship defects.

209.   These warranties were made, *inter alia*, in advertisements and in uniform statements provided by Ford to be made by salespeople.  These affirmations and promises were part of the basis of the bargain between Ford, on the one hand, and Plaintiffs and the other Class members, on the other hand.

210.   Ford did not provide at the time of sale, and has not provided since then, Defective Vehicles conforming to these express warranties.

211.   Furthermore, the limited warranty of repair and/or adjustments to defective parts fails in its essential purpose because the contractual remedy is insufficient to make the Plaintiffs and the other Class members whole.

212.   Accordingly, recovery by Plaintiffs and the other Class members is not limited to the limited warranty of repair or adjustments to parts defective in materials or workmanship, and Plaintiffs, individually and on behalf of the other Class members, seek all remedies as allowed by law.

213.   Moreover, as alleged in more detail herein, at the time that Ford warranted and sold the Defective Vehicles, it knew that the Defective Vehicles did not conform to the warranties and were inherently defective, and Ford wrongfully and fraudulently misrepresented and/or concealed material facts regarding the Defective Vehicles.

214.   Plaintiffs and the other Class members were therefore induced to purchase the Defective Vehicles under false and/or fraudulent pretenses.

215.   Moreover, many of the damages flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacement or adjustments," as those incidental and consequential damages have already been suffered due to Ford's conduct as alleged herein, and due to their failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the other Class members' remedies would be insufficient to make Plaintiffs and the other Class members whole.

216.   Ford was provided notice of these issues and defects through numerous complaints filed against it, as well as internal knowledge derived from testing and internal expert analysis.

217.   As a direct and proximate result of Ford's breach of express warranties, Plaintiffs and the other Class members have been damaged in an amount to be determined at trial.

218.   Finally, due to Ford's breach of warranties as set forth herein, Plaintiffs, individually and on behalf of the other Class members, assert as an additional and/or alternative remedy, as set forth under West Virginia law, for a revocation of acceptance of the goods, and for a return to Plaintiffs and to the other Class members the purchase price of all Defective Vehicles currently owned.

## NINTH CAUSE OF ACTION
### Breach of Implied Warranty of Merchantability
### W. Va. Code § 46-2-314
### (Brought on behalf of the West Virginia State Class)

219.   Plaintiffs hereby incorporate by reference the allegations contained in Paragraphs 1 through 113 of this Complaint, as if fully set forth herein.

220.   Plaintiff Phillip Clay Cecil brings this Count on behalf of the West Virginia State Class.

221.   Ford is and was at all relevant times a seller of motor vehicles under W. Va. Code § 46-2-314, and is also a "merchant" as the term is used under West Virginia law.

222.   A warranty that the Defective Vehicles were in merchantable condition was implied by law in the instant transaction, pursuant to W. Va. Code § 46-2-314.

223.   These Defective Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Defective Vehicles are equipped with defective EPAS systems, resulting in sudden and unexpected loss of power steering events during which the driver must exert markedly increased steering effort to control the vehicle.

224.   Ford was provided notice of these issues and defects through numerous complaints filed against it, reports by NHTSA and other governmental agencies, as well as internal knowledge derived from testing and internal expert analysis.

225. Plaintiffs and the other Class members have had sufficient dealings with either Ford or its agents (dealerships) to establish privity of contract between Ford, on the one hand, and Plaintiffs and the other Class members, on the other hand. Notwithstanding, privity is not required in this case for Plaintiffs and the other Class members pursuant to West Virginia law. Moreover, privity is also not required in this case because Plaintiffs and the other Class members are intended third-party beneficiaries of contracts between Ford and its dealers; specifically, they are the intended beneficiaries of Ford's implied warranties. The dealers were not intended to be the ultimate consumers of the Defective Vehicles and have no rights under the warranty agreements provided with the Defective Vehicles; the warranty agreements were designed for and intended to benefit the ultimate consumers only. Finally, privity is also not required because Plaintiffs' and Class members' Defective Vehicles are dangerous instrumentalities due to the aforementioned defects and nonconformities.

226. As a direct and proximate result of Ford's breach of the warranties of merchantability, Plaintiffs and the other Class members have been damaged in an amount to be proven at trial.

227. Finally, due to Ford's breach of warranties as set forth herein, Plaintiffs, individually and on behalf of the other Class members, assert as an additional and/or alternative remedy, as set forth under West Virginia law, for a revocation of acceptance of the goods, and for a return to Plaintiffs and to the other Class members the purchase price of all Defective Vehicles currently owned.

**TENTH CAUSE OF ACTION**
**Fraudulent Concealment**
**(Brought on behalf of the West Virginia State Class)**

228. Plaintiffs hereby incorporate by reference the allegations contained in Paragraphs 1 through 113 of this Complaint, as if fully set forth herein.

229. Plaintiff Phillip Clay Cecil brings this Count on behalf of the West Virginia State Class.

230. Ford intentionally concealed the defect and above-described material safety information, or acted with reckless disregard for the truth, and denied Plaintiffs and the other Class members information that is highly relevant to their purchasing and/or leasing decision concerning the Defective Vehicles.

231. Through advertisements and other forms of communication, Ford represented that the Defective Vehicles had no significant defects and would perform and operate properly when driven in normal usage.

232. Ford knew these representations were false when made.

233. Plaintiffs and the other Class members were unaware that Ford's representations were false.

234. The Defective Vehicles purchased or leased by Plaintiffs and the other Class members were, in fact, defective, unsafe, and unreliable, because the Defective Vehicles are equipped with defective EPAS systems, resulting in sudden and unexpected loss of power steering events during which the driver must exert markedly increased steering effort to control the vehicle.

235. Plaintiffs and the other Class members reasonably relied upon Ford to disclose the defects in the Defective Vehicles they purchased, as was their right.

236. The aforementioned concealment was material because if it had been disclosed Plaintiffs and the other Class members would not have bought or leased the Defective Vehicles.

237. The aforementioned representations, omissions, and concealment were material because they were facts that would typically be relied on by a person purchasing or leasing a new motor vehicle.

238. As a proximate result of Ford's conduct, Plaintiffs and the other Class members have been injured in an amount to be proven at trial.

## ELEVENTH CAUSE OF ACTION
### Fraud by Omission
### (Brought on behalf of the West Virginia State Class)

239.   Plaintiffs hereby incorporate by reference the allegations contained in Paragraphs 1 through 113 of this Complaint, as if fully set forth herein.

