1

2

3

4

5

6

7

8                              UNITED STATES DISTRICT COURT

9                             NORTHERN DISTRICT OF CALIFORNIA

10                                      SAN JOSE DIVISION

11

12    WILLIAM PHILIPS, et al.,                    Case No. 14-CV-02989-LHK

13                 Plaintiffs,                    **ORDER DENYING MOTION TO**
                                                  **DISMISS FOR MOOTNESS AND LACK**
14          v.                                    **OF STANDING**

15    FORD MOTOR COMPANY,                         Re: Dkt. No. 84

16                 Defendant.

17

18          Plaintiffs William Philips, Jaime Goodman, and Alison Colburn (collectively, "California

19    Plaintiffs")[1] bring this action against Defendant Ford Motor Company ("Defendant" or "Ford").

20    Before the Court is Ford's motion to dismiss California Plaintiffs' second amended complaint for

21    mootness and lack of standing.  *See* ECF No. 55 ("SAC"); ECF No. 84 ("Mot.").  The Court finds

22    _____

23    [1] In addition to California Plaintiffs, the SAC also includes the same non-California Plaintiffs from
      the First Amended Complaint ("FAC"): Jason Wilkinson, Robert Morris, Victoria Jackson,
24    Johnpaul Fournier, and Ryan and Rebecca Wolf.  *See* SAC ¶¶ 189–219.  Because the FAC
      contained fifty one causes of action, which included nationwide class claims and class claims
25    brought under the laws of six states, the Court decided to proceed by addressing the California
      claims first.  ECF No. 46.  To that end, the parties stipulated that "[a]lthough the SAC may contain
26    both California and non-California claims," any subsequent motions to dismiss "shall address only
      . . . California [Plaintiffs'] claims."  ECF No. 51 at 1.  Accordingly, this Order is limited to the
27    causes of action brought by California Plaintiffs in the SAC.

28                                                    1

this matter suitable for decision without oral argument pursuant to Civil Local Rule 7-1(b) and thus VACATES the motion hearing set for February 25, 2016, at 1:30 p.m.  The case management conference, currently scheduled for February 25, 2016, at 1:30 p.m., remains as set.  Having considered the submissions of the parties, the relevant law, and the record in this case, the Court DENIES Ford's motion to dismiss.

## I.    BACKGROUND

### A.  Factual Background

California Plaintiffs seek to represent a class of statewide consumers who purchased or leased Ford Fusion vehicles, model years 2010 through 2014, or Ford Focus vehicles, model years 2012 through 2014 (collectively, the "Vehicles").[2]  California Plaintiffs allege that these Vehicles[3] are equipped with a defective Electronic Power Assisted Steering ("EPAS") system.  SAC ¶ 1. The following chart summarizes California Plaintiffs' purchasing information:

| Plaintiff | Vehicle | Site of Purchase | Date of Purchase |
|-----------|---------|------------------|------------------|
| William Philips | 2011 Ford Fusion (used) | Salinas Valley Ford | March 2012 |
| Jaime Goodman | 2011 Ford Fusion (new) | Future Ford of Clovis | October 2010 |
| Alison Colburn | 2010 Ford Fusion (new) | Galpin Ford | January 2010 |

*Id.* ¶¶ 32–54.  Power steering systems supplement the torque that the driver must apply to the steering wheel, thus making it easier for the driver to turn the wheel.  *Id.* ¶ 76.  Instead of using a traditional power steering pump, Ford's EPAS system uses a power steering control motor, electronic control unit, torque sensor, and steering wheel position sensor.  *Id.* ¶ 2.  California Plaintiffs allege, however, that Ford's EPAS system suffers from a "systemic defect" that "renders the system prone to sudden and premature failure during ordinary and foreseeable driving situations."  *Id.*  This defect, California Plaintiffs contend, causes drivers of the Vehicles to "experience significantly increased steering effort and an increased risk of losing control of their

---

[2] In addition, the SAC further specifies that the "Vehicles include the following models: 2010–2014 Ford Fusion; 2010–2014 Ford Fusion Hybrid; 2013–2014 Ford Fusion Energi; 2012–2014 Ford Focus; and 2012–2014 Ford Focus Electric."  SAC ¶ 69.
[3] In this Order, the Court uses "Vehicles" only when collectively referring to all vehicles at issue in the SAC.

Case No. 14-CV-02989-LHK
ORDER DENYING MOTION TO DISMISS FOR MOOTNESS AND LACK OF STANDING

United States District Court
Northern District of California

vehicles when the EPAS system fails" and "defaults to manual steering."  *Id.* ¶¶ 3, 101.

In support of these allegations, California Plaintiffs rely upon three categories of evidence: (1) their own experiences with EPAS failure, (2) a National Highway Traffic Safety Administration's ("NHTSA") investigation into the EPAS system of the Ford Explorer, a vehicle not at issue in this action, and (3) complaints to NHTSA by other owners and lessees about power steering failures in the Vehicles.

### 1.  California Plaintiffs' Personal Experience with EPAS Failure

#### i.  Philips

As to the first category of evidence, California Plaintiffs allege that the EPAS system in each of their vehicles has failed.  Specifically, William Philips ("Philips") states that he "reviewed Ford's promotional materials and other information," and that he "would not have purchased his 2011 Ford Fusion, or would not have paid the purchase price charged," if Ford "had disclosed the EPAS system defects and failures."  *Id.* ¶ 34.  Philips also says he experienced "problems with the steering system in his Fusion."  *Id.* ¶ 36.  After lodging multiple complaints with Ford, Philips was informed during a dealership visit in 2013 "that it would cost approximately $2,000 to fix the problem" through an EPAS system replacement.  *Id.*  According to Philips, "Ford offered to pay 50%."  *Id.*  Philips declined to repair his vehicle at that time.  In July 2015, Philips received a notice from Ford alerting him that his "vehicle was subject to a safety recall," and asking Philips to take his vehicle to a dealership for further inspection.  ECF No. 97-5 at 192.  The details of Ford's recall are discussed at greater length below.  After receiving this notice, Philips brought his vehicle in for an inspection, at which time the Ford dealership replaced the EPAS system in Philips' vehicle.

#### ii.  Goodman

Jaime Goodman ("Goodman") claims that, prior to "purchasing her 2011 Ford Fusion," she "(a) viewed television advertisements concerning the vehicles; (b) viewed material concerning the Fusion on Ford's website; (c) reviewed the window sticker on the vehicle she would purchase; and (d) received and reviewed a brochure concerning the Fusion."  SAC ¶ 40.  "The window

United States District Court
Northern District of California

3

sticker," Goodman says, "indicated that the vehicle she would purchase was equipped with power steering." *Id.* "Nowhere in these materials did Ford disclose the EPAS system defects and failures," and had Ford done so, Goodman alleges that she "would not have purchased her 2011 Ford Fusion, or would not have paid the purchase price charged." *Id.* ¶¶ 40–41.  In addition, Goodman claims that in 2014 she "began having intermittent problems with the steering system in her 2011 Ford Fusion and experienced difficulty steering." *Id.* ¶ 43.  "The problems first occurred at low speeds, when the steering would lock up while she was attempting to park." *Id.*

Ultimately, Goodman "took [her] vehicle to a Ford dealership [in December 2014] and was told that it would cost $1,800 to fix the problem with the steering system." *Id.*  As with Philips, the dealership recommended that the EPAS system in Goodman's vehicle be replaced.  Although Goodman contended that her power steering problems were a safety issue, Ford refused to defray the costs of an EPAS system replacement.  ECF No. 94-8 at 47.  Citing financial hardship, Goodman declined to undertake any repairs to her vehicle at that time, and continued to experience problems with her vehicle.

