1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10                           SAN JOSE DIVISION

11

| | |
|---|---|
| WILLIAM PHILIPS, et al., | Case No. 14-CV-02989-LHK |
| Plaintiffs, | **ORDER DENYING MOTION TO DISMISS** |
| v. | Re: Dkt. No. 116 |
| FORD MOTOR COMPANY, | |
| Defendant. | |

        Plaintiffs William Philips, Jaime Goodman, and Alison Colburn (collectively, "California

Plaintiffs")[1] bring this action against Defendant Ford Motor Company ("Defendant" or "Ford").

Before the Court is Ford's motion to dismiss California Plaintiffs' implied warranty claims in the

third amended complaint.  ECF No. 114 ("TAC"); ECF No. 116 ("Mot.").  The Court finds this

---

[1] In addition to California Plaintiffs, the third amended complaint ("TAC") also includes the same
non-California Plaintiffs from the first amended complaint ("FAC"): Jason Wilkinson, Robert
Morris, Victoria Jackson, Johnpaul Fournier, and Ryan and Rebecca Wolf.  ECF No. 114 ¶¶ 200–
230.  Because the FAC contained fifty one causes of action, which included nationwide class
claims and class claims brought under the laws of six states, the Court decided to proceed by
addressing the California claims first.  ECF No. 46.  To that end, the parties stipulated that
"[a]lthough the [second amended complaint and any subsequent pleadings] may contain both
California and non-California claims," any future motions to dismiss "shall address only . . .
California [Plaintiffs'] claims."  ECF No. 51 at 1.  Accordingly, this Order is limited to the causes
of action brought by California Plaintiffs in the TAC.

1

Case No. 14-CV-02989-LHK
ORDER DENYING MOTION TO DISMISS

United States District Court
Northern District of California

matter suitable for decision without oral argument pursuant to Civil Local Rule 7-1(b) and thus

VACATES the motion hearing set for May 12, 2016, at 1:30 p.m.  The case management

conference, currently scheduled for May 12, 2016, at 1:30 p.m., remains as set.  Having

considered the submissions of the parties, the relevant law, and the record in this case, the Court

DENIES Ford's motion to dismiss.

## I.        BACKGROUND

### A.  Factual Background

California Plaintiffs seek to represent a class of statewide consumers who purchased or

leased Ford Fusion vehicles, model years 2010 through 2014, or Ford Focus vehicles, model years

2012 through 2014 (collectively, the "Vehicles").[2]  California Plaintiffs allege that these Vehicles

are equipped with a defective Electronic Power Assisted Steering ("EPAS") system.  TAC ¶ 1.

The following chart summarizes California Plaintiffs' purchasing information:

| Plaintiff | Vehicle | Site of Purchase | Date of Purchase |
|---|---|---|---|
| William Philips | 2011 Ford Fusion (used) | Salinas Valley Ford | March 2012 |
| Jaime Goodman | 2011 Ford Fusion (new) | Future Ford of Clovis | October 2010 |
| Alison Colburn | 2010 Ford Fusion (new) | Galpin Ford | January 2010 |

*Id.* ¶¶ 32–53.  Power steering systems supplement the torque that the driver must apply to the

steering wheel, thus making it easier for the driver to turn the wheel.  *Id.* ¶ 75.  Instead of using a

traditional power steering pump, Ford's EPAS system uses a power steering control motor,

electronic control unit, torque sensor, and steering wheel position sensor.  *Id.* ¶ 2.  California

Plaintiffs allege, however, that Ford's EPAS system suffers from a "systemic defect" that "renders

the system prone to sudden and premature failure during ordinary and foreseeable driving

situations."  *Id.*  This defect, California Plaintiffs contend, causes drivers of the Vehicles to

"experience significantly increased steering effort and an increased risk of losing control of their

vehicles when the EPAS system fails" and "defaults to manual steering."  *Id.* ¶¶ 3, 100.

---

[2] The TAC specifies that the "Vehicles include the following models: 2010–2014 Ford Fusion; 2010–2014 Ford Fusion Hybrid; 2013–2014 Ford Fusion Energi; 2012–2014 Ford Focus; and 2012–2014 Ford Focus Electric."  TAC ¶ 68.

Case No. 14-CV-02989-LHK
ORDER DENYING MOTION TO DISMISS

In support of these allegations, California Plaintiffs rely upon three categories of evidence: (1) their own experiences with EPAS failure, (2) a National Highway Traffic Safety Administration's ("NHTSA") investigation into the EPAS system of the Ford Explorer, and (3) complaints to NHTSA by other owners and lessees about power steering failures.

**1. California Plaintiffs' Personal Experience with EPAS Failure**

**i. Philips**

As to the first category of evidence, California Plaintiffs allege that the EPAS system in each of their vehicles has failed. Specifically, William Philips ("Philips") states that he "reviewed Ford's promotional materials and other information" and that he "would not have purchased his 2011 Ford Fusion, or would not have paid the purchase price charged" had Ford "disclosed the EPAS system defects and failures." *Id.* ¶ 34. Philips also says he experienced "problems with the steering system in his Fusion." *Id.* ¶ 36. After lodging multiple complaints with Ford, Philips was informed during a dealership visit in 2013 "that it would cost approximately $2,000 to fix the problem," through an EPAS system replacement. *Id.* Philips declined to repair his vehicle at that time. In July 2015, Philips received a notice from Ford alerting him that his "vehicle [was] subject to a safety recall," and asking Philips to bring his vehicle to a dealership for further inspection. ECF No. 97-5 at 192. After receiving this notice, Philips brought his vehicle in for an inspection, at which time Ford replaced the EPAS system in Philips' vehicle.

**ii. Goodman**

Jaime Goodman ("Goodman") claims that, prior to "purchasing her 2011 Ford Fusion," she "(a) viewed television advertisements concerning the vehicles; (b) viewed material concerning the Fusion on Ford's website; (c) reviewed the window sticker on the vehicle she would purchase; and (d) received and reviewed a brochure concerning the Fusion." TAC ¶ 40. "The window sticker," Goodman says, "indicated that the vehicle she would purchase was equipped with power steering." *Id.* "Nowhere in these materials did Ford disclose the EPAS system defects and failures," and had Ford done so, Goodman alleges that she "would not have purchased her 2011 Ford Fusion, or would not have paid the purchase price charged." *Id.* ¶¶ 40–41. In addition,

Case No. 14-CV-02989-LHK
ORDER DENYING MOTION TO DISMISS

1    Goodman claims that in 2014 she "began having intermittent problems with the steering system in

2    her 2011 Ford Fusion and experienced difficulty steering." *Id.* ¶ 43.

3         Ultimately, Goodman "took [her] vehicle to a Ford dealership [in December 2014] and was

4    told that it would cost $1,800 to fix the problem with the steering system." *Id.* As with Philips,

5    the dealership recommended that the EPAS system in Goodman's vehicle be replaced. Although

6    Goodman contended that her power steering problems were a safety issue, Ford refused to defray

7    the costs of an EPAS system replacement. ECF No. 94-8 at 47. Citing financial hardship,

8    Goodman declined to undertake any repairs to her vehicle at this time, and continued to experience

9    problems with her vehicle.

10        In July 2015, Goodman received "a letter from Ford Motor Company concerning the 2011

11   Fusion and a recall for the [Fusion's] EPAS [system]." *Id.* at 49. Pursuant to this letter, Goodman

12   took her vehicle to a Ford dealership in August 2015, with Goodman expecting that Ford would

13   now replace the EPAS system in her vehicle free of charge. During this August 2015 visit,

14   however, the dealership declined to perform a system replacement and instead simply

15   reprogrammed the computer in Goodman's vehicle.