240.   Plaintiff Phillip Clay Cecil brings this Count on behalf of the West Virginia State Class.

241.   Ford was aware of the defects and above-described material safety information as early as 2010.

242.   Ford, as a manufacturer of consumer products and motor vehicles, has a duty to disclose such known defects and material safety information to federal authorities, Plaintiffs, and other class members.

243.   Ford omitted from Plaintiffs and the other Class members the known safety-related defects and material safety information.

244.   Plaintiffs reasonably relied on Ford to perform its duty to disclose the known safety-related defects and material safety information.

245.   The existence of the safety-related defect and material safety information was material to the Plaintiffs and other Class members because, had they known of the safety-related defect and material safety information, they would not have purchased the Defective Vehicles.

246.   As a direct and proximate result of Ford's omission, Plaintiffs and other Class members purchased Defective Vehicles with the EPAS system defect described herein that they either paid too much for or would not have purchased if the defect had been disclosed to them and therefore have incurred damages in an amount to be proven at trial.

**TWELFTH CAUSE OF ACTION**
**Violation of the West Virginia Consumer Credit and Protection Act**
**W. Va. Code § 46A-6-101** *et seq.*
**(Brought on behalf of the West Virginia State Class)**

247.    Plaintiffs hereby incorporate by reference the allegations contained in Paragraphs 1 through 113 of this Complaint, as if fully set forth herein.

248.    Plaintiff Phillip Clay Cecil brings this Count on behalf of the West Virginia State Class.

249.    Plaintiffs are "consumers" under the West Virginia Consumer Credit and Protection Act ("WVCCPA"), W. Va. Code § 46A-6-102(2).  The sale and/or lease transactions resulting in Plaintiffs' acquisition of Defective Vehicles are "consumer transactions" under the same section.  Such transactions, and Ford's conduct described hereinabove and below, occurred in "trade" or "commerce" as defined in W. Va. Code § 46A-6-102(6).

250.    Ford engaged in deceptive and misleading trade practices when, in the course of its business it, among other acts and practices:

      a.    Knowingly made false representations as to the characteristics, uses and benefits of the Defective Vehicles;

      b.    Represented that the Defective Vehicles were of a particular standard, quality, or grade, or that that they were of a particular style or model, when it knew or should have known that they were of another;

      c.    Advertised Defective Vehicles with intent not to sell them as advertised;

      d.    Advertised or otherwise represented that Defective Vehicles were warranted when, under normal conditions, the warranties could not be practically fulfilled or which were for such a period of time or were otherwise of such a nature as to have had the capacity and the tendency to mislead purchasers or prospective purchasers into believing that the

Defective Vehicles had a greater degree of quality, safety, and reliability than was true in fact; and

e.      Failed to disclose material information concerning Defective Vehicles, which information was known to it at the time of advertising and selling Defective Vehicles, all of which was intended to induce consumers to purchase Defective Vehicles.

251.   Thus, Ford's conduct constitutes "[u]nfair methods of competition and unfair or deceptive acts or practices," declared unlawful in W. Va. Code § 46A-6-104.

252.   Ford's conduct significantly impacts the public as actual or potential consumers of Defective Vehicles because, upon information and belief, and as will be borne out through discovery, Ford sold thousands of Defective Vehicles throughout West Virginia, the consumers who purchased the vehicles were unsophisticated, the consumers who purchased the vehicles had no bargaining power, and the defects in the Defective Vehicles have impacted consumers and have significant potential to do so in the future.

253.   Additionally, this is a matter of public concern and the state has a strong interest in protecting purchasers from the conduct in which Ford engaged.

254.   Plaintiffs and the other Class members suffered injury, including ascertainable losses of money or property (that is, by being induced to purchase and/or overpay for goods on the basis of misrepresentations and omissions of material facts, and diminution in value of such goods insofar as defective vehicles are less valuable than defect-free vehicles), as a result of Ford's deceptive trade practices.  As a result, Plaintiffs and the other Class members are entitled to relief under the WVCCPA.  W. Va. Code § 46A-6-106(a).

255.   Ford is on notice of the claims against it and of the misconduct alleged, as set forth in more detail above.  Therefore, all pre-suit notice requirements under W.Va. Code § 46A-6-106 have been satisfied.

## THIRTEENTH CAUSE OF ACTION
### Negligence
### (Brought on behalf of the West Virginia State Class)

256.   Plaintiffs hereby incorporate by reference the allegations contained in Paragraphs 1 through 113 of this Complaint, as if fully set forth herein.

257.   Plaintiff Phillip Clay Cecil brings this Count on behalf of the West Virginia State Class.

258.   Plaintiffs and the other Class members are the owners of Defective Vehicles that were manufactured, designed, assembled, distributed, and otherwise placed in the stream of commerce by Ford.

259.   Ford had a duty to manufacture a product which would be safe for its intended and foreseeable uses and users, including the use to which it was put by Plaintiffs and the other Class members.  Ford breached its duty to Plaintiffs and the other Class members because it was negligent in the design, development, manufacture, and testing of the Defective Vehicles.

260.   Ford was negligent in its design, development, manufacture, and testing of the Defective Vehicles because it knew, or in the exercise of reasonable care should have known, that the Defective Vehicles are equipped with defective EPAS systems, resulting in sudden and unexpected loss of power steering events during which the driver must exert markedly increased steering effort to control the vehicle.

261.   Ford negligently failed to adequately warn and instruct Plaintiffs and the other Class members of the defective nature of the Defective Vehicles and of the high degree of risk attendant to using them.

262.   Ford further breached its duties to Plaintiffs and the other Class members by supplying Defective Vehicles directly and/or through a third person to be used by foreseeable persons such as Plaintiffs and the other Class members when:

a. Ford knew or had reason to know, that the Defective Vehicles were dangerous or were likely to be dangerous for the use for which they were supplied; and

b. Ford failed to exercise reasonable care to inform customers of the dangerous condition, or of the facts under which the Defective Vehicles are likely to be dangerous.

263.   As a result of Ford's negligence, Plaintiffs and the other Class members suffered damages.

## FOURTEENTH CAUSE OF ACTION
### Negligent Misrepresentation
### (Brought on behalf of the West Virginia State Class)

264.   Plaintiffs hereby incorporate by reference the allegations contained in Paragraphs 1 through 113 of this Complaint, as if fully set forth herein.