In July 2015, Goodman received "a letter from Ford Motor Company concerning the 2011 Fusion and a recall for the [Fusion's] EPAS [system]." *Id.* at 49.  Pursuant to this letter, Goodman took her vehicle to a Ford dealership in August 2015, with Goodman expecting that Ford would now replace the EPAS system in her vehicle free of charge.  During this August 2015 visit, however, the dealership declined to perform an EPAS system replacement and instead simply reprogrammed the computer in Goodman's vehicle.

In October 2015, Goodman once again experienced problems with her vehicle's power steering.  Specifically, while attempting to pull out of the parking lot at work, Goodman stated that she "could not turn the vehicle" and had to "turn[] [the vehicle] off." *Id.* at 52.  "On November 2, 2015, Ford's counsel contacted Plaintiffs' counsel to inform them that based on a review of the attached service records . . . , it appears that Jaime Goodman is eligible for a steering gear replacement." ECF No. 94-6 at 10.  Goodman thereafter scheduled a service appointment for November 12, 2015.  During this November 12, 2015 appointment, Goodman was met by a Ford

United States District Court
Northern District of California

4

engineer from Detroit, Michigan, sent specifically to inspect Goodman's vehicle, and by a member of Ford's counsel.  "A few hours after dropping off [her] vehicle," however, Goodman "received a call from a service associate . . . and was informed that . . . [her vehicle] was no longer eligible for a free replacement under Ford's recall program."  ECF No. 95-4 at 2.  After "Ford refused to replace [Goodman's] EPAS system on November 12, 2015," Plaintiffs' counsel once again reached out to Ford's counsel.  *Id.* at 3.  On November 24, 2015, Ford finally replaced the EPAS system in Goodman's vehicle.

### iii.  Colburn

Finally, prior to "purchasing her 2010 Ford Fusion," Alison Colburn ("Colburn") claims that, just like Goodman, she "(a) viewed television advertisements concerning the vehicles; (b) viewed material concerning the Fusion on Ford's website; (c) reviewed the window sticker on the vehicle she would purchase; and (d) received and reviewed a brochure concerning the Fusion," and that "[t]he window sticker indicated that the vehicle she would purchase was equipped with power steering."  SAC ¶ 47.  "Nowhere in these materials did Ford disclose the EPAS system defects and failures."  *Id.*  Had Ford done so, Colburn alleges that she "would not have purchased her 2010 Ford Fusion, or would not have paid the purchase price charged."  *Id.* ¶ 48.

### 2.  NHTSA Investigation into the Explorer

As to the second category of evidence, California Plaintiffs emphasize documents produced in connection with NHTSA's Ford Explorer investigation, which began on June 19, 2012.  *Id.* ¶ 83.  In response to NHTSA's request for information, Ford "produced a database containing 1,173 complaints" regarding loss of power steering, nine of which described "incidents that resulted in a crash."  *Id.* ¶ 89.  Ford also produced various internal e-mails which, California Plaintiffs allege, reveal that the Vehicles suffer from the same EPAS system defect as the Explorer and that Ford knew about the defect yet never disclosed it to the public or otherwise took corrective action.  *Id.* ¶¶ 90–98.

### 3.  Complaints to NHTSA Concerning Focus and Fusion Vehicles

As to the third category of evidence, California Plaintiffs provide a litany of testimonials

by other Ford owners complaining to NHTSA about alleged power steering failures in the Vehicles. *Id.* ¶¶ 104–32. The two dozen complaints California Plaintiffs detail in the SAC are, according to California Plaintiffs, a mere sampling of the hundreds of complaints that NHTSA received concerning EPAS failures in the Vehicles. *See id.* ¶ 104. For illustrative purposes, two such complaints are reproduced below.

> On December 11, 2012, a vehicle owner reported a crash in a 2010 Ford Fusion. The Defective Vehicle lost power steering, traction control, and the ability to brake upon entering a freeway on ramp. To stop the vehicle and avoid endangering other drivers, the driver was "forced to crash into the concrete wall barrier on the driver's side of the ramp." The driver and one other individual were injured.

> . . .

> On October 3, 2012, a vehicle owner reported a crash in a 2011 Ford Fusion. The steering wheel seized while the owner was driving at 35 MPH, causing her to crash into a curb. After the initial accident, the steering of the vehicle continued to fail. The vehicle was taken to a Ford dealer three times, and the dealer refused to help her because the failure could not be replicated. The vehicle owner notified Ford but Ford was unwilling to offer assistance.

*Id.* ¶¶ 110, 112. Based on the three categories of evidence outlined above, California Plaintiffs allege that Ford fraudulently concealed the claimed power steering defect. Despite press releases and web-based "promotional materials" touting "EPAS as a reliable and beneficial product," Ford, according to California Plaintiffs, knew as early as 2010 that the EPAS system was "prone to sudden, premature failure," and yet took no remedial action. *Id.* ¶ 11. In May 2011, and again in December 2012, Ford allegedly issued technical service bulletins indicating Ford's awareness of EPAS system failures in the Vehicles. *Id.* ¶¶ 13 (2012 Focus), 19 (2013 Fusion). California Plaintiffs further claim that "Ford concealed the fact that the EPAS system is prone to sudden and premature failure from consumers so that the warranty period on the Defective Vehicles would expire before consumers become aware of the problem." *Id.* ¶ 24. Had Ford disclosed the alleged defect, California Plaintiffs "would not have purchased . . . th[e] vehicles, or would have paid substantially less for the vehicles than they did." *Id.* ¶ 25. Moreover, "Ford's failure to disclose to consumers and the public at large the material fact that the EPAS system is prone to premature failure . . . recklessly risked the safety of occupants of the Defective Vehicles and the public at

6

1    large." *Id.* ¶ 6.

2        **B.  Procedural History**

3            On June 27, 2014, Plaintiffs filed their original complaint in this putative class action.

4    ECF No. 1.  Plaintiffs filed a first amended complaint ("FAC") on September 8, 2014, which

5    contained fifty one causes of action.  ECF No. 15 ("FAC").  On October 24, 2014, Ford moved to

6    dismiss the FAC for failure to state a claim upon which relief could be granted.  ECF No. 22; Fed.

7    R. Civ. P. 12(b)(6).  At a hearing held on February 12, 2015, the Court granted Ford's motion to

8    dismiss the FAC with leave to amend.  ECF No. 46.

9            In light of the unwieldy nature of the FAC, the parties agreed at the February 18, 2015 case

10   management conference to move forward only on the California claims for any subsequent

11   motions to dismiss.  ECF No. 51.  If any of the California claims survived, the parties would

12   continue to litigate those claims to resolution before this Court.  ECF No. 54 at 9.  If, however,

13   none of the California claims survived, then the Court would confer with the parties regarding

14   how to proceed on the non-California claims, with the possibility of transferring this action to a

15   more appropriate jurisdiction.  *Id.*

16           With this understanding in mind, California Plaintiffs filed a second amended complaint

17   ("SAC") on March 27, 2015.  The SAC asserted four causes of action under California law: (1)

18   violation of the unlawful and unfair prongs of California's Unfair Competition Law ("UCL"),

19   SAC ¶¶ 141–49; (2) violation of the fraud prong of the UCL, *id.* ¶¶ 150–59; (3) violation of

20   California's Consumer Legal Remedies Act ("CLRA"), *id.* ¶¶ 160–71; and (4) common law

21   fraudulent concealment, *id.* ¶¶ 172–85.  On April 30, 2015, Ford moved to dismiss the SAC, again

22   arguing that California Plaintiffs had failed to state a claim upon which relief could be granted.