16        In October 2015, Goodman once again experienced problems with her vehicle's power

17   steering. "On November 2, 2015, Ford's counsel contacted Plaintiffs' counsel to inform them that

18   based on a review of the attached service records . . . , it appears that Jaime Goodman is eligible

19   for a steering gear replacement." ECF No. 94-6 at 10. Goodman thereafter scheduled an

20   appointment to replace her vehicle's EPAS system on November 12, 2015. "A few hours after

21   dropping off [her] vehicle" on November 12, 2015, however, Goodman "received a call from a

22   service associate . . . and was informed that . . . [her vehicle] was no longer eligible for a free

23   replacement under Ford's recall program." ECF No. 95-4 at 2. After "Ford refused to replace

24   [Goodman's] EPAS system," Plaintiffs' counsel once again reached out to Ford. *Id.* at 3. On

25   November 24, 2015, Ford finally replaced the EPAS system in Goodman's vehicle.

26                    **iii. Colburn**

27        Finally, prior to "purchasing her 2010 Ford Fusion," Alison Colburn ("Colburn") claims

28
4

United States District Court
Northern District of California

that, like Goodman, she "(a) viewed television advertisements concerning the vehicles; (b) viewed material concerning the Fusion on Ford's website; (c) reviewed the window sticker on the vehicle she would purchase; and (d) received and reviewed a brochure concerning the Fusion," and that "[t]he window sticker indicated that the vehicle she would purchase was equipped with power steering." TAC ¶ 47.  "Nowhere in these materials did Ford disclose the EPAS system defects and failures." *Id.*  Had Ford done so, Colburn alleges that she "would not have purchased her 2010 Ford Fusion, or would not have paid the purchase price charged." *Id.* ¶ 48.  Colburn alleges that the power steering in her vehicle failed in October 2014. *Id.* ¶ 52.  Later that month, she took her vehicle to a Ford dealership and paid $990.19 to replace her vehicle's EPAS system. *Id.* ¶ 53.

### 2.  NHTSA Investigation into the Explorer

As to the second category of evidence, California Plaintiffs point to documents produced in connection with NHTSA's Ford Explorer investigation, which began on June 19, 2012.  *Id.* ¶ 82.  In response to NHTSA's request for information, Ford "produced a database containing 1,173 complaints" regarding loss of power steering in the Explorer. *Id.* ¶ 88.  Ford also produced various internal e-mails which, California Plaintiffs allege, reveal that the Vehicles suffer from the same EPAS system defect as the Explorer and that Ford knew about the defect, yet never disclosed it to the public or otherwise took corrective action.  *Id.* ¶¶ 90–98.

### 3.  Complaints to NHTSA Concerning Focus and Fusion Vehicles

As to the third category of evidence, California Plaintiffs provide a litany of testimonials by other Ford owners complaining to NHTSA about alleged power steering failures in the Vehicles.  *Id.* ¶¶ 103–31.  For illustrative purposes, two such complaints are reproduced below.

> On December 11, 2012, a vehicle owner reported a crash in a 2010 Ford Fusion. The Defective Vehicle lost power steering, traction control, and the ability to brake upon entering a freeway on ramp.  To stop the vehicle and avoid endangering other drivers, the driver was "forced to crash into the concrete wall barrier on the driver's side of the ramp."  The driver and one other individual were injured.
>
> * * *
>
> On October 3, 2012, a vehicle owner reported a crash in a 2011 Ford Fusion.  The steering wheel seized while the owner was driving at 35 MPH, causing her to crash into a curb.  After the initial accident, the steering of the vehicle continued to fail. The vehicle was taken to a Ford dealer three times, and the dealer refused to help

United States District Court
Northern District of California

Case No. 14-CV-02989-LHK
ORDER DENYING MOTION TO DISMISS

her because the failure could not be replicated.  The vehicle owner notified Ford but Ford was unwilling to offer assistance.

*Id.* ¶¶ 109, 111.

Based on the evidence outlined above, California Plaintiffs allege that Ford fraudulently concealed the claimed power steering defect.  Despite press releases and web-based "promotional materials" touting "EPAS as a reliable and beneficial product," Ford knew as early as 2010 that the EPAS system was "prone to sudden, premature failure," and yet took no remedial action.  *Id.* ¶ 11.  California Plaintiffs further claim that "Ford concealed the fact that the EPAS system [was] prone to sudden and premature failure from consumers so that the warranty period on the Defective Vehicles would expire before consumers became aware of the problem." *Id.* ¶ 24.  Had Ford disclosed the alleged defect, California Plaintiffs "would not have purchased . . . th[e] vehicles, or would have paid substantially less for the vehicles than they did." *Id.* ¶ 25.  Moreover, "Ford's failure to disclose to consumers and the public at large the material fact that the EPAS system is prone to premature failure . . . recklessly risked the safety of occupants of the Defective Vehicles and the public at large." *Id.* ¶ 6.

### B.  Procedural History

On June 27, 2014, Plaintiffs filed the original complaint in this putative class action.  ECF No. 1.  Plaintiffs filed the first amended complaint ("FAC") on September 8, 2014.  ECF No. 15 ("FAC").  At a hearing on February 12, 2015, the Court granted Ford's motion to dismiss the FAC.  ECF No. 46.

As to Plaintiffs' implied warranty claims, brought under California's Song-Beverly Consumer Warranty Act ("Song-Beverly Act") and the Magnuson-Moss Warranty Act, the Court found "that Plaintiffs ha[d] sufficiently alleged that the EPAS system defect made the [Vehicles] unfit for their ordinary purpose."  ECF No. 48 ("Hr'g Tr.") at 5.  However, an "implied warranty claim is [also] limited in duration . . . and Plaintiffs [had] not allege[d] a defect within the warranty period." *Id.*  "A latent defect that does not manifest within the warranty period does not constitute a breach of the implied warranty of merchantability."   *Id.*  In reaching this decision, the Court declined to follow the California Court of Appeal's decision in *Mexia v. Rinker Boat Co.,*

Case No. 14-CV-02989-LHK
ORDER DENYING MOTION TO DISMISS

1    *Inc.*, 95 Cal. Rptr. 3d 285 (Ct. App. 2009), which the Court characterized as being an "outlier."

2    Hr'g Tr. at 5.  The Court instead found more persuasive several federal district court decisions,

3    including *Daniel v. Ford Motor Company*, 2013 WL 2474934 (E.D. Cal. June 7, 2013).  The

4    Court granted Plaintiffs leave to amend their implied warranty claims because "there [we]re

5    factual allegations that the Plaintiffs could allege that could cure th[e] deficienc[ies] [identified]."

6    Hr'g Tr. at 10.

7        In addition, in light of the unwieldy nature of the FAC, the parties agreed at the February

8    18, 2015 case management conference to move forward only on the California claims for any

9    subsequent motions to dismiss.  ECF No. 51.  If any of the California claims survived, the parties

10   would continue to litigate those claims to resolution before this Court.  ECF No. 54 at 9.  If none

11   of the California claims survived, then the Court would confer with the parties regarding how to

12   proceed on the remaining claims, with the possibility of transferring this action to a more

13   appropriate jurisdiction.  *Id.*

14       With this understanding in mind, California Plaintiffs filed a second amended complaint

15   ("SAC") on March 27, 2015.  The SAC asserted four causes of action under California law: (1)

16   violation of the unlawful and unfair prongs of California's Unfair Competition Law ("UCL"); (2)

17   violation of the fraud prong of the UCL; (3) violation of California's Consumer Legal Remedies

18   Act ("CLRA"); and (4) common law fraudulent concealment.

19       On April 30, 2015, Ford moved to dismiss the SAC, ECF No. 58, which the Court granted

20   in part and denied in part, ECF No. 69.  Specifically, the Court granted with prejudice Ford's

21   motion to dismiss California Plaintiffs' UCL claims and California Plaintiffs' CLRA claim for

22   injunctive relief, and granted with prejudice Ford's motion to dismiss Ian Colburn, Alison

23   Colburn's son, as a named Plaintiff.  *Id.* at 31.  Two claims—the common law fraudulent

24   concealment claim and the CLRA claim for damages—survived Ford's second round motion to

25   dismiss.  *Id.*  Ford answered the SAC on August 6, 2015.  ECF No. 78.