265.   Plaintiff Phillip Clay Cecil brings this Count on behalf of the West Virginia State Class.

266.   Ford was aware of the defects and above-described material safety information as early as 2010.

267.   Ford, as manufacturer of consumer products and motor vehicles, has a duty to disclose such known defects and material safety information to federal authorities, Plaintiffs, and other class members.

268.   Notwithstanding this duty, and in violation thereof, Ford negligently failed to disclose to and warn Plaintiffs and the other Class members, and concealed and misrepresented the truth, about the significant defects which posed a clear, substantial and unreasonable risk of incidents, accidents, injuries and death.

269.   Because Plaintiffs and the other Class members did not have an equal opportunity to discover such truth about the Defective Vehicles, Plaintiffs and the other Class members purchased the Defective Vehicles in the reasonable, but, unbeknownst to

them, false belief they were fit for use, merchantable, and reasonably safe for their intended purposes.

270.   The existence of the defects and material safety information was material to the Plaintiffs and other Class members because, had they known of the defects and material safety information, they would not have purchased the Defective Vehicles.

271.   As a direct and proximate result of Ford's negligent failure to disclose and warn and its concealment and misrepresentation of such facts, Plaintiffs and other Class members purchased Defective Vehicles with the EPAS system defect described herein that they either paid too much for or would not have purchased if the defect had been disclosed to them and therefore have incurred damages in an amount to be proven at trial.

### FIFTEENTH CAUSE OF ACTION
#### Strict Product Liability
#### (Brought on behalf of the West Virginia State Class)

272.   Plaintiffs hereby incorporate by reference the allegations contained in Paragraphs 1 through 113 of this Complaint, as if fully set forth herein.

273.   Plaintiff Phillip Clay Cecil brings this Count on behalf of the West Virginia State Class.

274.   Ford was at all relevant times engaged in the business of designing, manufacturing, assembling, distributing, and otherwise placing in the stream of commerce the Defective Vehicles to be used by members of the general public, including Plaintiffs and the other members of the Class.

275.   Ford intended that the Defective Vehicles be used by Plaintiffs and the other members of the Class as safe and reliable means of transportation.

276.   At all times herein, Ford knew that the Defective Vehicles would be purchased by members of the public, including Plaintiffs and the other members of the Class, without inspection for defects.

277.   At all relevant times herein, Ford knew that the Defective Vehicles were not fit for their intended use because they are equipped with defective EPAS systems, resulting in sudden and unexpected loss of power steering events during which the driver must exert markedly increased steering effort to control the vehicle.

278.   Ford designed, manufactured, assembled, distributed, and sold the Defective Vehicles in this defective condition making them unreasonably dangerous to users and consumers or to their property.

279.   The Defective Vehicles are equipped with defective EPAS systems, resulting in sudden and unexpected loss of power steering events during which the driver must exert markedly increased steering effort to control the vehicle, at the time they were sold by Ford and were intended to and did reach Plaintiffs and the other members of the Class in substantially the same condition as they were when they were manufactured, sold, and left the control of Ford.

280.   Knowing the Defective Vehicles contained the defect described herein and were therefore dangerous and not safe for their intended use, Ford, in willful and conscious disregard for the safety of the public, including Plaintiffs and the other members of the Class, placed them on the market and omitted the information concerning the defect from customers or the unknowing public, including Plaintiffs and the other members of the Class.

281.   As a direct and proximate result of the defective and unreasonably dangerous conditions of the Defective Vehicles as alleged herein, Plaintiffs and the other members of the Class have suffered damages.

## SIXTEENTH CAUSE OF ACTION
### Unjust Enrichment
### (Brought on behalf of the West Virginia State Class)

282.   Plaintiffs hereby incorporate by reference the allegations contained in Paragraphs 1 through 113 of this Complaint, as if fully set forth herein.

283.   Plaintiff Phillip Clay Cecil brings this Count on behalf of the West Virginia State Class.

284.   Ford had knowledge of the safety defect in the Defective Vehicles, which it omitted from Plaintiffs and the other Class members.

285.   As a result of its wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design defect of the Defective Vehicles and the concealment of the defect, Ford charged a higher price for the Defective Vehicles than the vehicles' true value, and Ford obtained monies that rightfully belong to Plaintiffs and the other Class members.

286.   Ford accepted and retained the non-gratuitous benefits conferred by Plaintiffs and the other Class members, who without knowledge of the safety defect paid a higher price for Defective Vehicles that actually had lower values.  It would be inequitable and unjust for Ford to retain these wrongfully obtained profits.

287.   Plaintiffs and the other Class members are therefore entitled to restitution in an amount to be determined at trial.

**Claims Brought on Behalf of the North Carolina State Class**

**SEVENTEENTH CAUSE OF ACTION**
**Breach of Express Warranty**
**N.C. Gen. Stat. § 25-2-313**
**(Brought on behalf of the North Carolina State Class)**

288.   Plaintiffs hereby incorporate by reference the allegations contained in Paragraphs 1 through 113 of this Complaint, as if fully set forth herein.

289.   Plaintiffs Robert Halsey, Temple Halsey, and Performance Fire Protection, LLC bring this Count on behalf of the North Carolina State Class.

290.   Ford is and was at all relevant times a seller with respect to motor vehicles.

291.   In the course of selling the Ford Vehicles, Ford expressly warranted to repair and adjust to correct defects in materials and workmanship of any part supplied by

Ford. Ford has not repaired or adjusted, and has been unable to repair or adjust, the Defective Vehicles' materials and workmanship defects.

292.   Ford expressly warranted through statements and advertisements that the Defective Vehicles were of high quality, and at a minimum, would actually work properly and safely.

293.   These warranties were made, *inter alia*, in advertisements and in uniform statements provided by Ford to be made by salespeople.  These affirmations and promises were part of the basis of the bargain between Ford, on the one hand, and Plaintiffs and the other Class members, on the other hand.

294.   Ford did not provide at the time of sale, and has not provided since then, Defective Vehicles conforming to these express warranties.

295.   Furthermore, the limited warranty of repair and/or adjustments to defective parts fails in its essential purpose because the contractual remedy is insufficient to make the Plaintiffs and the other Class members whole.

296.   Accordingly, recovery by Plaintiffs and the other Class members is not limited to the limited warranty of repair or adjustments to parts defective in materials or workmanship, and Plaintiffs, individually and on behalf of the other Class members, seek all remedies as allowed by law.