23   ECF No. 58.  On July 7, 2015, the Court granted in part and denied in part Ford's motion to

24   dismiss the SAC.  ECF No. 69.  Specifically, the Court granted with prejudice Ford's motion to

25   dismiss California Plaintiffs' UCL claims and California Plaintiffs' CLRA claim for injunctive

26   relief, and granted with prejudice Ford's motion to dismiss Ian Colburn, Alison Colburn's son, as

27   a named Plaintiff.  *Id.* at 31.  Two claims—the fraudulent concealment claim and the CLRA claim

28

United States District Court
Northern District of California

7

1    for damages—survived Ford's second round motion to dismiss.  *Id.*  Ford filed an answer to the

2    SAC on August 6, 2015.  ECF No. 78.

3          In addition to the various proceedings in the instant action, on October 10, 2014, NHTSA

4    opened a preliminary evaluation into the "loss of power steering assist" as to the 2010–2012

5    Fusion.  ECF No. 84-2 at 2.  In accordance with NHTSA protocol, NHTSA sent Ford a letter

6    requesting information concerning "Ford's assessment of the alleged defect in the subject

7    vehicle."  ECF No. 84-3 at 8.  Ford responded to NHTSA's request on December 19, 2014.  ECF

8    No. 84-4.  In addition, on May 26, 2015, Ford announced a voluntary recall of 2011 and 2012

9    Fusions, ECF No. 84-5.  The terms of the recall are as follows:

   • All owners of 2011 and 2012 Fusions have been notified by mail to take their
     vehicle to a Ford dealership to have the Power Steering Control Module
     ("PSCM") checked for Diagnostic Trouble Codes ("DTCs").

   • If loss of steering assist DTCs are present (indicating that the vehicle has
     experienced a power steering failure), then the EPAS system will be replaced.

   • If no loss of steering assist DTCs are present, then dealers will update the
     PSCM software.  This software update will provide limited steering assist for
     owners who experience power steering problems in the future, and will also
     inform owners to bring their vehicle in for an EPAS system replacement
     should they experience any such steering problems.

   • Fusion owners who have already paid for an EPAS system replacement are
     eligible for reimbursement as long as these owners submit a claim for
     reimbursement prior to December 31, 2015.

*Id.* According to Ford, approximately 422,131 vehicles are subject to the recall.  ECF No. 97-3 at

119.  As of December 9, 2015, approximately 51% of these vehicles have been repaired, with

8,000 vehicles receiving EPAS system replacements.  *Id.* at 121.  Following the announcement of

Ford's recall, NHTSA closed its preliminary evaluation.  ECF No. 84-1 ("Williams Decl.") at 6.

          On October 28, 2015, Ford filed the instant motion to dismiss.  In this motion, Ford argues

that the Court should dismiss this action because the recall provides California Plaintiffs the relief

they seek under the prudential mootness and primary jurisdiction doctrines, and because California

8

Plaintiffs do not have standing to pursue their claims as to the 2012–2014 Focus and 2013–2014 Fusion.  California Plaintiffs filed an opposition on December 17, 2015, ECF No. 94-6 ("Opp'n"), and Ford filed a reply on January 14, 2016, ECF No. 97 ("Reply").

## II.     LEGAL STANDARD

### A.  Prudential Mootness

"Two varieties of mootness exist: Article III mootness and prudential mootness." *Ali v. Cangemi*, 419 F.3d 722, 723 (8th Cir. 2005) (en banc).  "Article III mootness arises from the Constitution's case and controversy requirement: Article III of the United States Constitution limits the jurisdiction of the federal courts to actual, ongoing cases and controversies." *Id.* (internal quotation marks omitted).  "On the other hand, prudential mootness, the cousin of the mootness doctrine, in its strict Article III sense, is a mélange of doctrines relating to the court's discretion in matters of remedy and judicial administration." *Id.* at 724 (internal quotation marks and alteration omitted).

"Even if a case is not constitutionally moot, a court may dismiss a case under the prudential-mootness doctrine if the case is so attenuated that considerations of prudence and comity for coordinate branches of government counsel the court to stay its hand, and to withhold relief it has the *power* to grant." *Jordan v. Sosa*, 654 F.3d 1012, 1024 (10th Cir. 2011) (internal quotation marks and alteration omitted).  "Prudential mootness . . . addresses not the *power* to grant relief, but the court's *discretion* in the exercise of that power." *Id.* (internal quotation marks and alteration omitted).  "In general, the prudential mootness doctrine only applies where . . . a plaintiff seeks injunctive or declaratory relief." *Id.*; *cf. S. Utah Wilderness All. v. Smith*, 110 F.3d 724, 727 (10th Cir. 1997) ("We have expressly recognized the doctrine of prudential mootness, and have stated that it has particular applicability in cases . . . where the relief sought is an injunction against the government.").

### B.  Primary Jurisdiction

"The primary jurisdiction doctrine allows courts to stay proceedings or to dismiss a complaint without prejudice pending the resolution of an issue within the special competence of

9

Case No. 14-CV-02989-LHK
ORDER DENYING MOTION TO DISMISS FOR MOOTNESS AND LACK OF STANDING

an administrative agency." *Clark v. Time Warner Cable*, 523 F.3d 1110, 1114 (9th Cir. 2008). "Primary jurisdiction applies in a limited set of circumstances." *Id.* "[T]he doctrine is not designed to secure expert advice from agencies every time a court is presented with an issue conceivably within the agency's ambit." *Id.* (internal quotation marks omitted). "Instead, it is to be used only if a claim requires resolution of an issue of first impression, or of a particularly complicated issue that Congress has committed to a regulatory agency and if protection of the integrity of a regulatory scheme dictates preliminary resort to the agency which administers the scheme." *Id.* (internal quotation marks and citation omitted).

Although "no fixed formula exists for applying the doctrine of primary jurisdiction," courts in the Ninth Circuit traditionally exercise primary jurisdiction "where there is (1) the need to resolve an issue that (2) has been placed by Congress within the jurisdiction of an administrative body having regulatory authority (3) pursuant to a statute that subjects an industry or activity to a comprehensive regulatory scheme that (4) requires expertise or uniformity in administration." *Davel Commc'ns, Inc. v. Qwest Corp.*, 460 F.3d 1075, 1086–87 (9th Cir. 2006) (internal quotation marks and alteration omitted).

## C. Standing

A defendant may move to dismiss an action for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). "A Rule 12(b)(1) jurisdictional attack may be facial or factual." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." *Id.* The Court "resolves a facial attack as it would a motion to dismiss under Rule 12(b)(6): [after] [a]ccepting the plaintiff's allegations as true and drawing all reasonable inferences in the plaintiff's favor, the court determines whether the allegations are sufficient as a legal matter to invoke the court's jurisdiction." *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014).