26       On October 28, 2015, Ford filed a second motion to dismiss the SAC.  ECF No. 84.  In this

27   motion, Ford argued for dismissal under the prudential mootness and primary jurisdiction

28

United States District Court
Northern District of California

doctrines.  ECF No. 105 at 8.  Ford also argued that California Plaintiffs lacked "standing to pursue their claims as to the 2012–2014 Focus and 2013–2014 Fusion."  *Id.* at 9.  The Court denied this motion in its entirety.  *Id.* at 25.

On February 18, 2016, the parties filed a joint case management statement in advance of the February 25, 2016 case management conference.  ECF No. 104.  In this statement, California Plaintiffs stated their intent to file a "motion for leave to amend to reassert their claims for breach of [implied] warranty."  *Id.* at 2.  According to California Plaintiffs, in light of the Ninth Circuit's December 2, 2015 decision in *Daniel v. Ford Motor Company*, 806 F.3d 1217 (9th Cir. 2015), the Court had erred in dismissing California Plaintiffs' implied warranty claims on February 12, 2015.  After reviewing the *Daniel* decision, the Court agreed with California Plaintiffs, and granted California Plaintiffs' leave to amend at the February 25, 2016 case management conference.  ECF No. 108.

California Plaintiffs filed the TAC on March 4, 2016.  The TAC includes two new claims: an implied warranty claim asserted under the Song-Beverly Act, TAC ¶¶ 154–170, and an implied warranty claim asserted under the Magnuson-Moss Warranty Act, *id.* ¶¶ 140–153.  On March 24, 2016, Ford moved to dismiss these implied warranty claims.  California Plaintiffs filed a response on April 14, 2016, and Ford filed a reply on April 28, 2016.  ECF No. 124 ("Opp'n"); ECF No. 132 ("Reply").

## II.     LEGAL STANDARD

### A.  Motion to Dismiss

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss an action for failure to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted).  For

8

purposes of ruling on a Rule 12(b)(6) motion, the Court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

Nonetheless, the Court is not required to "'assume the truth of legal conclusions merely because they are cast in the form of factual allegations.'" *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011) (quoting *W. Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981)).  Mere "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss." *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004); *accord Iqbal*, 556 U.S. at 678. Furthermore, "'a plaintiff may plead [him]self out of court'" if he "plead[s] facts which establish that he cannot prevail on his . . . claim." *Weisbuch v. Cnty. of L.A.*, 119 F.3d 778, 783 n.1 (9th Cir. 1997) (quoting *Warzon v. Drew*, 60 F.3d 1234, 1239 (7th Cir. 1995)).

**B.  Leave to Amend**

Under Rule 15(a) of the Federal Rules of Civil Procedure, leave to amend "shall be freely granted when justice so requires," bearing in mind "the underlying purpose of Rule 15 to facilitate decision on the merits, rather than on the pleadings or technicalities." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (ellipses omitted).  Generally, leave to amend shall be denied only if allowing amendment would unduly prejudice the opposing party, cause undue delay, or be futile, or if the moving party has acted in bad faith. *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 532 (9th Cir. 2008).

**III.   DISCUSSION**

Although California Plaintiffs assert claims under the Song-Beverly Act and the Magnuson-Moss Warranty Act, these claims rise and fall together.  *See Daniel*, 806 F.3d at 1227 ("Claims under the Magnuson-Moss Warranty Act stand or fall with express and implied warranty claims under state law.") (internal quotation marks and ellipses omitted).  Accordingly, the Court addresses Ford's arguments regarding California Plaintiffs' Song-Beverly Act claim with the understanding that these arguments apply with equal force to California Plaintiffs' Magnuson-Moss Warranty Act claim.

Case No. 14-CV-02989-LHK
ORDER DENYING MOTION TO DISMISS

United States District Court
Northern District of California

In the instant motion, Ford seeks dismissal of California Plaintiffs' Song-Beverly Act claim on three grounds. First, Ford argues that *Daniel* and *Mexia* are distinguishable from the instant case. Mot. at 2. Second, Ford contends that California "Plaintiffs waived . . . their [Song-Beverly Act] claim[] . . . when they failed to replead th[is] claims in the [SAC]." *Id.* Finally, Ford states that, even if *Daniel* and *Mexia* do apply, Colburn's claim would be time barred. *Id.* For the reasons that follow, the Court finds that each of these arguments lack merit.

**A. *Mexia* and *Daniel***

Before examining Ford's specific arguments regarding *Mexia* and *Daniel*, the Court takes a moment to briefly review the facts and reasoning of these cases. In *Mexia*, plaintiff Jess Mexia ("Mexia") sued Rinker Boat Company, Inc. ("Rinker") and Miller's Landing ("Miller") for "breach of the implied warranty of merchantability under the Song-Beverly Consumer Warranty Act." 95 Cal. Rptr. 3d at 287. "In essence, Mexia alleged that he purchased from Miller a boat manufactured by Rinker that was unmerchantable due to a latent defect, which . . . caused the boat's engine to corrode." *Id.* According to Mexia, the boat was operational at the time of purchase in 2003. However, by July 2005, significant "repairs to the boat were needed because of defects, nonconformities, misadjustments or malfunctions relating to corrosion in the engine." *Id.* at 288 (internal quotation marks omitted). By the time Mexia filed suit in November 2006, the boat was no longer merchantable. *Id.* at 289.

As the California Court of Appeal observed, Mexia's implied warranty claim implicated two statutory provisions, one in the California Commercial Code and one in the Song-Beverly Act. First, although "[t]he Song-Beverly Act does not include its own statute of limitations," "California courts have held that the statute of limitations for an action for breach of warranty under the Song-Beverly Act is governed by the same statute that governs the statute of limitations for warranties arising under the [California] Commercial Code." *Id.* at 291. The pertinent provision in the California Commercial Code provides that:

> (1) An action for breach of any contract for sale must be commenced within four years after the cause of action has accrued.

\* \* \*

10

United States District Court
Northern District of California

1
      (2) A cause of action accrues when the breach occurs, regardless of the aggrieved
      party's lack of knowledge of the breach.

2
Cal. Com. Code § 2725.  Pursuant to this provision, the *Mexia* court determined that Mexia's

3
Song-Beverly Act claim was subject to a four year statute of limitations.  95 Cal. Rptr. 3d at 292.

4
However, because Mexia had filed his complaint "three years [and] seven months after" the date

5
of purchase, the statute of limitations did not apply to Mexia's claim.  *Id.*

6
      Second, the Song-Beverly Act contains a "duration provision," which states that:

7

8
    The duration of the implied warranty of merchantability and where present the
    implied warranty of fitness shall be coextensive in duration with an express
    warranty . . . but in no event shall such implied warranty have a duration of less

9
    than 60 days nor more than one year following the sale of new consumer goods to
    a retail buyer.

10
Cal. Civ. Code § 1791.1(c).  Because the express warranty in *Mexia* was longer than one year, the

11
*Mexia* parties agreed that a one year duration provision applied to California Plaintiffs' claims.[3]

12
      As to the duration provision, the *Mexia* court rejected Rinker and Miller's argument "that

13
latent defects must be discovered and reported to the seller within" the one year duration period.