297.   Moreover, as alleged in more detail herein, at the time that Ford warranted and sold the Defective Vehicles, it knew that the Defective Vehicles did not conform to the warranties and were inherently defective, and Ford wrongfully and fraudulently misrepresented and/or concealed material facts regarding the Defective Vehicles.

298.   Plaintiffs and the other Class members were therefore induced to purchase the Defective Vehicles under false and/or fraudulent pretenses.

299.   Moreover, many of the damages flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacement or adjustments," as those incidental and consequential damages have already been suffered due to Ford's conduct

as alleged herein, and due to their failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the other Class members' remedies would be insufficient to make Plaintiffs and the other Class members whole.

300.   Ford was provided notice of these issues and defects through numerous complaints filed against it, as well as internal knowledge derived from testing and internal expert analysis.

301.   As a direct and proximate result of Ford's breach of express warranties, Plaintiffs and the other Class members have been damaged in an amount to be determined at trial.

## EIGHTEENTH CAUSE OF ACTION
### Breach of Implied Warranty of Merchantability
### N.C. Gen. Stat. § 25-2-314
### (Brought on behalf of the North Carolina State Class)

302.   Plaintiffs hereby incorporate by reference the allegations contained in Paragraphs 1 through 113 of this Complaint, as if fully set forth herein.

303.   Plaintiffs Robert Halsey, Temple Halsey, and Performance Fire Protection, LLC bring this Count on behalf of the North Carolina State Class.

304.   Ford is and was at all relevant times a merchant with respect to motor vehicles under N.C. Gen. Stat. § 25-2-314.

305.   Pursuant to N.C. Gen. Stat. § 25-2-314, a warranty that the Defective Vehicles were in merchantable condition was implied by law, and the Defective Vehicles were bought and sold subject to an implied warranty of merchantability.

306.   The Defective Vehicles did not comply with the implied warranty of merchantability as, at the time of sale and at all times thereafter, they were defective and not in merchantable condition and not fit for the ordinary purpose for which vehicles are used.  Specifically, the Defective Vehicles are equipped with defective EPAS systems,

resulting in sudden and unexpected loss of power steering events during which the driver must exert markedly increased steering effort to control the vehicle.

307.   Ford was and is aware that the Defective Vehicles are prone to sudden and unexpected loss of power steering and that such defect has numerous causes.  In addition, and most significantly, regardless of the cause of these admittedly foreseeable events, the Defective Vehicles share a common design defect in that they are equipped with defective EPAS systems, resulting in sudden and unexpected loss of power steering events during which the driver must exert markedly increased steering effort to control the vehicle.

308.   Ford was provided notice of these issues and defects through numerous complaints filed against it, as well as internal knowledge derived from testing and internal expert analysis.

309.   Plaintiffs and the other Class members suffered injuries due to the defective nature of the Defective Vehicles and Ford's breach of the warranty of merchantability.

310.   As a direct and proximate result of Ford's breach of the warranties of merchantability, Plaintiffs and the other Class members have been damaged in an amount to be proven at trial.

## NINETEENTH CAUSE OF ACTION
### Violation of the North Carolina Unfair and Deceptive Trade Practices Act
### N.C. Gen. Stat. § 75-1.1 *et seq.*
### (Brought on behalf of the North Carolina State Class)

311.   Plaintiffs hereby incorporate by reference the allegations contained in Paragraphs 1 through 113 of this Complaint, as if fully set forth herein.

312.   Plaintiffs Robert Halsey, Temple Halsey, and Performance Fire Protection, LLC bring this Count on behalf of the North Carolina State Class.

313.   Ford's unfair trade practices as described above were in and affecting trade or commerce.

314.   Ford's violations of the Act as set forth above proximately caused actual damage to Plaintiffs and the other Class members.

315.   Ford's unfair trade practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs and the other Class members, about the true safety and reliability of the Defective Vehicles.

316.   Plaintiffs and the other Class members risk irreparable injury as a result of Ford's acts and omissions in violation of the Act, and these violations present a continuing risk to Plaintiffs and the other Class members as well as to the general public.

317.   Pursuant to N.C. Gen. Stat. § 75-1.1 *et seq.*, Plaintiffs, individually and on behalf of the other Class members, seek monetary relief against Ford.

318.   Ford acted with willful and conscious disregard of the rights and safety of others, subjecting Plaintiffs and the other Class members to cruel and unjust hardship as a result, such that an award of punitive damages is appropriate.

319.   Plaintiffs, individually and on behalf of the other Class members, further seek an order enjoining Ford's unfair or deceptive acts or practices, and awarding restitution, treble damages, punitive damages, attorney's fees, and any other just and proper relief available under the Act.

### TWENTIETH CAUSE OF ACTION
**Fraud by Concealment**
**(Brought on behalf of the North Carolina State Class)**

320.   Plaintiffs hereby incorporate by reference the allegations contained in Paragraphs 1 through 113 of this Complaint, as if fully set forth herein.

321.   Plaintiffs Robert Halsey, Temple Halsey, and Performance Fire Protection, LLC bring this Count on behalf of the North Carolina State Class.

322.   As set forth above, Ford concealed and/or suppressed material facts concerning the safety of their Defective Vehicles, which it had a duty to disclose.

323.   The omitted facts were material because they directly impact the safety of the Defective Vehicles.  Whether a vehicle may suddenly and unexpectedly lose power steering is a material safety concern.

324.   Ford had a duty to disclose these omitted material facts, and yet it took affirmative steps to conceal these material facts.  Specifically, Ford took affirmative steps to conceal these material facts by consistently marketing their Defective Vehicles as safe and proclaiming that safety is one of Ford's highest priorities.  Further, Ford had a duty to disclose these safety issues once Ford made representations to the public about safety.  Ford was under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts that materially qualify those facts stated.  A manufacturer that volunteers information about its product must be truthful, and the telling of a half-truth calculated to deceive is fraud.

325.   In addition, Ford had a duty to disclose these omitted material facts because they were latent defects that were known and/or accessible only to Ford, who has superior knowledge and access to the facts.  Ford knew that these material facts were not known to Plaintiffs and the other Class members and that Plaintiffs and the other Class members were unable to discover these material facts through reasonable diligence.

326.   Ford possessed exclusive knowledge of the defects rendering the Defective Vehicles inherently more dangerous and unreliable than similar vehicles.