"[I]n a factual attack," on the other hand, "the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Safe Air for*

Case No. 14-CV-02989-LHK
ORDER DENYING MOTION TO DISMISS FOR MOOTNESS AND LACK OF STANDING

1    *Everyone*, 373 F.3d at 1039.  "In resolving a factual attack on jurisdiction," the Court "may review

2    evidence beyond the complaint without converting the motion to dismiss into a motion for

3    summary judgment."  *Id.*  The Court "need not presume the truthfulness of the plaintiff's

4    allegations" in deciding a factual attack.  *Id.*  However, "a jurisdictional finding of genuinely

5    disputed facts is inappropriate when the jurisdictional issue and substantive issues are so

6    intertwined that the question of jurisdiction is dependent on the resolution of factual issues going

7    to the merits of an action."  *Id.* (internal quotation marks and alteration omitted).

8    **III.    DISCUSSION**

9    **A.  Prudential Mootness**

10       On the issue of prudential mootness, Ford argues that "the recall provides an adequate

11   remedy for owners of the 2011–12 Fusion[]" because the recall "offers free repairs or an extended

12   warranty, and an update to the vehicles' software."  Mot. at 2.  In addition, the recall "reimburse[s]

13   owners who paid for covered repairs before the recall began."  *Id.*  Under these conditions, Ford

14   contends that continued litigation would be "unnecessary and wasteful."  *Id.* at 12.

15       The Court disagrees because (1) California Plaintiffs request for relief exceeds the scope of

16   relief provided under the recall, and (2) California Plaintiffs have established a cognizable danger

17   that the recall may fail to provide the relief promised.  The Court elaborates upon these reasons

18   below.

19       **1.  Request for Relief Exceeds Scope of Recall**

20       First, because prudential mootness is an equitable doctrine, courts have held that the

21   doctrine should apply only to "claims for equitable relief" which "appeal to the remedial discretion

22   of the courts."  *Winzler v. Toyota Motor Sales U.S.A., Inc.*, 681 F.3d 1208, 1210 (10th Cir. 2012).

23   In accordance with this principle, most courts have held that prudential mootness applies only

24   where "a plaintiff seeks injunctive or declaratory relief."  *Jordan*, 654 F.3d at 1024.  Here,

25   however, California Plaintiffs seek injunctive relief, declaratory relief, and damages.  With respect

26   to California Plaintiffs' fraudulent concealment claim, for instance, California Plaintiffs request

27   recovery for "the cost of repairing or replacing the EPAS system in their vehicles" and "the

28

11

Case No. 14-CV-02989-LHK
ORDER DENYING MOTION TO DISMISS FOR MOOTNESS AND LACK OF STANDING

1    diminished value of their Defective Vehicles[] as a result of the [alleged] defects." SAC ¶ 184.

2    This request for damages thus conflicts with the general understanding that prudential mootness

3    should apply only to situations where the parties request equitable relief.

4           In response to this particular point, Ford argues that the recall does, in fact, reimburse 2011

5    and 2012 Fusion owners who decided to replace their EPAS systems prior to the recall.  Per Ford,

6    $1.7 million in refunds have already been paid to 1,359 Fusion owners.  Reply at 9.  As such, this

7    provision provides California Plaintiffs with the monetary relief that they seek.

8           There are two flaws with this argument.  First, as Ford acknowledges, the recall reimburses

9    only owners who sought reimbursement prior to December 31, 2015.  The recall does not

10   reimburse those who did not file a claim or who filed a claim after December 31, 2015.

11   Successful prosecution of this action, however, could result in reimbursement to all owners who

12   paid for an EPAS system replacement out of pocket without regard to this December 31, 2015

13   deadline.  This represents a significant difference between the relief that the recall provides

14   (reimbursement for individuals filing before a particular deadline) and the relief that successful

15   prosecution of this lawsuit could provide (reimbursement for all individuals who paid for an EPAS

16   system replacement).

17          Second, California Plaintiffs seek recovery for both "the cost of repairing or replacing the

18   EPAS system in their vehicles" *and* for the loss in "value of their . . . Vehicles[] as a result of the

19   [alleged] defects." SAC ¶ 184.  Although the recall reimburses Fusion owners for EPAS-related

20   repairs, the recall says nothing about reimbursing owners for losses in market value.  Thus,

21   California Plaintiffs seek a form of monetary recovery that the recall simply does not provide.

22          Both of these points lead towards the same conclusion: the relief that California Plaintiffs

23   seek and the relief that Ford has provided under the recall are not one and the same.  If California

24   Plaintiffs are successful in litigating this action, Ford could be required to (1) provide

25   reimbursement without regard to a particular filing deadline, and (2) provide recovery to owners

26   for losses in market value.  Under the recall, Ford is not required to provide either type of

27   recovery.  In these circumstances, application of the prudential mootness doctrine is not warranted.

28

United States District Court
Northern District of California

Case No. 14-CV-02989-LHK
ORDER DENYING MOTION TO DISMISS FOR MOOTNESS AND LACK OF STANDING

1 Case law supports this determination.  In *Verde v. Stoneridge, Inc.*, 2015 WL 5915262, *4

2 (E.D. Tex. Sept. 23, 2015), for instance, the district court declined to apply the prudential

3 mootness doctrine even though defendants had announced that they would voluntarily undertake a

4 NHTSA-supervised recall.  As the district court explained, "an incomplete offer that does not meet

5 plaintiff's full demand does not render claims moot."  *Id.*  Specifically, in *Verde*, plaintiff sought

6 "relief such as the diminished value of the vehicle, incidental damages, and replacement of the

7 entire clutch hydraulic assembly."  *Id.* at *5.  Defendants' recall, however, did not provide for

8 such relief.  *Id.*  As a result, "because [plaintiff] seeks recovery that exceeds what [defendants]

9 offer[]," the district court found that plaintiff's claims were not prudentially moot.

10 Similarly, in *Sater v. Chrysler Group LLC*, No. 14-CV-0700 (C.D. Cal.), defendant also

11 undertook a NHTSA-supervised recall and also requested that the district court find plaintiff's

12 claims prudentially moot.  However, as the district court observed, "the class in this case is suing

13 on theories related to deceptive business practices, lost use of the Class Vehicles caused by the

14 defect, and diminished resale value due not to a defective part but negative publicity about the

15 Class Vehicles."  ECF No. 60 at 10.  Although "ordering [defendant] to replace the [defective

16 parts] would duplicate the NHTSA-supervised recall," "holding [defendant] accountable for the

17 other alleged injuries affords relief the recall does not provide."  *Id.* at 11.  Accordingly, the *Sater*

18 court declined to find plaintiff's claims prudentially moot.

19 Finally, looking outside the NHTSA context, the Court finds instructive the Tenth Circuit's

20 decision in *Building and Construction Department v. Rockwell International Corp.*, 7 F.3d 1487

21 (10th Cir. 1993).  In *Rockwell*, plaintiffs sought "establishment of a court supervised fund to

22 finance a program of medical monitoring for" workers exposed "to unsafe levels of radioactive

23 and non-radioactive hazardous substances."  *Id.* at 1490.  After Congress passed legislation

24 directing the U.S. Department of Energy "to establish a medical monitoring program" for certain

25 workers "at increased health risk due to exposure to hazardous or radioactive substances," the

26 *Rockwell* defendants moved to dismiss the suit under prudential mootness.  *Id.* at 1491.  The Tenth

27 Circuit rejected this argument.  As the court observed, "[a]ll the cases in which the prudential

United States District Court
Northern District of California

United States District Court
Northern District of California

1  mootness concept has been applied have involved a request for prospective equitable relief by

2  declaratory judgment or injunction." *Id.* at 1492.  "Obviously, the suit at issue here is very

3  different from those in which prudential mootness has been applied." *Id.*  "It is essentially a suit

4  for damages against private defendants as a remedy for past misconduct." *Id.*  "Thus, the doctrine

5  of prudential mootness does not apply [to plaintiffs' claims]." *Id.*

6      As in *Verde*, *Sater*, and *Rockwell*, California Plaintiffs here request relief—damages for

7  losses in market value and reimbursement without regard to a specific deadline—that Ford's recall

8  does not provide.  Consistent with these decisions, the Court finds that the instant action is not

9  prudentially moot.