14
95 Cal. Rptr. 3d at 295.  As the *Mexia* court explained, "[i]n the case of a latent defect, a product is

15
rendered unmerchantable, and the warranty of merchantability is breached, by the existence of the

16
unseen defect, not by its subsequent discovery."  *Id.* at 291; *see also id.* ("Although a defect may

17
not be discovered for months or years after a sale, merchantability is evaluated as if the defect

18
were known.").

19
      Requiring individuals to assert an implied warranty claim within the one year duration

20
period would, according to the *Mexia* court, contravene the California legislature's intent to

21
provide consumers protection from latent defects.  *See id.* at 295 (characterizing "Rinker and

22
Miller's interpretation of the duration provision" as having "no support in the text of the statute.").

23
Had the California legislature sought to impose a discovery and notice requirement via the

24
duration period, the California legislature "could have easily done so."  *Id.*  Moreover, "Rinker

25

26

27
        —————————————
[3] The parties in the instant case also agree that a one year duration provision applies.  Mot. at 11;
Opp'n at 8–9.

28
Case No. 14-CV-02989-LHK
ORDER DENYING MOTION TO DISMISS

and Miller's construction of the duration provision would not only impose a notification

requirement under the Song-Beverly Act, but would create a notification deadline that would

apply *even if the consumer has not discovered or could not have discovered the breach within the*

*duration period.*" *Id.* at 295–96.  That construction would give consumers less protection than

they would have received under the Uniform Commercial Code ("U.C.C.")—which would

"conflict[] with the policy repeatedly expressed by California courts of the need to construe the

Song-Beverly Act so as to implement the legislative intent to *expand* consumer protection and

remedies" beyond those afforded by the U.C.C.  *Id.* at 296.

The *Mexia* court also rejected Rinker and Miller's argument that Mexia could not bring an

implied warranty claim because "the boat was fit for its ordinary purpose" at the time of sale and

that Mexia "did not seek repair from the defendants until over two years from the time of

purchase." *Id.* at 293.  "This argument," the court noted, "ignores the distinction between

unmerchantability caused by a latent defect and the subsequent discovery of the defect." *Id.*

"[T]he fact that the alleged defect resulted in destructive corrosion two years after the sale of the

boat does not necessarily mean that the defect did not exist at the time of sale." *Id.*

As in *Mexia*, plaintiffs in *Daniel* alleged that the product that they had purchased—the

Ford Focus, model years 2005–2011—contained a latent defect.  That latent defect, which related

to the Focus's rear suspension, caused "premature tire wear" and "safety hazards such as

decreased control in handling, steering, stability, and braking, the threat of catastrophic tire failure,

and drifting while driving on wet or snow-covered roads." *Daniel*, 806 F.3d at 1221.  The district

court dismissed plaintiffs' Song-Beverly Act claim because plaintiffs "d[id] not present evidence

that the[ir] vehicle[s] became unmerchantable within the duration of the implied warranty."  2013

WL 2474934 at *8.  As the district court pointed out, the *Daniel* plaintiffs had replaced or had

been told to replace their tires more than one year after the date of purchase.  *Id.*  The district court

acknowledged that its decision was in tension with *Mexia*, and, in response, "decline[d] to adopt

*Mexia*'s holding." *Id.*

The Ninth Circuit reversed the district court's decision.  As the Ninth Circuit pointed out,

12

1    the *Mexia* court determined that "[t]here [was] nothing [in the Song-Beverly Act to] suggest[] a

2    requirement that the purchaser discover and report to the seller a *latent* defect within th[e] [one

3    year duration] period." *Daniel*, 806 F.3d at 1222 (quoting *Mexia*, 95 Cal. Rptr. 3d at 295).

4         As the Ninth Circuit further explained, this holding governs "unless there is compelling

5    evidence that the" California Supreme Court "would decide differently." *Id.*  On this point, the

6    Ninth Circuit noted that "[t]he California Supreme Court [had] denied the *Mexia* defendants'

7    petition for review and denied a non-party's request for 'depublication' of" *Mexia*. *Id.*  Several

8    other California Court of Appeal decisions, moreover, had "referenced the *Mexia* rule . . . without

9    disapproval." *Id.*  Finally, the Ninth Circuit observed that *Mexia* was not in conflict with an

10   earlier California Court of Appeal decision, *Atkinson v. Elk Corporation of Texas*, 48 Cal. Rptr. 3d

11   247 (Ct. App. 2006).  Thus, the Ninth Circuit determined that Ford had failed to present

12   "convincing evidence that the California Supreme Court would decide the issue

13   in *Mexia* differently." 806 F.3d at 1223.  Accordingly, *Mexia*'s rule that the duration provision

14   "does not create a deadline for discovering latent defects or for giving notice to the seller must be

15   followed." *Id.* (internal quotation marks and citation omitted).

16        In response to the panel decision in *Daniel*, Ford filed, on December 16, 2015, a petition

17   for panel rehearing or for rehearing en banc.  *Daniel v. Ford Motor Co.*, No. 13-16476 (9th Cir.

18   2015), ECF No. 36-1.  Ford's petition included a request for certification to the California

19   Supreme Court.  *Id.* at 15.  On January 8, 2016, the *Daniel* panel unanimously decided to deny

20   Ford's petition for panel rehearing.  ECF No. 48.  Additionally, "[t]he full [Ninth Circuit was]

21   advised of the petition for rehearing en banc and no judge of the court . . . requested a vote on the

22   petition." *Id.*

23        *Mexia* and *Daniel* govern the instant case.  Indeed, the facts here are almost identical to

24   those in *Daniel*: both cases involve the same defendant (Ford), the same sort of defect (a latent

25   defect brought under the Song-Beverly Act after the one year duration period), and even the same

26

27

28

Case No. 14-CV-02989-LHK
ORDER DENYING MOTION TO DISMISS

United States District Court
Northern District of California

1    vehicle (the Focus).[4]  The Song-Beverly Act claim survived in *Daniel*.  They also survive here.

2          Similar to the arguments that Ford presented in *Daniel*, Ford here argues that *Mexia* "held

3    only that the Song-Beverly Act does not require a plaintiff to *notify* the seller of a defect or *present*

4    *the goods* for repair during the relevant warranty period."  Mot. at 7.  *Mexia* did not, according to

5    Ford, "actually hold that a plaintiff can recover on an implied-warranty claim no matter when [a]

6    defect is 'discovered.'"  *Id.*  In other words, a defect—including a latent defect that a buyer might

7    not observe until more than a year after purchase—must be "discovered" within a year of

8    purchase.

9          This argument does not comport with *Mexia* and *Daniel*.  In fact, the *Mexia* court expressly

10   considered and rejected the argument that, "where there is . . . a latent defect, that defect must be

11   discovered and reported within the warranty period."  95 Cal. Rptr. 3d at 295 n.8 (alteration

12   omitted).  Instead, "[i]n the case of a latent defect, a product is rendered unmerchantable, and the

13   warranty of merchantability is breached, by the existence of the unseen defect, not by its

14   subsequent discovery."  *Id.* at 291.  Accordingly, in *Mexia*, the California Court of Appeal allowed

15   Mexia to pursue a Song-Beverly Act claim even though Mexia did not discover the latent defect

16   until two years after purchase.  Similarly, in *Daniel*, the Ninth Circuit determined that plaintiffs

17   could proceed with their Song-Beverly Act claim even though plaintiffs discovered the latent

18   defect in their vehicles outside the one year duration period.

19         Turning to the instant case, California Plaintiffs allege that the EPAS system "suffers from

20   a systemic defect" which "renders the system prone to sudden and premature failure."  TAC ¶ 2.