327.   Ford's concealment and/or suppression of these material facts was reasonably calculated to deceive Plaintiffs and the other Class members.

328.   Ford actively concealed and/or suppressed these material facts, in whole or in part, with the intent to deceive Plaintiffs and the other Class members and to induce Plaintiffs and the other Class members to purchase Defective Vehicles at a higher price, which did not match the vehicles' true value.

329.   Ford's concealment and/or suppression of these material facts did in fact deceive Plaintiffs and the other Class members, as Plaintiffs and the other Class

members were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' and the other Class members' actions were justified.

330.   As a result of the concealment and/or suppression of the facts, Plaintiffs and the other Class members sustained damage in an amount to be determined at trial.

331.   Ford's acts were done maliciously, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the other Class members' rights, such that an award of punitive damages is appropriate.

**TWENTY-FIRST CAUSE OF ACTION**
**Fraud by Omission**
**(Brought on behalf of the North Carolina State Class)**

332.  Plaintiffs hereby incorporate by reference the allegations contained in Paragraphs 1 through 113 of this Complaint, as if fully set forth herein.

333.   Plaintiffs Robert Halsey, Temple Halsey, and Performance Fire Protection, LLC bring this Count on behalf of the North Carolina State Class.

334.   Ford was aware of the defects and above-described material safety information as early as 2010.

335.   Ford, as a manufacturer of consumer products and motor vehicles, has a duty to disclose such known defects and material safety information to federal authorities, Plaintiffs, and other Class members.

336.   Ford, through its omission, failed to disclose the known safety-related defects and material safety information.

337.   Plaintiffs reasonably relied on Ford to perform its duty to disclose the known safety-related defects and material safety information.

338.   The existence of the safety-related defects and material safety information was material to the Plaintiffs and other Class members because, had they known of the safety-related defects and material safety information, they would not have purchased the Defective Vehicles.

339.   As a direct and proximate result of Ford's omission, Plaintiffs and other Class members purchased Defective Vehicles with the EPAS system defect described herein that they either paid too much for or would not have purchased if the defect had been disclosed to them and therefore have incurred damages in an amount to be proven at trial.

## TWENTY-SECOND CAUSE OF ACTION
### Negligence
### (Brought on behalf of the North Carolina State Class)

340.   Plaintiffs hereby incorporate by reference the allegations contained in Paragraphs 1 through 113 of this Complaint, as if fully set forth herein.

341.   Plaintiffs Robert Halsey, Temple Halsey, and Performance Fire Protection, LLC bring this Count on behalf of the North Carolina State Class.

342.   Plaintiffs and the other Class members are the owners of Defective Vehicles that were manufactured, designed, assembled, distributed, and otherwise placed in the stream of commerce by Ford.

343.   Ford had a duty to manufacture a product which would be safe for its intended and foreseeable uses and users, including the use to which it was put by Plaintiffs and the other Class members.  Ford breached its duty to Plaintiffs and the other Class members because it was negligent in the design, development, manufacture, and testing of the Defective Vehicles.

344.   Ford was negligent in its design, development, manufacture, and testing of the Defective Vehicles because it knew, or in the exercise of reasonable care should have known, that they were prone to sudden and unexpected loss of power steering.

345.   Ford negligently failed to adequately warn and instruct Plaintiffs and the other Class members of the defective nature of the Defective Vehicles and of the high degree of risk attendant to using them.

346.   Ford further breached its duties to Plaintiffs and the other Class members by supplying Defective Vehicles directly and/or through a third person to be used by foreseeable persons such as Plaintiffs and the other Class members when:

     a.   Ford knew or had reason to know, that the Defective Vehicles were dangerous or were likely to be dangerous for the use for which they were supplied; and

     b.   Ford failed to exercise reasonable care to inform customers of the dangerous condition, or of the facts under which the Defective Vehicles are likely to be dangerous.

347.   As a result of Ford's negligence, Plaintiffs and the other Class members suffered damages.

### TWENTY-THIRD CAUSE OF ACTION
**Negligent Misrepresentation**
**(Brought on behalf of the North Carolina State Class)**

348.   Plaintiffs hereby incorporate by reference the allegations contained in Paragraphs 1 through 113 of this Complaint, as if fully set forth herein.

349.   Plaintiffs Robert Halsey, Temple Halsey, and Performance Fire Protection, LLC bring this Count on behalf of the North Carolina State Class.

350.   Ford was aware of the defects and above-described material safety information as early as 2010.

351.   Ford, as a manufacturer of consumer products and motor vehicles, has a duty to disclose such known defects and material safety information to federal authorities, Plaintiffs, and other Class members.

352.   Notwithstanding this duty, and in violation thereof, Ford negligently failed to disclose to and warn Plaintiffs and the other Class members, and concealed and misrepresented the truth, about the significant defects which posed a clear, substantial and unreasonable risk of incidents, accidents, injuries and death.

353.   Because Plaintiffs and the other Class members did not have an equal opportunity to discover such truth about the Defective Vehicles, Plaintiffs and the other Class members purchased the Defective Vehicles in the reasonable, but, unbeknownst to them, false belief they were fit for use, merchantable, and reasonably safe for their intended purposes.

354.   The existence of the defects and material safety information was material to the Plaintiffs and other Class members because, had they known of the defects and material safety information, they would not have purchased the Defective Vehicles.

355.   As a direct and proximate result of Ford's negligent failure to disclose and warn and its concealment and misrepresentation of such facts, Plaintiffs and other Class members purchased Defective Vehicles with the EPAS system defect described herein that they either paid too much for or would not have purchased if the defect had been disclosed to them and therefore have incurred damages in an amount to be proven at trial.

**TWENTY-FOURTH CAUSE OF ACTION**
**Strict Products Liability**
**(Brought on behalf of the North Carolina State Class)**

356.   Plaintiffs hereby incorporate by reference the allegations contained in Paragraphs 1 through 113 of this Complaint, as if fully set forth herein.

357.   Plaintiffs Robert Halsey, Temple Halsey, and Performance Fire Protection, LLC bring this Count on behalf of the North Carolina State Class.

358.   Ford was at all relevant times engaged in the business of designing, manufacturing, assembling, distributing, and otherwise placing in the stream of commerce the Defective Vehicles to be used by members of the general public, including Plaintiffs and the other members of the Class.

359.   Ford intended that the Defective Vehicles be used by Plaintiffs and the other members of the Class as safe and reliable means of transportation.