10      Neither *Winzler v. Toyota Motor Sales U.S.A.* nor *Cheng v. BMW of North America, LLC*,

11  2013 WL 3940815 (C.D. Cal. July 26, 2013), two cases that Ford discusses at length in its motion,

12  compel a different finding.  In *Winzler*, plaintiff sought only injunctive relief; plaintiff did not seek

13  damages.  681 F.3d at 1209–10.  In finding that Toyota's voluntary recall rendered plaintiff's

14  claims prudentially moot, the Tenth Circuit emphasized the remedial nature of plaintiff's suit.

15  *See, e.g.*, *id.* at 1210 ("[O]nce the plaintiff has a remedial promise from a coordinate branch in

16  hand, we will generally decline to add the promise of a judicial remedy to the heap.").  As the

17  court observed, because plaintiff sought only injunctive relief, "Congress and the Executive have,"

18  via NHTSA, "committed to ensure Ms. Winzler precisely the relief she seeks."  *Id.* at 1211.

19      Similarly, in *Cheng*, plaintiff "d[id] not pray for any monetary damages as a result of

20  Defendants' violations of the CLRA" in plaintiff's complaint.  2013 WL 3940815, *4 (alteration

21  omitted).[4]  Thus, as in *Winzler*, plaintiff's suit in *Cheng* was limited to a request for equitable

22

23

24  [4] With respect to the issue of damages, the *Cheng* court did note that "it is unclear how [p]laintiff
    can demonstrate [such] injury in light of BMW's offer to completely repair the roll away defect."

25  2013 WL 3940815, *4.  The Court finds this statement unpersuasive.  As the Court has noted,
    plaintiff in *Cheng* did not request damages in the complaint.  Thus, any statements regarding how

26  the *Cheng* court would have resolved the issue of damages is dicta.  In addition, California
    Plaintiffs have argued that the various defects at issue here render the EPAS System prone to

27  failure.  California Plaintiffs further argue that such conditions "vitiate[] the [market] value of the
    Defective Vehicles."  SAC ¶ 80.  California Plaintiffs have thus connected the EPAS defects at
    issue to a resulting economic injury, the loss in market value of their vehicles.

28
                                                 14
   Case No. 14-CV-02989-LHK
   ORDER DENYING MOTION TO DISMISS FOR MOOTNESS AND LACK OF STANDING

relief and not for damages.

The circumstances in *Winzler* and in *Cheng* differ materially from the circumstances in this case. Here, California Plaintiffs seek recovery for losses in market value, which were not at issue in either *Winzler* or in *Cheng*. Likewise, depending on the outcome of this suit, California Plaintiffs may be able to recover repair costs for all class members without regard to a particular deadline.

The remaining cases Ford relies upon—*Hadley v. Chrysler Group LLC*, 2014 WL 988962 (E.D. Mich. Mar. 13, 2014), *In re Aqua Dots Products Liability Litigation*, 270 F.R.D. 377 (N.D. Ill. 2010), and *In re ConAgra Peanut Butter Products Liability Litigation*, 251 F.R.D. 689 (N.D. Ga. 2008)—are equally unavailing. In *Hadley*, defendants sent recall notices to vehicle owners in January 2013. This notice alerted owners that defendants would repair an airbag defect free of charge. Because of a variety of issues, however, defendants failed to obtain replacement parts in a timely manner. Plaintiffs thereafter filed suit in August 2013, seven months after the announcement of the recall. In plaintiffs' complaint, plaintiffs essentially requested that defendants "fulfill [their] . . . promise to provide [plaintiffs] a free vehicle repair." 2014 WL 988962, *4 (internal quotation marks omitted). The *Hadley* court dismissed plaintiffs' complaint on the basis of Article III standing. *Id.* at *7. Notably, in deciding to grant defendants' motion to dismiss, the district court did not discuss or examine the prudential mootness doctrine.

The procedural posture and the relief sought in *Hadley* differs significantly from the procedural posture and the relief sought here. In *Hadley*, defendants announced a recall *prior* to the commencement of any litigation. The *Hadley* plaintiffs then brought suit because defendants had failed to implement this recall in a timely manner. The *Hadley* plaintiffs did not seek relief beyond the scope of the recall: instead, the *Hadley* plaintiffs requested only that defendants implement the recall as defendants had initially promised to do. On the other hand, in the instant case, California Plaintiffs brought suit nearly a full year prior to Ford's decision to implement a voluntary recall. More importantly, unlike the *Hadley* plaintiffs, California Plaintiffs request relief which goes above and beyond the relief provided by Ford under Ford's recall.

15

Case No. 14-CV-02989-LHK
ORDER DENYING MOTION TO DISMISS FOR MOOTNESS AND LACK OF STANDING

1    *In re Aqua Dots* and *In re ConAgra* are similarly distinguishable.  In both cases, the district

2    court determined that a class action would not be superior to the relief that defendants had already

3    offered to putative class members: "a [full] refund—without needless judicial intervention,

4    lawyer's fees, or delay."  270 F.R.D. at 385; 251 F.R.D. at 699.  The *In re Aqua Dots* and *In re*

5    *ConAgra* courts did not discuss or examine prudential mootness, and focused instead entirely on

6    whether the case should proceed as a class action pursuant to Federal Rule of Civil Procedure

7    23(b)(3).  Fed. R. Civ. P. 23(b)(3) (class action must be "superior to other available methods for

8    fairly and efficiently adjudicating the controversy.").  In order to reach this decision, both courts

9    examined case law and authority specific to Rule 23(b)(3) class certification.  Because the instant

10   action has not yet reached the class certification stage, neither *In re Aqua Dots* nor *In re ConAgra*

11   is of much help to Ford at this point in litigation, and the Court does not rely upon either case in

12   deciding whether to apply the prudential mootness doctrine.

13        Thus, to summarize, none of the cases cited by Ford compel a finding of prudential

14   mootness here.  The Court therefore does not rely upon these cases and instead finds, consistent

15   with *Verde*, *Sater*, and *Rockwell*, that the instant action is not prudentially moot.

16        **2.  Cognizable Danger**

17        In addition to the issue of damages, California Plaintiffs have also established a

18   "cognizable danger" that the Ford recall "will fail."  *Winzler*, 681 F.3d at 1211–12.  As the Tenth

19   Circuit explained in *Winzler*, "[i]f the party seeking relief can show that there exists some . . .

20   cognizable danger that the coordinate branch will fail and she will be left without a complete

21   remedy, we will continue with the case even in the face of a simultaneous remedial commitment

22   from another branch."  *Id.* at 1211–12 (internal quotation marks omitted).  "To carry the burden of

23   showing a cognizable danger of failure," a "plaintiff must identify something more than the mere

24   possibility of failure."  *Id.* at 1212 (internal quotation marks omitted).  The "'cognizable danger'

25   standard," however, should represent "a relatively modest hurdle."  *Id.*

26        Here, there is a cognizable danger that Ford's recall will not be implemented in an efficient

27   and effective manner.  As noted above, Goodman brought her Fusion to a Ford dealership on at

28

16

United States District Court
Northern District of California

least four different occasions: December 4, 2014; August 3, 2015; November 12, 2015; and

November 24, 2015.  Prior to her August 3, 2015 visit, Goodman had received notice from Ford

regarding the recall and understood that, under the terms of Ford's recall, her vehicle was eligible

for an EPAS system replacement.  Nonetheless, the Ford dealership refused to replace the EPAS

system in Goodman's vehicle on August 3, 2015.  After again receiving confirmation—this time

directly from Ford's counsel—that her Fusion was eligible for an EPAS system replacement,

Goodman brought her Fusion to another Ford dealership on November 12, 2015.  During this visit,

Goodman was met by a Ford engineer sent from Ford and by a member of Ford's counsel.  At the

end of Goodman's visit, Ford once again refused to replace Goodman's EPAS system.