21   Although that defect was not discovered until more than a year after purchase, the defect itself

22   apparently existed at the time of purchase.  Thus, the Vehicles at issue were unmerchantable at the

23   time of sale, *see* 95 Cal. Rptr. 3d at 290–91 ("The implied warranty of merchantability may be

24   breached by a latent defect undiscoverable at the time of sale."), and California Plaintiffs have

25

26   _____

27   [4] Plaintiffs in *Daniel* sought to represent all 2005–2011 Focus owners, while California Plaintiffs
     in the instant case seek to represent 2012–2014 Focus owners, as well as 2010–2014 Fusion
     owners.

28                                              14

United States District Court
Northern District of California

1  sufficiently alleged an implied warranty claim under the Song-Beverly Act.

2          In response to this conclusion, Ford contends that such an interpretation of *Mexia* and

3  *Daniel* would render the duration provision meaningless, as it would essentially imply "that

4  implied warranties [would] last forever." Reply at 1.  Ford presented these very same arguments

5  before the Ninth Circuit in *Daniel* in its petition for panel rehearing and for rehearing en banc.

6  *See, e.g.*, *Daniel v. Ford Motor Co.*, No. 13-16476 (9th Cir. 2015), ECF No. 36-1 at 6 ("[T]he

7  Panel's interpretation of [the Song-Beverly Act] renders the one-year time limitation

8  meaningless.").  Several amicus briefs were also filed in support of Ford.  *Daniel v. Ford Motor*

9  *Co.*, No. 13-16476 (9th Cir. 2015), ECF No. 46 (brief by Products Liability Advisory Council);

10  ECF No. 47 (brief by Chamber of Commerce).  Nonetheless, the Ninth Circuit declined to grant

11  panel rehearing, and *no* Ninth Circuit judge requested a vote for rehearing en banc.  In light of

12  these decisions, the Court finds Ford's arguments as to these implications unavailing.

13          Ford's two remaining arguments regarding *Mexia* and *Daniel* are likewise unavailing.

14  First, Ford asserts that California Plaintiffs must "prove at a minimum that the defects actually

15  'existed' in their vehicles . . . during the one-year period" after purchase.  Second, Ford contends

16  that "[t]here is no remedy for a breach that occurs after [a] warranty has expired." Mot. at 9, 11.

17          As to the issue of the defect's existence, California Plaintiffs allege that the EPAS defect

18  existed at the time of purchase, which falls within the one year duration period.  Ford's citation to

19  *Ortega v. Toyota Motor Sales, U.S.A., Inc.*, 422 F. App'x 599 (9th Cir. 2011), to challenge this

20  conclusion is of no consequence.  In *Ortega*, defendant moved for judgment as a matter of law

21  *after* a trial on the merits.  *Id.* at 600.  As the *Ortega* court noted, *Mexia* "was decided at the

22  pleading stage where the court was required to assume the factual allegations in the complaint as

23  true." *Id.* at 601.  On the other hand, in *Ortega*, plaintiff had produced no evidence at trial that the

24  alleged design defect existed at the time of sale.  *See id.* ("Ortega's expert could not identify the

25  cause of the vehicle's defects, and was not asked if the defects were present at the time of sale.").

26  It is possible that, at trial, California Plaintiffs will be unable to produce sufficient evidence to

27  demonstrate that the EPAS systems were inherently defective.  However, for purposes of the

28

Case No. 14-CV-02989-LHK
ORDER DENYING MOTION TO DISMISS

1    instant motion to dismiss, the Court must "accept factual allegations in the complaint as true" and

2    must, therefore, accept as true California Plaintiffs' allegations that the Vehicles suffered from a

3    systemic and latent design defect.  *Manzarek*, 519 F.3d at 1031.

4            Next, as to the issue of remedy, Ford relies entirely upon *Daugherty v. American Honda

5    Motor Co., Inc.*, 51 Cal. Rptr. 3d 118 (Ct. App. 2006).  As Ford acknowledges, however,

6    *Daugherty* is not "an implied-warranty case."  Mot. at 10.  Instead, the *Daugherty* court examined

7    whether "a latent defect, discovered outside the limits of a written warranty, may form the basis

8    for a valid *express warranty claim* if the warrantor knew of the defect at the time of sale."  51 Cal.

9    Rptr. 3d at 122 (emphasis added).  California Plaintiffs have not asserted an express warranty

10   claim in the TAC.  Instead, California Plaintiffs have asserted implied warranty claims, which are

11   governed not by *Daugherty*, but by *Mexia* and *Daniel*.  Both *Mexia* and *Daniel* make clear that

12   purchasers are not required to "discover and report to the seller a *latent* defect within [the one year

13   duration] period," *Daniel*, 806 F.3d at 1222, and that "the warranty of merchantability is

14   breached[] by the existence of the unseen defect, not by its subsequent discovery," *Mexia*, 95 Cal.

15   Rptr. 3d at 291.  Thus, under the allegations set forth in the TAC, the breach in the instant case

16   occurred within the warranty period, and California Plaintiffs may be able to obtain a remedy

17   should they prevail on the merits at trial.

18           Ford has failed to explain why *Mexia* and, in particular, *Daniel*—a published Ninth Circuit

19   decision involving the same basic claim against the same defendant and concerning the same

20   vehicle—do not govern the instant case.  Accordingly, the Court finds that California Plaintiffs

21   have sufficiently alleged a Song-Beverly Act claim under *Mexia* and *Daniel*.

22       **B.  Waiver**

23           Second, on the issue of waiver, Ford notes that California Plaintiffs' "fail[ed] to replead

24   [their Song-Beverly Act] claim[] despite leave to amend."  Mot. at 4.  That action, Ford argues,

25   should be "treated as a voluntary dismissal of th[e] claim[]."  *Id.*  In support of this contention,

26   Ford cites a single sentence from *Lacey v. Maricopa County*, 693 F.3d 896, 928 (9th Cir. 2012)

27   (en banc), where the Ninth Circuit stated that "for any claims voluntarily dismissed, we will

28
                                                      16

United States District Court
Northern District of California

1   consider those claims to be waived if not repled."

2        Ford reads *Lacey* out of context.  In *Lacey*, the Ninth Circuit examined its prior decision in

3   *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1474 (9th Cir. 1997), which held "that a plaintiff waives

4   all claims alleged in a dismissed complaint which are not realleged in an amended complaint."  As

5   the Ninth Circuit observed, an overwhelming number of courts and commentators had criticized

6   this rule as being overly "harsh," "formalistic," and "mechanical."  *Lacey*, 693 F.3d at 926; *see*

7   *also id.* at 927 ("[O]n reflection, we do not believe that the *Forsyth* rule is prudent or sufficiently

8   justified, and we agree that it is formalistic and harsh.").  Accordingly, the Ninth Circuit overruled

9   *Forsyth* and held that "claims dismissed with prejudice and without leave to amend" do not need

10  to "be repled in a subsequent amended complaint to preserve them for appeal."  *Id.* at 928.  In

11  reaching this decision, the Ninth Circuit explained that the *Forsyth* rule was (1) unfair to litigants,

12  (2) unfair to district courts, and (3) not justified by practical considerations.  *Id.* at 927–28.

13  Applied here, each of these three factors also weighs in California Plaintiffs' favor.

14       First, California Plaintiffs were originally granted leave to amend their implied warranty

15  claims because there were factual allegations that the Plaintiffs could allege to cure the

16  deficiencies that the Court had identified.  Hr'g Tr. at 10.  California Plaintiffs did not make any

17  such allegations in the SAC, nor did California Plaintiffs add another named Plaintiff.   Thus, had

18  California Plaintiffs simply repleaded the factual allegations from the FAC, California Plaintiffs

19  might well have faced "sanctions [for] realleging dismissed claims." *Lacey*, 693 F.3d at 927.  On

20  the other hand, California Plaintiffs can appeal this Court's dismissal of the implied warranty

21  claims after this Court enters final judgment.  Neither facing the risk of sanctions nor waiting for

22  an appeal despite the Ninth Circuit's *Daniel* ruling is fair to California Plaintiffs or promotes

23  judicial economy.