360.   At all times herein, Ford knew that the Defective Vehicles would be purchased by members of the public, including Plaintiffs and the other members of the Class, without inspection for defects.

361.   At all relevant times herein, Ford knew that the Defective Vehicles were not fit for their intended use because they are equipped with defective EPAS systems, resulting in sudden and unexpected loss of power steering events during which the driver must exert markedly increased steering effort to control the vehicle.

362.   Ford designed, manufactured, assembled, distributed, and sold the Defective Vehicles in this defective condition making them unreasonably dangerous to users and consumers or to their property.

363.   The Defective Vehicles were equipped with defective EPAS systems, resulting in sudden and unexpected loss of power steering events during which the driver must exert markedly increased steering effort to control the vehicle, at the time they were sold by Ford and were intended to and did reach Plaintiffs and the other members of the Class in substantially the same condition as they were when they were manufactured, sold, and left the control of Ford.

364.   Knowing the Defective Vehicles contained the defect described herein and were therefore dangerous and not safe for their intended use, Ford, in willful and conscious disregard for the safety of the public, including Plaintiffs and the other members of the Class, placed them on the market and omitted the information concerning the defect from customers or the unknowing public, including Plaintiffs and the other members of the Class.

365.   As a direct and proximate result of the defective and unreasonably dangerous condition of the Defective Vehicles as alleged herein, Plaintiffs and the other members of the Class have suffered damages.

## TWENTY-FIFTH CAUSE OF ACTION
### Unjust Enrichment
### (Brought on behalf of the North Carolina State Class)
### Pled in the Alternative to Other Causes of Action Under North Carolina Law

366.    Plaintiffs hereby incorporate by reference the allegations contained in Paragraphs 1 through 113 of this Complaint, as if fully set forth herein.

367.    Plaintiffs Robert Halsey, Temple Halsey, and Performance Fire Protection, LLC bring this Count on behalf of the North Carolina State Class.

368.    Ford had knowledge of the safety defect in the Defective Vehicles, which it failed to disclose to Plaintiffs and the other Class members.

369.    As a result of its wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design defect of their Defective Vehicles and the concealment of the defect, Ford charged a higher price for the Defective Vehicles than the vehicles' true value and Ford obtained monies that rightfully belong to Plaintiffs and the other Class members.  Ford received a measurable benefit.

370.    Ford accepted and retained the non-gratuitous benefits conferred by Plaintiffs and the other Class members, who without knowledge of the safety defect paid a higher price for Defective Vehicles that actually had lower values.  Plaintiffs and the other Class members did not confer these benefits officiously or gratuitously, and it would be inequitable and unjust for Ford to retain these wrongfully obtained profits.

371.    Plaintiffs and the other Class members are therefore entitled to restitution in an amount to be determined at trial.

### Claims Brought on Behalf of the Ohio State Class

## TWENTY-SIXTH CAUSE OF ACTION
### Violation of the Ohio Consumer Sales Practices Act
### Ohio Rev. Code § 1345.01, *et seq.*
### (Brought on behalf of the Ohio State Class)

372.    Plaintiffs hereby incorporate by reference the allegations contained in Paragraphs 1 through 113 of this Complaint, as if fully set forth herein.

373. Plaintiff Jason Wilkinson brings this Count on behalf of the Ohio State Class.

374. At all times relevant to this suit, Ford was a "supplier," as defined in the Ohio Consumer Sales Practices Act, Ohio Rev. Code § 1345.01.

375. At all times relevant to this suit, Plaintiff and the other Class members were "consumers," as defined in the Ohio Consumer Sales Practices Act, Ohio Rev. Code § 1345.01.

376. At all times relevant to this suit, Plaintiff and the other Class members purchased the Vehicles through "consumer transactions," as defined in the Ohio Consumer Sales Practices Act, Ohio Rev. Code § 1345.01.

377. As a result of placing a defective product into the stream of commerce, Ford has breached its implied warranty in tort, which is an unfair and deceptive act, as defined in Ohio Rev. Code § 1345.09(B).

378. Ford has committed unfair and deceptive acts in violation of Ohio's Consumer Sales Practices Act by knowingly placing into the stream of commerce the defectively designed Defective Vehicles that are equipped with defective EPAS systems, resulting in sudden and unexpected loss of power steering events during which the driver must exert markedly increased steering effort to control the vehicle.

379. Moreover, Ford has committed an unfair, deceptive, and unconscionable act by knowingly concealing the defect in the Defective Vehicles and failing to inform Plaintiff and the other Class members of this defect.

380. Further, Ford, as reflected by the facts alleged elsewhere in this Complaint, has made representations and/or public statements about the quality, safety, and reliability of the Defective Vehicles, which are unfair and deceptive in violation of Ohio law.

381. The Ohio Attorney General has made available for public inspection prior state court decisions which have held that the acts and omissions of Ford as detailed in

this Complaint, including, but not limited to, the failure to honor both implied warranties and express warranties, the making and distribution of false, deceptive, and/or misleading representations, and the concealment and/or non-disclosure of a dangerous defect, constitute deceptive sales practices in violation of Ohio's Consumer Sales Practices Act.  These cases include, but are not limited to, the following:

    a.   *Mason v. Mercedes Benz USA, LLC* (OPIF #10002382);

    b.   *State ex rel. Betty D. Montgomery v. Ford Motor Co.* (OPIF #10002123);

    c.   *State ex rel. Betty D. Montgomery v. Bridgestone/Firestone, Inc.* (OPIF #10002025);

    d.   *Bellinger v. Hewlett-Packard Co.,* No. 20744, 2002 Ohio App. LEXIS 1573 (Ohio Ct. App. Apr. 10, 2002) (OPIF #10002077);

    e.   *Borror v. MarineMax of Ohio*, No. OT-06-010, 2007 Ohio App. LEXIS 525 (Ohio Ct. App. Feb. 9, 2007) (OPIF #10002388);

    f.   *State ex rel. Jim Petro v. Craftmatic Organization, Inc.* (OPIF #10002347);

    g.   *Mark J. Cranford, et al. v. Joseph Airport Toyota, Inc.* (OPIF #10001586);

    h.   *State ex rel. William J. Brown v. Harold Lyons, et al.* (OPIF #10000304);

    i.   *Brinkman v. Mazda Motor of America, Inc.,* (OPIF #10001427);

    j.   *Khouri v. Don Lewis*, (OPIF #100001995);

    k.   *Mosley v. Performance Mitsubishi aka Automanage*, (OPIF #10001326);

    l.   *Walls v. Harry Williams dba Butch's Auto Sales*, (OPIF #10001524); and,

    m. *Brown v. Spears*, (OPIF #10000403).