Goodman's EPAS system was not replaced until a subsequent dealership visit on November 24,

2015.

In response to this string of incidents, Ford acknowledges that "the dealership should have

conducted the steering gear replacement" on either August 3, 2015 or on November 12, 2015.

ECF No. 92 at 5.  Ford, however, contends that "[d]ealerships are independent businesses, and it is

unclear why the dealership declined to replace the steering gear."  *Id.*  A single dealership

misunderstanding, though, "hardly undermines the recall program as a whole."  *Id.* (internal

quotation marks omitted).

Such arguments lack merit.  Ford repeatedly promised to replace the EPAS system in

Goodman's vehicle.  Ford repeatedly failed to deliver upon this promise.  Indeed, the Court

observes (1) that Goodman is a named Plaintiff in this action, (2) that Ford's counsel specifically

notified Goodman that her vehicle was eligible for an EPAS system replacement, (3) that a

member of Ford's counsel was in fact on site during Goodman's November 12, 2015 visit, and (4)

that Ford *still* refused to conduct an EPAS system replacement on November 12, 2015.  It is

possible that other putative class members experienced similar treatment and that such treatment

discouraged individuals from obtaining the relief promised under the recall.  In other words, it is

impossible to tell whether Goodman's experience is unique (as Ford contends) or whether Ford's

inability to effectively implement the recall might have contributed to only 51% of eligible

Case No. 14-CV-02989-LHK
ORDER DENYING MOTION TO DISMISS FOR MOOTNESS AND LACK OF STANDING

United States District Court
Northern District of California

United States District Court
Northern District of California

1  vehicles being repaired as of December 9, 2015.

2        The *Winzler* court appeared to have this particular scenario in mind when discussing the

3  "cognizable danger" standard.  As the Tenth Circuit remarked, "if a plaintiff can show that the

4  remedial mechanisms selected by a coordinate branch aren't just different but that those

5  differences present a cognizable, a perceptible, a recognizable danger they will lead our coordinate

6  branch to fail to achieve its stated objectives, we can and will proceed with the case."  681 F.3d at

7  1214–15.  In addition, if a plaintiff can establish more than a "conjectural" possibility of failure,

8  then the court should decline to find an action prudentially moot.  *Id.* at 1215.  Based on Ford's

9  handling of Goodman's EPAS system replacement, California Plaintiffs have made this showing.

10        To summarize, California Plaintiffs request relief beyond the scope of Ford's recall.  In

11  addition, California Plaintiffs have demonstrated a cognizable danger that the recall process may

12  fail to provide the relief promised.  Under these circumstances, the prudential mootness doctrine

13  does not apply to the instant case.  Ford's motion to dismiss this action as prudentially moot is

14  therefore DENIED.

15      **B.  Primary Jurisdiction**

16        Ford also contends that the Court should, in its discretion, "decline to exercise jurisdiction

17  over the 2011–12 Fusion claims in deference to NHTSA's supervision of the recall, as authorized

18  by the doctrine of primary jurisdiction."  Mot. at 12.  "[I]n considering the issue" of primary

19  jurisdiction, courts have traditionally examined factors such as "(1) the need to resolve an issue

20  that (2) has been placed by Congress within the jurisdiction of an administrative body having

21  regulatory authority (3) pursuant to a statute that subjects an industry or activity to a

22  comprehensive regulatory authority that (4) requires expertise or uniformity in administration."

23  *Davel Commc'ns*, 460 F.3d at 1086–87.  Considered together, these factors counsel against

24  application of the primary jurisdiction doctrine to the instant case.

25      **1.  Need to Resolve an Issue Within Jurisdiction of an Administrative Body**

26        As to the first two factors—the need to resolve an issue that has been placed by Congress

27  within the jurisdiction of an administrative body—the Court emphasizes that Ford's recall does

28   

Case No. 14-CV-02989-LHK
ORDER DENYING MOTION TO DISMISS FOR MOOTNESS AND LACK OF STANDING

1    not provide California Plaintiffs with all of the relief that they seek.  Indeed, even if the Court

2    were to allow Ford's NHTSA-supervised recall to run its course, the Court would still need to

3    determine whether California Plaintiffs could recover for losses in market value to their vehicles.

4        The Seventh Circuit addressed an analogous situation in *Ryan v. Chemlawn Corp.*, 935

5    F.2d 129, 131 (7th Cir. 1991), where plaintiff sought both injunctive relief and damages.

6    Although the Seventh Circuit determined that an EPA-supervised program would provide plaintiff

7    with the injunctive relief which plaintiff had requested, the EPA program could not "provide . . .

8    plaintiff with any form of compensatory or punitive damages."  *Id.*  Under such circumstances, the

9    Seventh Circuit declined to apply the primary jurisdiction doctrine.  *Id.* at 132.  In like manner, the

10   fact that California Plaintiffs seek recovery which the recall does not provide weighs against

11   application of the primary jurisdiction doctrine here.

12       **2.  Comprehensive Regulatory Authority**

13       Second, as to whether California Plaintiffs' claims are governed by a comprehensive

14   regulatory authority, Ford concedes that "a number of courts have refused to apply primary

15   jurisdiction in automotive cases."  Mot. at 14.  Ford specifically cites cases from the Northern

16   District of California, the Central District of California, the District of New Jersey, the Eastern

17   District of Pennsylvania, and the Southern District of West Virginia as examples where courts

18   have decided not to defer to NHTSA under the primary jurisdiction doctrine.  *Id.*

19       Indeed, unlike some federal agencies, which may be charged with the administration of a

20   particular law, *see Clark*, 523 F.3d at 1115 (holding that FCC is charged with administering

21   Federal Communications Act), there is little authority to suggest that Congress intended for

22   NHTSA to have exclusive authority over automobile safety.  *See, e.g.*, *Marsikian v. Mercedes*

23   *Benz USA, LLC*, 2009 WL 8379784, *9 (C.D. Cal. May 4, 2009) ("Defendant cites no cases from

24   federal or California courts that analyze the applicability of the primary jurisdiction doctrine in a

25   case involving automobile safety, much less cases that hold that . . . NHTSA does have primary

26   jurisdiction."); *Kent v. DaimlerChrysler Corp.*, 200 F. Supp. 2d 1208, 1218 (N.D. Cal. 2002)

27   ("[T]he Court does not find that exercise of the doctrine of primary jurisdiction is necessary at this

28

United States District Court
Northern District of California

19

1   stage of the case, either to ensure uniformity of regulation or because NHTSA is better-equipped

2   than the Court to address the issues raised by [p]laintiffs' claims.").

3          Nonetheless, Ford points to several automobile-defect cases where courts purportedly

4   dismissed claims based on primary jurisdiction.  *See* Mot. at 13.  None of these cases are on point.