24       Second, Ford's reading of the waiver doctrine requires this Court to ignore controlling

25  Ninth Circuit precedent, something this Court will not do.

26       Third, a number of practical considerations counsel against waiver.  Indeed, in lieu of

27  requesting leave to amend, California Plaintiffs could have filed a motion for leave to file a motion

28

Case No. 14-CV-02989-LHK
ORDER DENYING MOTION TO DISMISS

United States District Court
Northern District of California

1    for reconsideration, pursuant to Civil Local Rule 7-9.  Civil Local Rule 7-9(b)(2) specifically

2    allows a district court to reconsider a previous order in light of "[t]he emergence of new material

3    facts or a change of law occurring after the time of such order."  Civil L.R. 7-9(b)(2).  Similarly,

4    California Plaintiffs could have also waited for a final judgment and then sought relief under

5    Federal Rules of Civil Procedure 59 or 60; both Rules provide litigants with relief from a final

6    judgment or order.  The only meaningful difference between these avenues and the approach taken

7    by the Court is that the Court's approach saves the Court and the parties time and resources.  On

8    this particular point, the Court observes that this is the fourth motion to dismiss that Ford has filed

9    in this action, that fact discovery closes on June 30, 2016, and that the deadline to file a motion for

10   class certification is July 29, 2016.  Four complaints have been filed in this action, with Plaintiffs

11   filing the original complaint in June 2014.  These considerations counsel in favor of the Court

12   efficiently moving this case towards trial and staying on the case schedule.

13            These practical considerations also point to a fourth reason why Ford's reliance upon

14   *Lacey* is unavailing: the *Lacey* court was primarily concerned with addressing whether an

15   argument is waived for purposes of appeal—not whether, as in the instant case, a party may re-

16   assert a previously dismissed claim in an amended complaint based on a change of law.  As the

17   *Lacey* court explained, "[f]or claims dismissed with prejudice and without leave to amend, we will

18   not require that they be repled in a subsequent amended complaint *to preserve them for appeal*."

19   693 F.3d at 928 (emphasis added).  On the other hand, for claims that are voluntarily dismissed,

20   "we"—as in the Ninth Circuit—"will consider those claims . . . waived [on appeal] if not repled."

21   *Id.*  U.S. District Judge Thelton Henderson took note of this particular distinction in *Digby Adler*

22   *Group, LLC v. Mercedes-Benz U.S.A., LLC*, 2015 WL 5138080, *7 n.1 (N.D. Sept. 1, 2015),

23   where he described *Lacey* as "address[ing] the waiver of rights to appeal, [and] not [the] waiver of

24   the right to reassert a claim in a later amended complaint."

25            This distinction between appellate review and district court review reflects the general

26   principle, as expressed by the U.S. Supreme Court in *United States v. Dieter*, 429 U.S. 6, 8 (1976),

27   that "plenary consideration of an issue by an appellate court ordinarily requires more time than is

28

United States District Court
Northern District of California

18

Case No. 14-CV-02989-LHK
ORDER DENYING MOTION TO DISMISS

1    required for disposition by a trial court of a petition for rehearing." There is thus "wisdom [in]

2    giving district courts the opportunity promptly to correct their own alleged errors." *Id.* Consistent

3    with *Dieter*, the Ninth Circuit has noted that "[t]he authority of district courts to reconsider their

4    own orders before they become final, absent some applicable rule or statute to the contrary, allows

5    them to correct not only simple mistakes, but also decisions based on shifting precedent, rather

6    than waiting for the time-consuming, costly process of appeal." *United States v. Martin*, 226 F.3d

7    1042, 1049 (9th Cir. 2000); *see also Dreith v. Nu Image, Inc.*, 648 F.3d 779, 787 (9th Cir. 2011)

8    ("[A] district court has the inherent power to revisit its non-final orders."). Finally, Federal Rule

9    of Civil Procedure 54(b) states that "any order or other decision, however designated, that

10    adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does

11    not end the action as to any of the claims or parties and *may be revised at any time before the entry*

12    *of a judgment* adjudicating all the claims and all the parties' rights and liabilities." Fed. R. Civ. P.

13    54(b) (emphasis added).

14          California Plaintiffs' Song-Beverly Act claim falls squarely within the purview of the legal

15    authority recited above. Because a final judgment has not yet been entered, the Court acted well

16    within its inherent discretion in granting California Plaintiffs leave to amend. Fed. R. Civ. P.

17    54(b). Moreover, as in *Dieter*, *Martin*, and *Dreith*, California Plaintiffs were allowed to file the

18    TAC because of a "shift[] [in] precedent," which obviated the need for California Plaintiffs to

19    "wait[] for the time-consuming, costly process of appeal." *Martin*, 226 F.3d at 1049. Given the

20    Court's discretion and the relative efficiency of allowing California Plaintiffs to amend the

21    complaint, there was simply no compelling reason to apply waiver.

22          As a final matter, the remaining cases cited by Ford are likewise inapposite. In none of

23    these cases did the Ninth Circuit or the district court consider whether a party could replead a

24    claim in light of an intervening change in law or fact. *See, e.g.*, *Somers v. Apple, Inc.*, 729 F.3d

25    953, 960–61 (9th Cir. 2013) (holding that individual claim had been abandoned where plaintiff, in

26    putative class action, did not pursue individual claim through litigation and had not identified a

27    change in law or fact); *Chubb Custom Ins. Co. v. Space Sys./Loral Inc.*, 710 F.3d 946, 973–75 (9th

28

United States District Court
Northern District of California

19

1    Cir. 2013) (holding that plaintiff had waived claims for purposes of appeal where plaintiff did not

2    assert these claims in an amended complaint, did not present them on appeal, and did not cite an

3    intervening change in law or fact); *Westley v. Oclaro, Inc.*, 2013 WL 2384244, *10–*11 (N.D.

4    Cal. May 30, 2013) (denying leave to file third amended complaint to add defendant where

5    defendant had been dismissed in the original complaint, was not named in the first or second

6    amended complaints, and plaintiffs had cited no change in law or fact).

7         By contrast, in the instant case, the Court dismissed California Plaintiffs' implied warranty

8    claims because the Court decided to rely upon the district court's decision in *Daniel* instead of the

9    California Court of Appeal's decision in *Mexia*.  That district court decision was subsequently

10   overturned by the Ninth Circuit, with the Ninth Circuit holding—in a published, binding

11   decision—that the district court should have followed *Mexia* and should not have dismissed the

12   implied warranty claims at issue in *Daniel*.  Furthermore, *Daniel* involved the same defendant

13   (Ford), the same type of defect (a latent defect that was not discovered until more than one year

14   after purchase), the same legal principles (whether such defects can form the basis of an implied

15   warranty claim), and even the same vehicle (the Focus).  Under such circumstances, applying

16   waiver would be unfair, inefficient, and overly harsh to California Plaintiffs.  Accordingly, the

17   Court finds that California Plaintiffs did not waive their Song-Beverly Act claim.

18   **C.  Statute of Limitations**

19        Finally, as to Colburn, Ford points out that Colburn purchased her vehicle in January 2010.

20   California Plaintiffs filed the original complaint in June 2014—more than four years after the date

21   of Colburn's purchase.  Mot. at 15.  As noted above, an action for breach of the implied warranty

22   of merchantability must "be commenced within four years after the cause of action has accrued."