382.   Ford committed these and other unfair and deceptive acts with regard to the marketing and sale of the Defective Vehicles.  Ford is liable to Plaintiff and the other Class members for compensatory damages, injunctive/equitable relief, and attorneys' fees pursuant to Ohio Rev. Code § 1345.09.

## TWENTY-SEVENTH CAUSE OF ACTION
### Breach of Express Warranty
### Ohio Rev. Code § 1302.26
### (Brought on behalf of the Ohio State Class)

383.   Plaintiffs hereby incorporate by reference the allegations contained in Paragraphs 1 through 113 of this Complaint, as if fully set forth herein.

384.   Plaintiff Jason Wilkinson brings this Count on behalf of the Ohio State Class.

385.   In the course of selling the Defective Vehicles, Ford expressly warranted to repair and adjust to correct defects in materials and workmanship of any part supplied by Ford.  Ford has not repaired or adjusted, and has been unable to repair or adjust, the Defective Vehicles' materials and workmanship defects.

386.   Ford expressly warranted through statements and advertisements that the Defective Vehicles were of high quality, and at a minimum, would actually work properly and safely.

387.   These warranties were made, *inter alia*, in advertisements and in uniform statements provided by Ford to be made by salespeople.  These affirmations and promises were part of the basis of the bargain between Ford, on the one hand, and Plaintiff and the other Class members, on the other hand.

388.   Ford did not provide at the time of sale, and has not provided since then, vehicles conforming to these express warranties.

389.   Furthermore, the limited warranty of repair and/or adjustments to defective parts fails in its essential purpose because the contractual remedy is insufficient to make the Plaintiff and the other Class members whole.

68
COMPLAINT

390.   Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited warranty of repair or adjustments to parts defective in materials or workmanship, and Plaintiff, individually and on behalf of the other Class members, seek all remedies as allowed by law.

391.   Moreover, as alleged in more detail herein, at the time that Ford warranted and sold the Defective Vehicles, it knew that the Defective Vehicles did not conform to the warranties and were inherently defective, and Ford wrongfully and fraudulently misrepresented and/or concealed material facts regarding the Defective Vehicles.

392.   Plaintiff and the other Class members were therefore induced to purchase the Defective Vehicles under false and/or fraudulent pretenses.

393.   Moreover, many of the damages flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacement or adjustments," as incidental and consequential damages have already been suffered due to Ford's conduct as alleged herein, and due to their failure and/or continued failure to provide such limited remedy within a reasonable time, any limitation on Plaintiff's and the other Class members' remedies would be insufficient to make Plaintiff and the other Class members whole.

394.   Ford was provided notice of these issues and defects through numerous complaints filed against it, as well as internal knowledge derived from testing and internal expert analysis.

395.   As a direct and proximate result of Ford's breach of express warranties, Plaintiff and the other Class members have been damaged in an amounted to be determined at trial.

396.   Finally, due to Ford's breach of warranties as set forth herein, Plaintiff and the other Class members assert as an additional and/or alternative remedy, as set forth in Ohio Rev. Code § 1302.66, for a revocation of acceptance of the goods, and for a return

to Plaintiff and the other Class members of the purchase price of all Defective Vehicles currently owned.

### TWENTY-EIGHTH CAUSE OF ACTION
#### Breach of Implied Warranty in Tort
#### (Brought on behalf of the Ohio State Class)

397.   Plaintiffs hereby incorporate by reference the allegations contained in Paragraphs 1 through 113 of this Complaint, as if fully set forth herein.

398.   Plaintiff Jason Wilkinson brings this Count on behalf of the Ohio State Class.

399.   Ford manufactured and sold Defective Vehicles to Plaintiff and the other Class members.

400.   The Defective Vehicles were defective because they are equipped with defective EPAS systems, resulting in sudden and unexpected loss of power steering events during which the driver must exert markedly increased steering effort to control the vehicle.

401.   These defects existed at the time the Defective Vehicles left the hands of Ford.

402.   Based upon these defects, Ford has failed to meet the expectations of a reasonable consumer.  The Defective Vehicles have failed their ordinary, intended use because they are vulnerable to sudden and unexpected lack of power steering events.

403.   These defects in the Defective Vehicles were the direct and proximate cause of economic damages to Plaintiff and the other Class members.

### TWENTY-NINTH CAUSE OF ACTION
#### Fraudulent Concealment
#### (Brought on behalf of the Ohio State Class)

404.   Plaintiffs hereby incorporate by reference the allegations contained in Paragraphs 1 through 113 of this Complaint, as if fully set forth herein.

405. Plaintiff Jason Wilkinson brings this Count on behalf of the Ohio State Class.

406. Ford intentionally concealed the defect and above-described material safety information, or acted with reckless disregard for the truth, and denied Plaintiff and the other Class members information that is highly relevant to their purchasing and/or leasing decision concerning the Defective Vehicles.

407. Through advertisements and other forms of communication, Ford represented that the Defective Vehicles had no significant defects and would perform and operate properly when driven in normal usage.

408. Ford knew these representations were false when made.

409. Plaintiff and the other Class members were unaware that Ford's representations were false.

410. The Defective Vehicles purchased or leased by Plaintiff and the other Class members were, in fact, defective, unsafe, and unreliable, because the Defective Vehicles are equipped with defective EPAS systems, resulting in sudden and unexpected loss of power steering events during which the driver must exert markedly increased steering effort to control the vehicle.

411. Plaintiff and the other Class members reasonably relied upon Ford to disclose the defects in the Defective Vehicles they purchased, as was their right.

412. The aforementioned concealment was material because if it had been disclosed Plaintiff and the other Class members would not have bought or leased the Defective Vehicles.

413. The aforementioned representations, omissions, and concealment were material because they were facts that would typically be relied on by a person purchasing or leasing a new motor vehicle.

414. As a proximate result of Ford's conduct, Plaintiff and the other Class members have been injured in an amount to be proven at trial.

## THIRTIETH CAUSE OF ACTION
### Fraud by Omission
### (Brought on behalf of the Ohio State Class)

415.   Plaintiffs hereby incorporate by reference the allegations contained in Paragraphs 1 through 113 of this Complaint, as if fully set forth herein.