5   In *Chin v. Chrysler Corp.*, 182 F.R.D. 448 (D.N.J. 1998), and *Ford Motor Co. v. Magill*, 698

6   So.2d 1244 (Fla. Dist. Ct. App. 1997), the court did not even discuss primary jurisdiction.  Instead,

7   the *Chin* court found class certification inappropriate because plaintiffs had failed to demonstrate

8   superiority, as required under Federal Rule of Civil Procedure 23(b)(3).  182 F.R.D. at 462–65.

9   Similarly, in *Magill*, the Florida District Court of Appeal de-certified a class upon determining

10  that certification was no longer appropriate as a matter of Florida law.  698 So.2d at 1245.  As the

11  Court has made clear, California Plaintiffs have not yet filed a motion for class certification, and

12  the Court will not consider class certification issues until California Plaintiffs do so.  *See, e.g.*,

13  *Bussian v. DaimlerChrysler Corp.*, 411 F. Supp. 2d 614, 629 (M.D.N.C. 2006) (referring to *Chin*

14  and *Magill* and stating that class certification cases do "not address the issue of primary

15  jurisdiction and are of very little assistance to the Court at this stage in the proceedings.").

16         In both *Solarz v. DaimlerChrysler Corp.*, 2002 WL 452218 (Pa. Com. Pl. Mar. 13, 2002),

17  and *Coker v. DaimlerChrysler Corp.*, 2004 WL 32676 (N.C. Super. Jan. 5, 2004), the court

18  determined that a NHTSA-supervised recall would provide the very relief sought by plaintiffs.

19  *See Solarz*, 2002 WL 452218, *4 ("[T]o avoid entanglement with . . . NHTSA, this court will not

20  compel DaimlerChrysler to install park brake interlocks."); *Coker*, 2004 WL 32676, *5 ("If a

21  design defect does in fact exist, the agency has the resources to . . . order a recall to retrofit the

22  minivans.  The Court must refrain from entering injunctive relief.").  Here, on the other hand,

23  California Plaintiffs' request for relief exceeds the scope of relief provided under Ford's recall.

24  Likewise, in *Silvas v. General Motors, LLC*, 2014 WL 1572590, *3 (S.D. Tex. Apr. 17, 2014),

25  plaintiffs moved for an injunction which, if granted, would have required defendant to take actions

26  in "conflict[] with" defendant's NHTSA-supervised recall.  There is no such conflict here.  Ford

27  could readily comply with both the terms of its recall (replacing the EPAS systems) *and* provide

28

United States District Court
Northern District of California

20

Case No. 14-CV-02989-LHK
ORDER DENYING MOTION TO DISMISS FOR MOOTNESS AND LACK OF STANDING

1    California Plaintiffs with the additional relief that California Plaintiffs seek (damages for losses in

2    market value).

3           Lastly, Ford's reliance on *Bussian v. DaimlerChrysler Corp.*, 11 F. Supp. 2d 614

4    (M.D.N.C. 2006), is misplaced.  In *Bussian*, plaintiff brought suit against defendants because of an

5    alleged safety defect in 1998–2003 Dodge Durangos.  During the course of the *Bussian* litigation,

6    NHTSA conducted an investigation into 1998–2003 Durangos and "conclud[ed] that a safety

7    defect in fact exist[ed] with regard to 2000–2003 four-wheel drive Durangos."  411 F. Supp. 2d at

8    628.  Accordingly, defendants agreed to replace all defective parts in all 2000–2003 four-wheel

9    drive Durangos.  NHTSA did not find a safety defect "[w]ith regard to 2000–2003 two-wheel

10   drive Durangos and all 1998–1999 Durangos," and defendants did not take any action as to these

11   vehicles.  *Id.* at 628–29.  Based on the facts above, the *Bussian* court concluded that "the

12   prospective class . . . could not . . . include present owners and lessees of 2000 to 2003 model year,

13   four-wheel drive Dodge Durangos."  *Id.* at 628.

14          The facts in the instant case differ materially from those in *Bussian*.  In *Bussian*, NHTSA

15   undertook a full investigation and made a number of formal findings regarding the safety of 2000–

16   2003 four-wheel drive Durangos.  Pursuant to these findings, defendants agreed to replace the

17   defective parts in every 2000–2003 four-wheel drive Durango.

18          Here, on the other hand, NHTSA requested information from Ford regarding the 2010–

19   2012 Fusion.  Shortly after providing NHTSA with this information, Ford announced plans to

20   undertake a voluntary recall.  On the heels of Ford's announcement, NHTSA closed its

21   preliminary evaluation and did not collect any additional information from Ford.  Thus, unlike

22   what took place in *Bussian*, NHTSA did not undertake a full investigation, did not independently

23   examine Ford's data, and did not issue any formal findings.

24          In addition, unlike defendants in *Bussian*, Ford has not agreed to replace the allegedly

25   defective part in every 2011–2012 Fusion.  Instead, an EPAS system is replaced *only* if the

26   owner's vehicle reports a particular Diagnostic Trouble Code.  In all other instances, Ford simply

27   updates the vehicle's software and requests that the owner bring the vehicle back to the dealership

28
                                                        21

1    should the owner experience power steering issues in the future.  By all indications, the recall is a

2    product of Ford's own design.  Ford has submitted no evidence that it discussed, consulted, or

3    negotiated with NHTSA over any of the recall's terms.  Moreover, Ford has provided no evidence

4    regarding whether NHTSA has found the recall—both as designed and as implemented—to be

5    effective in addressing the problems identified by California Plaintiffs.

6         When presented with a similar set of facts in *In re Toyota Motor Corp. Hybrid Brake*

7    *Marketing, Sales, Practices and Products Liability Litigation*, 890 F. Supp. 2d 1210 (C.D. Cal.

8    2011), the *In re Toyota* court found *Bussian* distinguishable.  In particular, the *In re Toyota* court

9    emphasized that "here, in contrast to *Bussian*, there has been no [NHTSA] finding of the efficacy

10   of the software update for the Class Vehicles, and Plaintiffs take fundamental issue with whether

11   the software update remedied the braking defect."  *Id.* at 1224.  Moreover, it is not "evident from

12   the face of Toyota's quarterly reports to . . . NHTSA that [NHTSA] has inquired into the

13   effectiveness of [Toyota's] software update."  *Id.*  Under such circumstances, the *In re Toyota*

14   court declined to apply the primary jurisdiction doctrine to plaintiff's claims.

15        In sum, given the fact that NHTSA did not complete a full investigation and did not make

16   any formal findings in this case, and given the fact that Ford designed its recall without input or

17   evaluation from NHTSA, the Court declines to follow *Bussian*.  Instead, consistent with *In re*

18   *Toyota*, the Court finds that it would be inappropriate to defer to NHTSA in the instant case.

19        **3.  Uniformity of Administration**

20        As a final matter, with respect to the uniformity of administration, Plaintiffs seek

21   certification of a nationwide class and sub-classes in California, Ohio, Michigan, Georgia, Illinois,

22   and Arizona of all Vehicle owners.  SAC ¶¶ 226–27.  Thus, if Plaintiffs are successful in the

23   prosecution of this action, Ford will be required to provide relief to all Vehicle owners on a

24   nationwide and statewide basis.  Accordingly, allowing this action to proceed would not

25   jeopardize the uniformity of administration of relief to Plaintiffs or putative class members.