23   Cal. Com. Code § 2725(1).  Consequently, because Ford breached the implied warranty of

24   merchantability at the time of sale, Colburn's implied warranty claim, Ford argues, falls outside

25   the statute of limitations.

26        **1.  "Future Performance" Exception**

27        Although California Plaintiffs concede that Colburn brought her claim more than four

28

Case No. 14-CV-02989-LHK
ORDER DENYING MOTION TO DISMISS

United States District Court
Northern District of California

years after purchase, California Plaintiffs argue that her claim falls under the "future performance"

exception.  That exception, located in § 2725(2) of the California Commercial Code, states that:

> A breach of warranty occurs when tender of delivery is made, except that where a
> warranty explicitly extends to future performance of the goods and discovery of
> the breach must await the time of such performance the cause of action accrues
> when the breach is or should have been discovered.

Cal. Com. Code § 2725(2).  Pursuant to this exception, California Plaintiffs contend that the

statute of limitations for Colburn began to run at "the discovery of the breach."  Opp'n at 10.

The Court is unpersuaded by this argument.  As the California Court of Appeal has

observed, the future performance exception "must be narrowly construed."  *Cardinal Health 301,*

*Inc. v. Tyco Elecs. Corp.*, 87 Cal. Rptr. 3d 5, 16 (Ct. App. 2008).  The exception "applies only

when the seller has *expressly agreed* to warrant its product *for a specific and defined period of*

*time.*"  *Id.* (first emphasis added).  Consequently, the California Court of Appeal has interpreted

and applied the future performance exception almost exclusively in the express warranty context.

*See id.* at 16–18 (citing cases).  To emphasize this point, the *Cardinal Health* court stated that,

"[b]ecause an implied warranty is one that arises by operation of law rather than by an express

agreement of the parties, courts have consistently held [that] it is not a warranty that explicitly

extends to future performance of the goods."  *Id.* at 19–20; *see also id.* at 20 (citing cases)

Consistent with *Cardinal Health*, in *MacDonald v. Ford Motor Company*, 37 F. Supp. 3d

1087, 1100 (N.D. Cal. 2014), plaintiffs alleged that coolant pumps in various Ford vehicles

"suffered from an inherent defect at the time of sale."  The original complaint in *MacDonald*,

however, "was filed on June 28, 2013, more than five years after the last [vehicle] purchase."  *Id.*

Accordingly, the district court determined that plaintiffs' implied warranty claim fell outside the

four year statute of limitations.  The district court, citing *Cardinal Health*, also determined that the

future performance exception did not apply to plaintiffs' implied warranty claim.  Specifically, the

court stated that, "[t]his exception applies only when the seller has expressly agreed to warrant its

product for a specific and defined period of time."  *Id.* at 1100 (internal quotation marks omitted).

Accordingly, "[b]ecause [p]laintiffs' cause of action is for breach of an implied warranty, the

21

1    future performance exception is inapplicable to their claim." *Id.*

2         In reaching this decision, the *MacDonald* court distinguished *MacDonald* from *Ehrlich v.*

3    *BMW of North America LLC*, 801 F. Supp. 2d 908 (C.D. Cal. 2010), *Falco v. Nissan North*

4    *America*, 2013 WL 5575065 (C.D. Cal. Oct. 10, 2013), and *Krieger v. Nick Alexander Imports,*

5    *Inc.*, 285 Cal. Rptr. 717 (Ct. App. 1991)—the same cases upon which California Plaintiffs rely in

6    their opposition. Opp'n at 11.

7         As the *MacDonald* court pointed out, the *Ehrlich* court "tolled the statute of limitations on

8    a Song-Beverly claim for the duration of an *express* warranty." 37 F. Supp. 3d at 1101 (emphasis

9    added). "That approach was subsequently followed," without additional analysis, in *Falco*. *Id.*

10   *Ehrlich* cited the California Court of Appeal's decision in *Krieger*, but, according to the

11   *MacDonald* court, "nothing" in *Krieger* "supports tolling the statute of limitations on an implied

12   warranty claim for the duration of an express warranty." *Id.*

13        The *MacDonald* court went on to examine the relevant statutory language, and stated that,

14   "[p]arsing the language of section 2725 [of the California Commercial Code], it appears that at all

15   times[] the statute refers to the warranty that forms the basis for the cause of action." *Id.* In other

16   words, the future performance exception only applies to the breach of an express warranty. It does

17   not allow the breach of an express warranty to toll the statute of limitations "to an altogether

18   separate claim," such as an implied warranty claim. *Id.*

19        Several other district courts are in concert with *Cardinal Health* and *MacDonald*. *See,*

20   *e.g.*, *Durkee v. Ford Motor Co.*, 2014 WL 7336672, *5 (N.D. Cal. Dec. 24, 2014) ("An implied

21   warranty is not a warranty that explicitly extends to the future performance of goods."); *Johnson v.*

22   *Ford Motor Company*, 2015 WL 7571841, *4 (S.D.W.Va. Nov. 24, 2015) ("Courts have

23   consistently held an implied warranty is not a warranty that explicitly extends to future

24   performance of goods.") (alterations omitted).

25        Finally, *Mexia* itself does not support California Plaintiffs understanding of the future

26   performance exception. As noted above, California Plaintiffs state that when the future

27   performance exception applies, tolling accrual begins when the latent defect is discovered, not on

28
                                                          22

1    the date of purchase.  However, as the *Mexia* court observed, "the earliest date the implied

2    warranty of merchantability regarding Mexia's boat could have accrued was the date Mexia

3    purchased it—April 12, 2003."  95 Cal. Rptr. at 292.  "Because Mexia filed this action three years

4    seven months after that date, he did so within the *four-year* limitations period."  *Id.* (emphasis

5    added).  In other words, even though Mexia did not discover the defect in his boat until two years

6    after purchase, the California Court of Appeal did not read the four year statute of limitations as

7    applying at the moment of discovery of the defect.  This reading contradicts Plaintiffs' position

8    that tolling accrual begins when the defect is discovered.

9         Pursuant to *Cardinal Health*, *MacDonald*, and *Mexia*, the Court finds that the future

10   performance exception does not apply to California Plaintiffs' Song-Beverly Act claim.

11        **2.  Fraudulent Concealment Tolling**

12        Although the "future performance" exception does not apply, Colburn's claim is

13   nevertheless not time barred because of fraudulent concealment tolling.  Section 2725(4) of the

14   California Commercial Code states that "[t]his section"—the section providing the statute of

15   limitations for claims brought under the Song-Beverly Act—"does not alter the law on tolling of

16   the statute of limitations."  Cal. Com. Code § 2725(4).

17        As the California Supreme Court has explained, in order "[t]o align the actual application

18   of the [statute of] limitations defense more closely with the policy goals animating it, the courts

19   and the Legislature have over time developed a handful of equitable exceptions to and

20   modifications of the usual rules governing limitations periods."  *Aryeh v. Canon Bus. Sols., Inc.*,

21   292 P.3d 871, 875 (Cal. 2013).  "These doctrines may alter the rules governing either the initial

22   accrual of a claim, the subsequent running of the limitations period, or both."  *Id.*  Of particular

23   importance to the instant motion, "[t]he doctrine of fraudulent concealment tolls the statute of

24   limitations where a defendant, through deceptive conduct, has caused a claim to grow stale."  *Id.*

25   "This doctrine requires the plaintiff (1) plead with particularity the facts giving rise to the

26   fraudulent concealment claim and (2) demonstrate that he or she used due diligence in an attempt

27   to uncover the facts."  *Allen v. Similasan Corp.*, 96 F. Supp. 3d 1063, 1071 (S.D. Cal. 2015)

28

23

1    (citing *Hunter v. Gates*, 68 F. App'x 69, 71 (9th Cir. 2003) (internal citation omitted)); *accord*

2    *Inv'rs Equity Life Holding Co. v. Schmidt*, 126 Cal. Rptr. 3d 135, 146 (Ct. App. 2011).