416.   Plaintiff Jason Wilkinson brings this Count on behalf of the Ohio State Class.

417.   Ford was aware of the defects and above-described material safety information as early as 2010.

418.   Ford, as a manufacturer of consumer products and motor vehicles, has a duty to disclose such known defects and material safety information to federal authorities, Plaintiff, and other Class members.

419.   Ford, through its omission, failed to disclose the known safety-related defects and material safety information.

420.   Plaintiff reasonably relied on Ford to perform its duty to disclose the known safety-related defects and material safety information.

421.   The existence of the safety-related defect and material safety information was material to the Plaintiff and other Class members because, had they known of the safety-related defect and material safety information, they would not have purchased the Defective Vehicles.

422.   As a direct and proximate result of Ford's omission, Plaintiff and other Class members purchased Defective Vehicles with the EPAS system defect described herein that they either paid too much for or would not have purchased if the defect had been disclosed to them and therefore have incurred damages in an amount to be proven at trial.

## THIRTY-FIRST CAUSE OF ACTION
### Negligence
### (Brought on behalf of the Ohio State Class)

423.   Plaintiffs hereby incorporate by reference the allegations contained in Paragraphs 1 through 113 of this Complaint, as if fully set forth herein.

424.   Plaintiff Jason Wilkinson brings this Count on behalf of the Ohio State Class.

425.   Ford negligently designed and manufactured the Defective Vehicles.

426.   Ford owed Plaintiff and the other Class members the duty to design and manufacture the Defective Vehicles in such a way as to ensure that they would not contain defective EPAS systems.

427.   Discovery will reveal additional information from Ford regarding the design and manufacturing process to support the conclusion that Ford's design and manufacture of the Defective Vehicles constitutes negligent design and/or manufacturing.

428.   As a direct and proximate result of Ford's negligence, Plaintiff and the other Class members have sustained damages.

## THIRTY-SECOND CAUSE OF ACTION
### Unjust Enrichment
### (Brought on behalf of the Ohio State Class – pled in the alternative to the other causes of action under Ohio law)

429.   Plaintiffs hereby incorporate by reference the allegations contained in Paragraphs 1 through 113 of this Complaint, as if fully set forth herein.

430.   Plaintiff Jason Wilkinson brings this Count on behalf of the Ohio State Class.

431.   Ford had knowledge of the safety defect in the Defective Vehicles, which it failed to disclose to Plaintiffs and the other Class members.

432.   As a result of its wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design defect of their Defective Vehicles and the concealment of

the defect, Ford charged a higher price for the Defective Vehicles than the vehicles' true value and Ford obtained monies that rightfully belong to Plaintiffs and the other Class members.  Ford received a measurable benefit.

433.   Ford accepted and retained the non-gratuitous benefits conferred by Plaintiffs and the other Class members, who without knowledge of the safety defect paid a higher price for Defective Vehicles that actually had lower values.  Plaintiffs and the other Class members did not confer these benefits officiously or gratuitously, and it would be inequitable and unjust for Ford to retain these wrongfully obtained profits.

434.   Plaintiffs and the other Class members are therefore entitled to restitution in an amount to be determined at trial.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the other members of the Nationwide Class and Statewide Classes they seek to represent, respectfully request that the Court enter judgment in their favor and against Defendant, Ford Motor Company, as follows:

(a)   Declaring that this action is a proper class action, certifying the nationwide and Statewide Classes as requested herein, designating Plaintiffs as Nationwide and Statewide Class Representatives and appointing Plaintiffs' attorneys as lead Class Counsel;

(b)   Enjoining Defendant from continuing the unfair business practices alleged in this Complaint and requiring Defendant to institute a recall or free replacement program and/or otherwise repair the Defective Vehicles;

(c)   Ordering Defendant to pay actual damages (including punitive damages) to Plaintiffs and the other Nationwide and Statement Class members to the full extent allowable by law;

(d)   Ordering Defendant to pay attorneys' fees and costs of suit; and

(e)   Ordering such other and further relief as may be just and proper.

1

2                    <u>**DEMAND FOR JURY TRIAL**</u>

3        Plaintiffs request trial by jury on all issues so triable.

4                        Respectfully submitted,

5    Dated:  June 27, 2014              BARON & BUDD, P.C.

6                                       /s/ Mark Pifko

7                               By:     Mark Pifko

8                                       Roland Tellis (SBN 186269)
                                        rtellis@baronbudd.com
9                                       Mark Pifko (SBN 228412)
                                        mpifko@baronbudd.com
10                                      Isaac Miller (SBN 266459)
                                        imiller@baronbudd.com
11                                      **BARON & BUDD, P.C.**
                                        15910 Ventura Boulevard, Suite 1600
12                                      Encino, California  91436
                                        Telephone:  (818) 839-2333
13                                      Facsimile:   (818) 986-9698

14

15                                      Adam J. Levitt (to be admitted *pro hac vice*)
                                        alevitt@gelaw.com
16                                      John E. Tangren (to be admitted *pro hac vice*)
                                        jtangren@gelaw.com
17                                      **GRANT & EISENHOFER P.A.**
                                        30 North LaSalle Street, Suite 1200
18                                      Chicago, Illinois  60602
                                        Telephone:  (312) 214-0000
19                                      Facsimile:   (312) 214-0001

20

21                                      Justin S. Brooks (to be admitted *pro hac vice*)
                                        jbrooks@gelaw.com
22                                      **GRANT & EISENHOFER P.A.**
                                        123 Justison Street
23                                      Wilmington, Delaware 19801
                                        Telephone:  (302) 622-7000
24                                      Facsimile:   (302) 622-7100

25

26

27

28

                                       75
                                   COMPLAINT

Niall A. Paul (to be admitted *pro hac vice*)
npaul@spilmanlaw.com
**SPILMAN THOMAS & BATTLE, PLLC**
300 Kanawha Boulevard, East (25301)
Post Office Box 273
Charleston, West Virginia  25321
Telephone:   (304) 340-3800
Facsimile:   (304) 340-3801

Nathan B. Atkinson (to be admitted *pro hac vice*)
natkinson@spilmanlaw.com
**SPILMAN THOMAS & BATTLE, PLLC**
110 Oakwood Drive, Suite 500
Winston-Salem, North Carolina 27103
Telephone:   (336) 725-4710
Facsimile:   (336) 725-4476

COMPLAINT