26        In sum, based on the factors discussed above, the primary jurisdiction doctrine does not

27   apply to the instant case.  Accordingly, Ford's motion to dismiss this action under the primary

28

Case No. 14-CV-02989-LHK
ORDER DENYING MOTION TO DISMISS FOR MOOTNESS AND LACK OF STANDING

United States District Court
Northern District of California

1    jurisdiction doctrine is DENIED.

2       **C.  Standing**

3           Finally, Ford acknowledges that California Plaintiffs have standing to bring their claims as

4    to the 2010–2012 Fusion.  Ford, however, argues (1) that none of the California Plaintiffs

5    purchased a 2012–2014 Focus or 2013–2014 Fusion, and (2) that the 2012–2014 Focus and 2013–

6    2014 Fusion are not substantially similar to the 2010–2012 Fusion.  Accordingly, Ford argues that

7    California Plaintiffs do not have standing to bring their claims as to the 2012–2014 Focus and

8    2013–2014 Fusion.

9           Ford made this same argument in its previous motion to dismiss the SAC as a facial attack.

10   *See Safe Air for Everyone*, 373 F.3d at 1039 ("In a facial attack, the challenger asserts that the

11   allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction.").

12   The Court found Ford's argument unavailing.  As the Court explained, "a plaintiff may have

13   standing to assert claims for unnamed class members based on products he or she did not purchase

14   so long as the products and alleged misrepresentations are *substantially similar*."  ECF No. 69 at

15   12.  "In this particular case, the Court finds that California Plaintiffs have adequately alleged that

16   the supposedly defective EPAS system is substantially similar across the Vehicles."  *Id.*

17          In reaching this determination, the Court relied upon "internal communications between

18   Ford employees where the power steering systems in different vehicles were commonly referred to

19   as 'the EPAS,' without any indication that the EPAS system varied across vehicles."  *Id.*  In

20   addition, the Court observed that, in the SAC, "California Plaintiffs allege repeatedly that the

21   EPAS systems in all the vehicles are 'uniform,' and that the steering defect manifested in similar

22   manners across different models of vehicles."  *Id.* (citations omitted).  Because Ford had asserted

23   its standing argument as a facial attack, the Court was required to "[a]ccept[] [California

24   Plaintiffs'] allegations as true and draw[] all reasonable inferences in [California Plaintiffs']

25   favor."  *Leite*, 749 F.3d at 1121.  Accordingly, the Court denied Ford's motion to dismiss

26   California Plaintiffs' claims as to the 2012–14 Focus and the 2013–2014 Fusion.

27          Ford has renewed its standing argument in the instant motion to dismiss, but as a factual

28

23

United States District Court
Northern District of California

United States District Court
Northern District of California

1   instead of a facial attack.  *Safe Air for Everyone*, 373 F.3d at 1039 ("[I]n a factual attack, the

2   challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal

3   jurisdiction.").  "In resolving a factual attack on jurisdiction," the Court "may review evidence

4   beyond the complaint without converting the motion to dismiss into a motion for summary

5   judgment."  *Id.*  The Court may not, however, "resolve genuinely disputed facts where the

6   question of jurisdiction is dependent on the resolution of factual issues going to the merits."  *Plum*

7   *Creek Timber Co., Inc. v. Trout Unlimited*, 255 F. Supp. 2d 1159, 1162 (D. Id. 2003) (internal

8   quotation marks omitted).

9        Here, with regard to the Focus, California Plaintiffs have submitted emails which suggest

10   that the Fusion and Focus shared a similar EPAS system.  In an email sent on January 26, 2012,

11   for example, a Ford representative stated that "[w]e are actively engaged on an EPAS issue which

12   is affecting [the] 2012 Focus, 2012 Fusion and 2012 Explorer (*mostly Focus and Fusion*)."  ECF

13   No. 94-8 at 58 (emphasis added).  The email continued: "All [of these vehicles use] the same

14   EPAS supplier (TRW) and all use the same electronics."  *Id.* at 59.  In addition to this email, Ford

15   engineer Jeffrey Williams acknowledged, at a December 9, 2015 deposition, that similar steering

16   problems which plagued the Fusion might have also plagued the Focus.  ECF No. 94-8 at 40–41.

17   These pieces of evidence complement the internal Ford communications identified in the SAC.

18   *See, e.g.*, SAC ¶¶ 14–15 (referring to power steering system as "the EPAS" without indication that

19   the EPAS system varied across vehicles).

20        In response to these arguments, Ford contends that, "while [the Focus] shares some

21   electronic components with the [Fusion], the Focus does not have the same printed circuit board,

22   and the board's different layout means that the" issues affecting the Fusion were "not a problem in

23   the Focus."  Mot. at 16.  In addition, Ford points to the fact that fewer Focus owners filed warranty

24   claims related to the Focus' EPAS system.  *Id.*

25        Both parties have thus presented evidence in support of their respective positions.

26   California Plaintiffs rely upon emails, testimony, and internal communications.  Ford relies upon

27   design differences and differences in warranty claim rates.  Taken together, this evidence raises

28

24

several genuine disputes of material fact.  In addition, these factual disputes go directly to the merits of California Plaintiffs' claims.  Resolution of these disputes, for instance, is essential to determining what caused the defects at issue, whether and when Ford knew about these defects, and whether these defects were isolated to a single vehicle sold across two model years (as Ford contends) or whether these defects were more widespread (as California Plaintiffs allege).  As the Ninth Circuit has observed, "[a] district court is permitted to resolve disputed factual issues bearing upon subject matter jurisdiction in the context of a Rule 12(b)(1) motion *unless* the jurisdictional issue and the substantive issues are so intermeshed that the question of jurisdiction is dependent on decision of the merits."  *Kingman Reef Atoll Invs., L.L.C. v. U.S.*, 541 F.3d 1189, 1196–97 (9th Cir. 2008) (internal quotation marks omitted).  Accordingly, because Ford's factual attack as to the Focus is "intermeshed" with the merits of this action, the Court can not resolve the factual disputes discussed above and can not dismiss California Plaintiffs' claims as to the 2012–2014 Focus.

Similarly, with regard to the 2013–2014 Fusion, California Plaintiffs have produced an email, sent on June 26, 2014, where Ford's EPAS supplier reported that "Loss of [A]ssist" error codes "remain[] high."  ECF No. 94-8 at 90.  In response, Ford contends that the steering gear design of the 2013–2014 Fusion is different from the steering gear design of the 2011–2012 Fusion.  Mot. at 16.  Once again, both parties have presented evidence to support their arguments and, once again, these disputes implicate the merits of California Plaintiffs' claims.  Thus, consistent the Court's determination as to the Focus, the Court can not dismiss California Plaintiffs' claims as to the 2013–2014 Fusion.

In sum, because Ford's standing argument involves factual disputes that implicate the merits of California Plaintiffs' claims, the Court DENIES Ford's motion to dismiss California Plaintiffs' claims as to the 2012–2014 Focus and the 2013–2014 Fusion.

## IV.   CONCLUSION

For the foregoing reasons, Ford's motion to dismiss for mootness and lack of standing is DENIED.

Case No. 14-CV-02989-LHK
ORDER DENYING MOTION TO DISMISS FOR MOOTNESS AND LACK OF STANDING

1    **IT IS SO ORDERED.**

2    Dated:  February 22, 2016

3                                                     _Lucy H. Koh_

4                                                     LUCY H. KOH
                                                      United States District Judge

Case No. 14-CV-02989-LHK
ORDER DENYING MOTION TO DISMISS FOR MOOTNESS AND LACK OF STANDING