3         Several courts have determined that fraudulent concealment tolling applies to claims

4    brought under the Song-Beverly Act.  In *Sater v. Chrysler Group LLC*, 2015 WL 736273 (C.D.

5    Cal. Feb. 20, 2015), for instance, plaintiffs filed suit against Chrysler, and alleged "that the

6    steering linkage systems in certain Dodge Ram trucks suffer[ed] from design defects."  *Id.* at *1

7    (internal quotation marks and parenthetical omitted).  As here, Chrysler argued that a named

8    plaintiff's implied warranty claim was "untimely because he bought his [vehicle] in January 2010

9    but filed his claim in April 2014, exceeding the four-year statute of limitations for breach of

10   warranty actions."  *Id.* at *8.  In response to this argument, the *Sater* court acknowledged that "the

11   statute of limitations for an implied warranty claim under the [Song-Beverly Act] is four years."

12   *Id.*  Moreover, citing *MacDonald*, the *Sater* court also agreed that the named plaintiff's "claim

13   accrued at the time of purchase."  *Id.*  However, as the district court observed, the *Sater* complaint

14   also "specifically alleges facts t[o] show Chrysler's fraudulent concealment."  *Id.* at *9.  In

15   addition, this particular named plaintiff "had good reason to fail to discover the underlying

16   breach": the plaintiff had purchased his vehicle believing that it would be free from any defects,

17   and was not alerted about any possible issues until Chrysler implemented a recall in September

18   2011, a year and a half after the date of purchase.  *Id.*  Consequently, the district court denied

19   Chrysler's motion to dismiss.

20        Consistent with *Sater*, the district court in *Roberts v. Electrolux Home Products*, 2013 WL

21   7753579 (C.D. Cal. Mar. 4, 2013), also applied fraudulent concealment tolling to a Song-Beverly

22   Act claim.  As the district court explained, "[t]he purpose of [fraudulent concealment tolling] is to

23   disarm a defendant who, by his own deception, has caused a claim to become stale and a plaintiff

24   dilatory."  *Id.* at *8 (internal quotation marks omitted).  In *Roberts*, "defendant [allegedly] had

25   knowledge of the defect [in question] since at least 2002"—five years prior to the date of

26   purchase.  *Id.*  In addition, "the fact that defendant had exclusive knowledge of the defect also

27   excuse[d] plaintiffs' late discovery of their claim."  *Id*.  Under these facts, the *Roberts* court

28

United States District Court
Northern District of California

24

Case No. 14-CV-02989-LHK
ORDER DENYING MOTION TO DISMISS

1  concluded that plaintiffs' "implied warranty claims [were] not time barred." *Id.*

2      In accordance with *Sater* and *Roberts*, a number of other courts have found that, when

3  properly pleaded, fraudulent concealment tolls the statute of limitations for claims brought under

4  the Song-Beverly Act. *See, e.g.*, *In re Ford Motor Co. E-350 Van Prods. Liab. Litig. (No. II)*,

5  2008 WL 4126264, *16–*19 (D.N.J. Sept. 2, 2008) (applying fraudulent concealment tolling to

6  Song-Beverly Act claims asserted in an MDL); *cf. Unique Functional Prods., Inc. v. JCA Corp.*,

7  2012 WL 367245, *3–*4 (S.D. Cal. Feb. 3, 2012) (holding that equitable tolling doctrines apply to

8  Song-Beverly Act claims); *Mills v. Forestex Co.*, 134 Cal. Rptr. 2d 273, 288 (Ct. App. 2003)

9  (noting that Song-Beverly Act claims are "subject to tolling or estoppel").

10      In light of the foregoing, Colburn's implied warranty claim would be subject to fraudulent

11  concealment tolling so long as California Plaintiffs have "(1) plead[ed] with particularity the facts

12  giving rise to the fraudulent concealment claim and [have] (2) demonstrate[d] that [they] used due

13  diligence in an attempt to uncover the facts." *Allen*, 96 F. Supp. 3d at 1071.

14      Both requirements are met here. First, the Court has already denied Ford's motion to

15  dismiss California Plaintiffs' fraudulent concealment claim. ECF No. 69 at 16–24. In response to

16  Ford's arguments in its first motion to dismiss the SAC, the Court determined (1) that California

17  Plaintiffs had "plausibly alleged that Ford knew about the EPAS system defects" prior to

18  Colburn's purchase, *id.* at 18, (2) that Ford "had a duty to disclose," *id.* at 22, and (3) that

19  California Plaintiffs had met the pleading standards set forth in Federal Rule of Civil Procedure

20  9(b), *id.* at 23. Ford has not challenged this determination. In addition, the TAC includes several

21  paragraphs under the heading "Fraudulent Concealment Tolling." TAC ¶¶ 58–63. As the TAC

22  avers, "Ford has been aware since 2010, if not earlier, that the EPAS system it designed,

23  manufactured, and installed in the Defective Vehicles [was] prone to sudden and premature

24  failure." *Id.* ¶ 59. Moreover, "[d]espite its knowledge of these defects, Ford failed to disclose and

25  concealed, and continues to conceal, this critical information from the California Plaintiffs." *Id.* ¶

26  60. As to the second requirement for fraudulent concealment tolling, California Plaintiffs allege

27  that Colburn's vehicle first experienced issues in October 2014, at which point Colburn took her

28

25

Case No. 14-CV-02989-LHK
ORDER DENYING MOTION TO DISMISS

United States District Court
Northern District of California

1   vehicle in for service at a local Ford dealership. *Id.* ¶ 52–53.  Colburn's actions thus demonstrate

2   "due diligence" in uncovering "the [pertinent] facts."  *Allen*, 96 F. Supp. 3d at 1071

3           Applying fraudulent concealment tolling in the instant case does not conflict with *Mexia*,

4   *MacDonald*, or any of the other cases discussed above regarding the future performance

5   exception.  In those cases, plaintiffs did not argue for fraudulent concealment tolling, and the court

6   did not discuss fraudulent concealment tolling.  In contrast, in the instant case, the Court has

7   already denied Ford's motion to dismiss California Plaintiffs' fraudulent concealment claim.  The

8   Court specifically determined that California Plaintiffs had sufficiently alleged knowledge by Ford

9   *prior* to Colburn buying her vehicle.  California Plaintiffs, moreover, include several paragraphs in

10  the TAC that plead tolling "with respect to any claims that the California Plaintiffs . . . sustained . .

11  . by virtue of [Ford's] fraudulent concealment."  TAC ¶ 63.

12          In sum, although Colburn's implied warranty claim falls outside the statute of limitations

13  and the future performance exception does not apply, Colburn's claim is subject to fraudulent

14  concealment tolling.  Accordingly, the Court finds Ford's motion to dismiss Colburn's claim as

15  time barred to be without merit.

## IV.    CONCLUSION

17          For the foregoing reasons, Ford's motion to dismiss California Plaintiffs' Song-Beverly

18  Act claim is DENIED.  Because California Plaintiffs' Song-Beverly Act claim rises and falls with

19  their Magnuson-Moss Warranty Act claim, *Daniel*, 806 F.3d at 1227, Ford's motion to dismiss

20  California Plaintiffs' Magnuson-Moss Warranty Act claim is also DENIED.

21  **IT IS SO ORDERED.**

22  Dated:  May 3, 2016

23                                                  *Lucy H. Koh*

24                                                  LUCY H. KOH
                                                    United States District Judge

United States District Court
Northern District of California

Case No. 14-CV-02989-LHK
ORDER DENYING MOTION TO DISMISS