1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT

9

NORTHERN DISTRICT OF CALIFORNIA

10

SAN JOSE DIVISION

11

| | |
|---|---|
| WILLIAM PHILIPS, et al., | Case No. 14-CV-02989-LHK |
| Plaintiffs, | **ORDER DENYING MOTION FOR CLASS CERTIFICATION** |
| v. | **REDACTED** |
| FORD MOTOR COMPANY, | Re: Dkt. No. 173 |
| Defendant. | |

Plaintiffs William Philips, Jaime Goodman, and Alison Colburn (collectively,

"Plaintiffs")[1] bring this action against Defendant Ford Motor Company ("Defendant" or "Ford").

---

[1] Plaintiffs Philips, Goodman, and Colburn allege only California claims. In addition to these Plaintiffs, the third amended complaint ("TAC") also includes the same non-California Plaintiffs from the first amended complaint ("FAC"): Jason Wilkinson, Robert Morris, Victoria Jackson, Johnpaul Fournier, and Ryan and Rebecca Wolf. ECF No. 114 ¶¶ 200–230. In ruling on Ford's first motion to dismiss, the Court addressed all fifty-one causes of action in the FAC, which included nationwide class claims and class claims brought under the laws of six states. ECF No. 46. After this ruling, however, the Court decided to proceed by addressing the California claims first. *Id.* To that end, the parties stipulated that "[a]lthough the [second amended complaint and any subsequent pleadings] may contain both California and non-California claims," any future motions to dismiss "shall address only . . . California [Plaintiffs'] claims." ECF No. 51 at 1. Thus, every order subsequent to the first motion to dismiss has addressed only California claims. Accordingly, this Order is limited to the causes of action brought by California Plaintiffs in the

1

Before the Court is Plaintiffs' motion for class certification. Having considered the submissions and oral arguments of the parties, the relevant law, and the record in this case, the Court DENIES Plaintiff's motion for class certification.

## I.    BACKGROUND

### A.    Factual Background

The following facts are from Plaintiffs' Third Amended Complaint and the evidence produced in support of Plaintiffs' motion for class certification. Plaintiffs seek to represent three classes of statewide consumers who purchased or leased Ford Fusion vehicles, model years 2010 through 2014, or Ford Focus vehicles, model years 2012 through 2014 (collectively, "Class Vehicles").[2] Plaintiffs allege that these Vehicles are equipped with a defective Electronic Power Assisted Steering ("EPAS") system.  TAC ¶ 1.  The following chart summarizes the named Plaintiffs' purchasing information:

| Plaintiff | Vehicle | Site of Purchase | Date of Purchase |
|---|---|---|---|
| William Philips | 2011 Ford Fusion (used) | Salinas Valley Ford | March 2012 |
| Jaime Goodman | 2011 Ford Fusion (new) | Future Ford of Clovis | October 2010 |
| Alison Colburn | 2010 Ford Fusion (new) | Galpin Ford | January 2010 |

*Id.* ¶¶ 32–53.  Power steering systems supplement the torque that the driver must apply to the steering wheel, thus making it easier for the driver to turn the wheel.  *Id.* ¶ 75.  Instead of using a traditional power steering pump, Ford's EPAS system uses a power steering control motor, electronic control unit, torque sensor, and steering wheel position sensor.  *Id.* ¶ 2.  Plaintiffs allege, however, that Ford's EPAS system suffers from a "systemic defect" that "renders the system prone to sudden and premature failure during ordinary and foreseeable driving situations."  *Id.* Specifically, Plaintiffs claim that "[w]hen developing the requirements for its EPAS system, Ford . . . ignored sound engineering judgment by incorporating unreliable electromechanical relays, which are foreseeably prone to failure, into the design." Mot. at 1–2. This defect, Plaintiffs

---

TAC.

[2] The TAC specifies that the "Vehicles include the following models: 2010–2014 Ford Fusion; 2010–2014 Ford Fusion Hybrid; 2013–2014 Ford Fusion Energi; 2012–2014 Ford Focus; and 2012–2014 Ford Focus Electric."  TAC ¶ 68.

2

United States District Court
Northern District of California

1     contend, causes drivers of the Class Vehicles to "experience significantly increased steering effort

2     and an increased risk of losing control of their vehicles when the EPAS system fails" and "defaults

3     to manual steering." *Id.* ¶¶ 3, 100.

4        **1. The Named Plaintiffs' Personal Experiences with EPAS Failure**

5           **i. Plaintiff Philips**

6        The named Plaintiffs allege that they paid more for their vehicles than they would have if

7     Ford has disclosed that their vehicles' EPAS systems were defective.  Specifically, William

8     Philips ("Plaintiff Philips") states that he "reviewed Ford's promotional materials and other

9     information" and that he "would not have purchased his 2011 Ford Fusion, or would not have paid

10    the purchase price charged" had Ford "disclosed the EPAS system defects and failures." *Id.* ¶ 34.

11    Philips also alleges that he experienced "problems with the steering system in his Fusion." *Id.*

12    ¶ 36.  After lodging multiple complaints with Ford, Plaintiff Philips was informed during a

13    dealership visit in 2013 "that it would cost approximately $2,000 to fix the problem," through an

14    EPAS system replacement.  *Id.*  Plaintiff Philips declined to repair his vehicle at that time.  In July

15    2015, Plaintiff Philips received a notice from Ford alerting him that his "vehicle [was] subject to a

16    safety recall," and asking Plaintiff Philips to bring his vehicle to a dealership for further

17    inspection.  ECF No. 97-5 at 192.  After receiving this notice, Plaintiff Philips brought his vehicle

18    in for an inspection, at which time Ford replaced the EPAS system in Plaintiff Philips's vehicle.

19           **ii. Plaintiff Goodman**

20        Jaime Goodman ("Goodman") claims that, prior to "purchasing her 2011 Ford Fusion,"

21    she "(a) viewed television advertisements concerning the vehicles; (b) viewed material concerning

22    the Fusion on Ford's website; (c) reviewed the window sticker on the vehicle she would purchase;

23    and (d) received and reviewed a brochure concerning the Fusion." TAC ¶ 40.  "The window

24    sticker," Plaintiff Goodman says, "indicated that the vehicle she would purchase was equipped

25    with power steering." *Id.*  "Nowhere in these materials did Ford disclose the EPAS system defects

26    and failures," and had Ford done so, Plaintiff Goodman alleges that she "would not have

27    purchased her 2011 Ford Fusion, or would not have paid the purchase price charged." *Id.* ¶¶ 40–

28

United States District Court
Northern District of California

3

1    41.  In addition, Plaintiff Goodman claims that in 2014 she "began having intermittent problems

2    with the steering system in her 2011 Ford Fusion and experienced difficulty steering." *Id.* ¶ 43.

3           Ultimately, Plaintiff Goodman "took [her] vehicle to a Ford dealership [in December 2014]

4    and was told that it would cost $1,800 to fix the problem with the steering system." *Id.*  As with

5    Plaintiff Philips, the dealership recommended that the EPAS system in Plaintiff Goodman's

6    vehicle be replaced.  Although Plaintiff Goodman contended that her power steering problems

7    were a safety issue, Ford refused to defray the cost of an EPAS system replacement.  ECF No. 94-

8    8 at 47.  Citing financial hardship, Plaintiff Goodman declined to undertake any repairs to her

9    vehicle at this time and continued to experience problems with her vehicle.

10          In July 2015, Plaintiff Goodman received "a letter from Ford Motor Company concerning

11   the 2011 Fusion and a recall for the [Fusion's] EPAS [system]." *Id.* at 49.  Pursuant to this letter,

12   Plaintiff Goodman took her vehicle to a Ford dealership in August 2015, expecting that Ford

13   would replace the EPAS system in her vehicle free of charge.  During this August 2015 visit,

14   however, the dealership declined to perform a system replacement and instead simply

15   reprogrammed the computer in Plaintiff Goodman's vehicle.

16          In October 2015, Plaintiff Goodman once again experienced problems with her vehicle's

17   power steering.  "On November 2, 2015, Ford's counsel contacted Plaintiffs' counsel to inform

18   them that based on a review of the attached service records . . . , it appears that Jaime Goodman is

19   eligible for a steering gear replacement." ECF No. 94-6 at 10.  Plaintiff Goodman thereafter

20   scheduled an appointment to replace her vehicle's EPAS system on November 12, 2015.  "A few

21   hours after dropping off [her] vehicle" on November 12, 2015, however, Plaintiff Goodman

22   "received a call from a service associate . . . and was informed that . . . [her vehicle] was no longer

23   eligible for a free replacement under Ford's recall program." ECF No. 95-4 at 2.  After "Ford

24   refused to replace [Goodman's] EPAS system," Plaintiffs' counsel once again reached out to Ford.

25   *Id.* at 3.  On November 24, 2015, Ford finally replaced the EPAS system in Plaintiff Goodman's

26   vehicle.

27

28

4

### iii.  Plaintiff Colburn

Finally, prior to "purchasing her 2010 Ford Fusion," Alison Colburn ("Plaintiff Colburn") claims that, like Plaintiff Goodman, she "(a) viewed television advertisements concerning the vehicles; (b) viewed material concerning the Fusion on Ford's website; (c) reviewed the window sticker on the vehicle she would purchase; and (d) received and reviewed a brochure concerning the Fusion," and that "[t]he window sticker indicated that the vehicle she would purchase was equipped with power steering."  TAC ¶ 47.  "Nowhere in these materials did Ford disclose the EPAS system defects and failures."  *Id.*  Had Ford done so, Plaintiff Colburn alleges that she "would not have purchased her 2010 Ford Fusion, or would not have paid the purchase price charged."  *Id.* ¶ 48.  Plaintiff Colburn alleges that the power steering in her vehicle failed in October 2014.  *Id.* ¶ 52.  Later that month, she took her vehicle to a Ford dealership and paid $990.19 to replace her vehicle's EPAS system.  *Id.* ¶ 53.

### 2.  The Nature of the Alleged Defect

In their complaint, Plaintiffs point to various possible defects in EPAS systems in Ford vehicles. *Id.* ¶ 79. However, after considerable discovery, Plaintiffs have narrowed their theory for the purposes of their motion for class certification of their California claims. As relevant to the instant motion, Plaintiffs assert that the EPAS systems in 2010-2012 Fusion vehicles and 2012-2014 Focus vehicles are defective because the EPAS systems contain unreliable electro-mechanical relays.

Ford began to use electro-mechanical relays in EPAS systems in 2009 to produce the 2010 Fusion. Pascarella Rpt., Ex. A to Opp., at 3. The EPAS system is manufactured by a Ford supplier called TRW and includes two electro-mechanical relays: a "link relay" and a "star point" relay. Arora Rpt., Ex. B to Opp., at 28. The link relay controls power to the EPAS system, and the star point relay controls power to the steering motor. *Id.* at 36, 40. These relays control power through a circuit that is completed when two metal plates in the relays make contact. Ex. 3 to Mot., at 55–58. When the metal plates are in contact, the circuit is closed and power is engaged. *Id.* When the metal plates are separated, the circuit is opened and power is cut off. *Id.* Occasionally, these relays

Case No. 14-CV-02989-LHK
ORDER DENYING MOTION FOR CLASS CERTIFICATION

experience "faults," meaning the circuits open and power is cut off at unexpected times. When a fault occurs, power steering is cut off and the vehicle reverts to manual steering. Ex. B, at 36–40. These faults are indicated by "diagnostic trouble codes" to assist in diagnosis and repair. A code number B43 indicates a fault in the link relay, and a code number B3A indicates a fault in the star point relay. Ex. B, at 40; Report of Dr. Marthinius van Schoor, Ex. 2 to Mot., at 8.

Plaintiffs claim that Ford knew as early as 2007 that electro-mechanical relays were unfit for use in EPAS systems. Mot. at 2. In their Motion for Class Certification and the exhibits attached to that motion, Plaintiffs point to many Ford emails suggesting that Ford employees believed that electro-mechanical relays were subject to issues such as thermal expansion and sensitivity to variations in manufacturing. Mot. at 4; Ex. 15 to Mot. at 114. Other internal Ford emails suggested that Ford hoped to "remove electro-mechanical relays out of EPS products." Ex. 16 to Mot., at 122. Nevertheless, Plaintiffs claim that because of budgetary issues, Ford decided not to change the design to omit electro-mechanical relays. Mot. at 5; Ex. 4 to Mot., at 63.

Ford continually diagnosed and assessed relay problems, and Ford began to make some changes to the EPAS systems in 2011. Mot. at 5; Opp. at 5. However, according to Plaintiffs, none of these changes addressed the ultimate cause of the EPAS system's unusually high failure rates: inclusion of unreliable electro-mechanical relays. During this time, Ford also received an unusual number of complaints regarding sudden and unexpected failures of power steering systems. Opp. at 17. At the time, Ford concluded that there were several causes for the power steering issues, but the main cause was the fact that "ribbon cables" in the EPAS systems were sometimes damaged during assembly. Opp. at 5, Ex. B at 48–49. After the National Highway Transportation Safety Administration (NHTSA) opened an investigation into reports of power steering failures in Fusion vehicles, Ford began a recall of certain Fusion vehicles based on the ribbon-cable issues. Opp. at 6. However, according to Plaintiffs, this recall does not address their concerns because even after replacement, the EPAS systems are still defective because they incorporate unreliable electro-mechanical relays. Plaintiffs claim that Ford knew that inclusion of the unreliable relays posed safety concerns and that other feasible designs would not pose the same dangers. Mot. 7–9.

Case No. 14-CV-02989-LHK
ORDER DENYING MOTION FOR CLASS CERTIFICATION

United States District Court
Northern District of California

Based on the evidence outlined above, Plaintiffs allege that Ford fraudulently concealed the alleged defect in the EPAS systems.  Despite press releases and web-based "promotional materials" touting "EPAS as a reliable and beneficial product," Ford knew as early as 2007 that the EPAS system was "prone to sudden, premature failure," and yet took no remedial action.  *Id.* ¶ 11.  Plaintiffs further claim that "Ford concealed the fact that the EPAS system [was] prone to sudden and premature failure from consumers so that the warranty period on the Defective Vehicles would expire before consumers became aware of the problem."  *Id.* ¶ 24.  Had Ford disclosed the alleged defect, Plaintiffs "would not have purchased . . . th[e] vehicles, or would have paid substantially less for the vehicles than they did."  *Id.* ¶ 25.  Moreover, "Ford's failure to disclose to consumers and the public at large the material fact that the EPAS system is prone to premature failure . . . recklessly risked the safety of occupants of the Defective Vehicles and the public at large."  *Id.* ¶ 6.

### B.  Procedural History

On June 27, 2014, Plaintiffs filed the original complaint in this putative class action.  ECF No. 1.  Plaintiffs filed the first amended complaint ("FAC") on September 8, 2014.  ECF No. 15 ("FAC").  At a hearing on February 12, 2015, the Court granted Ford's motion to dismiss the FAC with leave to amend.  ECF No. 46.

As to Plaintiffs' implied warranty claims, brought under California's Song-Beverly Consumer Warranty Act ("Song-Beverly Act") and the Magnuson-Moss Warranty Act ("Magnuson-Moss Act"), the Court found "that Plaintiffs ha[d] sufficiently alleged that the EPAS system defect made the [Vehicles] unfit for their ordinary purpose."  ECF No. 48, at 5.  However, the Court also found that an "implied warranty claim is [also] limited in duration . . . and Plaintiffs [had] not allege[d] a defect within the warranty period."  *Id.*  In reaching this decision, the Court declined to follow the California Court of Appeal's decision in *Mexia v. Rinker Boat Co., Inc.*, 95 Cal. Rptr. 3d 285 (Ct. App. 2009), which the Court characterized as being an "outlier."  ECF No. 48, at 5.  The Court instead found more persuasive several federal district court decisions, including *Daniel v. Ford Motor Company*, 2013 WL 2474934 (E.D. Cal. June 7, 2013).  The

7

1   Court granted Plaintiffs leave to amend their implied warranty claims because "there [we]re

2   factual allegations that the Plaintiffs could allege that could cure th[e] deficienc[ies] [identified]."

3   ECF No. 48, at 10.

4        In addition, in light of the unwieldy nature of the FAC, the parties agreed at the February

5   18, 2015 case management conference to move forward only on the California claims for any

6   subsequent motions to dismiss.  ECF No. 51.  If any of the California claims survived, the parties

7   would continue to litigate those claims to resolution before this Court.  ECF No. 54 at 9.  If none

8   of the California claims survived, then the Court would confer with the parties regarding how to

9   proceed on the remaining claims, with the possibility of transferring this action to a more

10  appropriate jurisdiction.  *Id.*

11       With this understanding in mind, Plaintiffs filed a second amended complaint ("SAC") on

12  March 27, 2015.  The SAC asserted four causes of action under California law: (1) violation of the

13  unlawful and unfair prongs of California's Unfair Competition Law ("UCL"); (2) violation of the

14  fraud prong of the UCL; (3) violation of California's Consumer Legal Remedies Act ("CLRA");

15  and (4) common law fraudulent concealment.

16       On April 30, 2015, Ford moved to dismiss the SAC, ECF No. 58, which the Court granted

17  in part and denied in part, ECF No. 69.  Specifically, the Court granted with prejudice Ford's

18  motion to dismiss Plaintiffs' UCL claims and Plaintiffs' CLRA claim for injunctive relief, holding

19  that Plaintiffs were not entitled to equitable relief because they had an adequate remedy at law. *Id.*

20  at 30. The Court also granted with prejudice Ford's motion to dismiss Ian Colburn, Alison

21  Colburn's son, as a named Plaintiff.  *Id.* at 31.  Two claims—the common law fraudulent

22  concealment claim and the CLRA claim for damages—survived Ford's second round motion to

23  dismiss.  *Id.*  Ford answered the SAC on August 6, 2015.  ECF No. 78.

24       On October 28, 2015, Ford filed a second motion to dismiss the SAC.  ECF No. 84.  In this

25  motion, Ford argued for dismissal under the prudential mootness and primary jurisdiction

26  doctrines.  ECF No. 105 at 8.  Ford also argued that Plaintiffs lacked "standing to pursue their

27  claims as to the 2012–2014 Focus and 2013–2014 Fusion."  *Id.* at 9.  The Court denied this motion

28

Case No. 14-CV-02989-LHK
ORDER DENYING MOTION FOR CLASS CERTIFICATION

United States District Court
Northern District of California

in its entirety.  *Id.* at 25.

On February 18, 2016, the parties filed a joint case management statement in advance of the February 25, 2016 case management conference.  ECF No. 104.  In this statement, Plaintiffs stated their intent to file a "motion for leave to amend to reassert their claims for breach of [implied] warranty."  *Id.* at 2.  According to Plaintiffs, in light of the Ninth Circuit's December 2, 2015 decision in *Daniel v. Ford Motor Company*, 806 F.3d 1217 (9th Cir. 2015), the Court had erred in dismissing Plaintiffs' implied warranty claims on February 12, 2015.  After reviewing the *Daniel* decision, the Court agreed with Plaintiffs, and granted Plaintiffs leave to amend at the February 25, 2016 case management conference.  ECF No. 108.

Plaintiffs filed the TAC on March 4, 2016.  The TAC includes two new claims: an implied warranty claim asserted under the Song-Beverly Act, TAC ¶¶ 154–170, and an  implied warranty claim asserted under the Magnuson-Moss Act, *id.* ¶¶ 140–153.  On March 24, 2016, Ford moved to dismiss these implied warranty claims. On May 3, 2016, the Court denied Ford's motion to dismiss. ECF No. 134. The Court held that under the Ninth Circuit's recent decision in *Daniel v. Ford Motor Company*, 806 F.3d 1217 (9th Cir. 2015), Plaintiffs had stated a claim for relief under the Song-Beverly Act and the Magnuson-Moss Act for breach of implied warranty. *Id.* at 16. The Court also found that Plaintiffs had not waived these claims by failing to replead the claims in the SAC, *id.* at 20, and that Plaintiff Colburn's claims fell within the applicable four year statute of limitations because Plaintiff Colburn had sufficiently alleged tolling of the statute of limitations because of fraudulent concealment, *id.* at 26.

On July 29, 2016, Plaintiffs filed a motion for class certification under Federal Rule of Procedure ("Rule") 23. ECF No. 173. Ford filed an opposition to the motion for class certification on September 19, 2016. ECF No. 194. On September 26, 2016, Ford filed a *Daubert* motion to exclude the expert report of Dr. Jonathan Arnold, ECF No. 196, and a *Daubert* motion to exclude the expert report of Dr. Marthinius van Schoor, ECF No. 197. On November 8, 2016, Plaintiffs filed an opposition to the motion to exclude the expert report of Dr. Jonathan Arnold, ECF No. 201, and an opposition to the motion to exclude the expert report of Dr. Marthinius van Schoor,

United States District Court
Northern District of California

Case No. 14-CV-02989-LHK
ORDER DENYING MOTION FOR CLASS CERTIFICATION

1   ECF No. 202. On November 14, 2015, Plaintiffs filed a reply to Ford's opposition to the motion

2   for class certification. ECF No. 204. On November 22, 2016, Ford filed replies to Plaintiffs'

3   oppositions to Ford's *Daubert* motions. On December 6, 2016, Ford filed a notice of supplemental

4   authority in support of its opposition to the motion for class certification. ECF No. 216. On

5   December 8, 2016, the Court held a hearing on Plaintiffs' motion for class certification and on

6   Ford's *Daubert* motions. ECF No. 219.

7   **C. Proposed Classes**

8   In their motion for class certification, Plaintiffs move to certify the following three classes:

9   (1) New Vehicle Class: All residents of California who, at any time, purchased or

10   leased a new 2010-2012 Ford Fusion or 2012-2014 Ford Focus vehicle from Ford

11   Motor Company or through a Ford Motor Company dealership.

12   (2) Out-of-Pocket Class: All residents of California who incurred expenses in

13   connection with the diagnosis, repair, or replacement of the Electronic Power

14   Assisted Steering system in a 2010-2012 Ford Fusion or 2012-2014 Ford Focus

15   vehicle.

16   (3) Current Owner/Lessee Class: All residents of California who currently own or

17   lease a 2010-2012 Ford Fusion or 2012- 2014 Ford Focus vehicle.

18   Plaintiffs seek to certify the New Vehicle Class and the Out-of-Pocket Class under Rule

19   23(b)(3), Reply at 11, and seek to certify the Current Owner-Lessee Class under Rule

20   23(b)(2), *id.*

21   On behalf of the New Vehicle Class, Plaintiffs assert CLRA claims, implied warranty

22   (Song-Beverly Act and Magnuson-Moss Act) claims, and fraudulent concealment claims and

23   seek benefit-of-the-bargain damages. On behalf of the Out-of-Pocket Class, Plaintiffs assert

24   CLRA claims, implied warranty (Song-Beverly Act and Magnuson-Moss Act) claims, and

25   fraudulent concealment claims and seek reimbursement for money spent diagnosing and

26   repairing the allegedly defective EPAS systems. On behalf of the Current/Owner Lessee

27   Class, Plaintiffs assert only an implied warranty claim and seek an injunction requiring Ford

28

Case No. 14-CV-02989-LHK
ORDER DENYING MOTION FOR CLASS CERTIFICATION

1    to replace the allegedly defective EPAS systems.

2         At the December 8, 2016 hearing on Plaintiffs' Motion for Class Certification, Plaintiffs

3    agreed that the Current Owner/Lessee Class should be revised to include only individuals who

4    purchased new vehicles in California for personal, family, or household purposes. Hr'g Tr. at

5    19:16–21. Plaintiffs also agreed that for the purposes of their CLRA claims and their implied

6    warranty claims, the New Vehicle Class and the Out-of-Pocket Class should be revised to contain

7    only individuals who purchased new vehicles in California for personal, family, or household

8    purposes.[3] Hr'g Tr. at 35–36.

9    **II.      LEGAL STANDARD**

10        Class actions are governed by Rule 23 of the Federal Rules of Civil Procedure. Rule 23

11   does not set forth a mere pleading standard. To obtain class certification, Plaintiffs bear the burden

12   of showing that they have met each of the four requirements of Rule 23(a) and at least one

13   subsection of Rule 23(b). *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186, *amended by*

14   273 F.3d 1266 (9th Cir. 2001). "A party seeking class certification must affirmatively demonstrate

15   . . . compliance with the Rule[.]" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

16        Rule 23(a) provides that a district court may certify a class only if: "(1) the class is so

17   numerous that joinder of all members is impracticable; (2) there are questions of law or fact

18   common to the class; (3) the claims or defenses of the representative parties are typical of the

19   claims or defenses of the class; and (4) the representative parties will fairly and adequately protect

20   the interests of the class." Fed. R. Civ. P. 23(a). That is, the class must satisfy the requirements of

21   numerosity, commonality, typicality, and adequacy of representation to maintain a class action.

22   *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 588 (9th Cir. 2012). Further, while Rule 23(a)

23   is silent as to whether the class must be ascertainable, courts have held that the Rule implies this

24   requirement as well. *See, e.g., In re Yahoo Mail Litig.*, 308 F.R.D. 577, 596 (N.D. Cal. 2015)

25   (party seeking class certification under Rule 23(b)(3) "must demonstrate that an identifiable and

26

27   _____
     [3] Plaintiffs believe that such a limitation would not be appropriate for the fraudulent concealment
     claims asserted by the New Vehicle Class and the Out-of-Pocket Class. Hr'g Tr. at 35–36, 19.

28
     Case No. 14-CV-02989-LHK
     ORDER DENYING MOTION FOR CLASS CERTIFICATION

1  ascertainable class exists"); *Herrera v. LCS Fin. Servs. Corp.*, 274 F.R.D. 666, 672 (N.D. Cal.

2  2011).

3           If all four prerequisites of Rule 23(a) are satisfied, the Court must also find that Plaintiffs

4  "satisfy through evidentiary proof" at least one of the three subsections of Rule 23(b). *Comcast*

5  *Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013). Rule 23(b) sets forth three general types of class

6  actions. *See* Fed. R. Civ. P. 23(b)(1)–(b)(3). Of these types, Plaintiffs seek certification under Rule

7  23(b)(3) and Rule 23(b)(2). The Court can certify a class under Rule 23(b)(3) if the Court finds

8  that "questions of law or fact common to class members predominate over any questions affecting

9  only individual members, and that a class action is superior to other available methods for fairly

10 and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The Court can certify a

11 Rule 23(b)(2) class if "the party opposing the class has acted or refused to act on grounds that

12 apply generally to the class, so that final injunctive relief or corresponding declaratory relief is

13 appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

14          "[A] court's class-certification analysis must be 'rigorous' and may 'entail some overlap

15 with the merits of the plaintiff's underlying claim[.]'" *Amgen Inc. v. Conn. Ret. Plans & Trust*

16 *Funds*, 133 S.Ct. 1184, 1194 (2013) (quoting *Dukes*, 564 U.S. at 351); *see also Mazza*, 666 F.3d at

17 588 ("'Before certifying a class, the trial court must conduct a 'rigorous analysis' to determine

18 whether the party seeking certification has met the prerequisites of Rule 23.'" (quoting *Zinser*, 253

19 F.3d at 1186)). This "rigorous" analysis applies to both Rule 23(a) and Rule 23(b). *Comcast*, 133

20 S. Ct. at 1432 (stating that Congress included "addition[al] . . . procedural safeguards for (b)(3)

21 class members beyond those provided for (b)(1) or (b)(2) class members (e.g., an opportunity to

22 opt out)" and that a court has a "duty to take a 'close look' at whether common questions

23 predominate over individual ones").

24          Nevertheless, "Rule 23 grants courts no license to engage in free-ranging merits inquiries

25 at the certification stage." *Amgen*, 133 S. Ct. at 1194–95. "Merits questions may be considered to

26 the extent—but only to the extent—that they are relevant to determining whether the Rule 23

27 prerequisites for class certification are satisfied." *Id.* at 1195. If a court concludes that the moving

28
Case No. 14-CV-02989-LHK
ORDER DENYING MOTION FOR CLASS CERTIFICATION

party has met its burden of proof, then the court has broad discretion to certify the class. *Zinser*, 253 F.3d at 1186.

## III.   DISCUSSION

The Court begins by discussing the requirements under Rule 23(a). The Court then discusses the requirements under Rule 23(b)(3) and Rule 23(b)(2). Although the Court finds that Plaintiffs have met the Rule 23(a) requirements, the Court finds, as set forth below, that Plaintiffs have not met the predominance requirement of Rule 23(b)(3) or the requirements for certification under Rule 23(b)(2).

### A.   Rule 23(a) Requirements

#### 1.   Numerosity

Pursuant to Rule 23(a)(1), Plaintiffs must show that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Plaintiffs need not state the precise number of potential class members, nor is there a specific minimum threshold requirement. *In re Rubber Chems. Antitrust Litig.*, 232 F.R.D. 346, 350–51 (N.D. Cal. 2005). Rather, the Court must examine the specific facts of each case to determine whether the numerosity requirement is met. *Gen. Tel. Co. of Nw., Inc. v. EEOC*, 446 U.S. 318, 330 (1980).

Ford does not contest that the numerosity requirement is met in the instant case, and "general knowledge and common sense indicate" that the number of 2010-2012 Fusion and 2012-2014 Focus owners in California is "large" and that joinder is therefore impractical. *Perez-Olano v. Gonzalez*, 248 F.R.D. 248, 256 (C.D. Cal. 2008); *see also In re Beer Distrib. Antitrust Litig.*, 188 F.R.D. 557, 562 (N.D. Cal. 1999) (holding that 25 class members satisfied numerosity requirement). This is sufficient to satisfy the numerosity requirement.

#### 2.   Commonality

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." *Dukes*, 564 U.S. at 349. To satisfy the commonality requirement, Plaintiffs must show that the class members have suffered "the same injury," meaning that class members' claims must "depend upon a common contention" of such a nature that "determination of its truth or falsity will resolve

an issue that is central to the validity of each [claim] in one stroke." *Id.* at 350 (quotation marks and citation omitted). Plaintiffs must demonstrate not merely the existence of a common question, but rather "the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* (quotation marks omitted) (emphasis in original). Nevertheless, the "common contention need not be one that will be answered, on the merits, in favor of the class." *Alcantar v. Hobart Serv.*, 800 F.3d 1047, 1053 (9th Cir. 2015) (internal quotation marks omitted). Additionally, "for purposes of Rule 23(a)(2), even a single common question will do." *Dukes*, 564 U.S. at 359 (alteration and quotation marks omitted).

In the instant case, Plaintiffs have alleged that the EPAS systems installed in all Class Vehicles suffer from a common defect. "In automobile defect cases, commonality is often found when the most significant question concerns the existence of a defect." *Parkinson v. Hyundai Motor Am.*, 258 F.R.D. 580 (C.D. Cal. 2008). Plaintiffs have set forth several issues that are common to the class, including the existence of a defect, whether Ford knew of the alleged defect, whether Ford had a duty to disclose its knowledge and breached that duty, whether the failures to disclose were material, and whether those failures violated the law. Mot. at 13; *see Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 962 (9th Cir. 2005) (holding that similar common questions met the commonality requirement).

In determining commonality, "[t]he existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998). Thus, although as discussed below Plaintiffs fail to show that common issues predominate under Rule 23(b)(3), Plaintiffs have identified at least some common issues. Thus, the Court finds that issues such as the existence of a defect and Ford's knowledge of the defect are enough to meet "the relatively 'minimal' showing required to establish commonality." *Ries v. Ariz. Beverages USA LLC*, 287 F.R.D. 523, 537 (N.D. Cal. 2012) (citing *Hanlon*, 150 F.3d at 1020).

### 3. Typicality

Under Rule 23(a)(3) a representative party must have claims or defenses that are "typical

14

of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Typicality is satisfied "when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendants' liability." *Rodriguez v. Hayes*, 591 F.3d 1105, 1122 (9th Cir. 2010) (citations omitted). This requirement is "permissive and requires only that the representative's claims are reasonably co-extensive with those of the absent class members; they need not be substantially identical." *Hanlon*, 150 F.3d at 1020. Claims that are reasonably co-extensive with the claims of absent class members will satisfy the typicality requirement, but the class must be limited to "those fairly encompassed by the named plaintiff's claims." *Dukes*, 131 S.Ct. at 2550. "[C]lass certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." *Hanon*, 976 F.2d at 508 (citations omitted). "The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class." *Id.*

The named Plaintiffs assert that they meet the typicality requirement because "all class members are alleged to have suffered injury as a result of the same conduct" by Ford. Mot. at 14 (quoting *Doyle v. Chrysler Group LLC*, 2014 WL 7690155, at *7 (C.D. Cal. Oct. 9, 2014). Therefore, according to Plaintiffs, the named Plaintiffs' claims are "reasonably co-extensive with those of absent class members" because the named "Plaintiffs and all class members allegedly suffered the same injury, entitling them to relief under the same legal theories." *Hanlon*, 976 F.2d at 508.

Ford argues that the named Plaintiffs do not meet the typicality requirement for several reasons. First, Ford argues that the evidence shows that the alleged EPAS failures were due to individual causes, and not to a classwide defect in the EPAS system. Opp. at 24. Second, Ford argues that the named Plaintiffs owned only Fusion vehicles, but the class also covers the "materially different" Focus vehicles as well. Opp. at 25. Third, Ford argues that the named Plaintiffs are subject to various defenses that are not typical of the class. Opp. at 25–26.

The Court first addresses a threshold issue regarding Plaintiff Philips, after which the Court addresses each of Ford's arguments in turn.

Case No. 14-CV-02989-LHK
ORDER DENYING MOTION FOR CLASS CERTIFICATION

United States District Court
Northern District of California

**i. Plaintiff Philips is Not a Member of Any of the Proposed Classes**

Before the Court addresses Ford's arguments, the Court notes that Plaintiff Philips is not a member of any of the proposed classes and therefore must be dismissed. Plaintiff Philips purchased a used vehicle, and therefore Plaintiff Philips is not a member of the New Vehicle Purchaser Class. TAC ¶ 33 ("Plaintiff Philips owns a 2011 Ford Fusion, which he purchased used from Salinas Valley Ford in March 2012."). Plaintiff Philips also does not allege that he paid for diagnosis or repair for his vehicle's EPAS system, and therefore Plaintiff Philips is not a member of the Out-of-Pocket Class. *See id.* (containing no allegation of payment for diagnosis or repair). Additionally, as discussed above, Plaintiffs concede that the Current Owner/Lessee class must be revised to include only those who own Class Vehicles and who purchased those vehicles new. As stated above, Plaintiff Philips purchased his vehicle used. Therefore, Plaintiff Philips is not a member of the Current Owner/Lessee Class as revised.

"[T]ypicality requires that the named Plaintiffs be members of the class they represent," and thus Plaintiff Phillips cannot represent any of the proposed classes. *Torres v. Goddard*, 314 F.R.D. 644, 656 (D. Ariz. 2010); *see also Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156 (1982) ("We have repeatedly held that "a class representative must be part of the class . . . ."). Therefore, the Court dismisses Plaintiff Philips from the action. Nevertheless, even without Plaintiff Philips, each of the proposed classes contains at least one of the named Plaintiffs. Plaintiffs Colburn and Goodman are members of the New Vehicle Class. TAC ¶¶ 45, 38. Plaintiff Goodman is a member of the Current Owner/Lessee Class. *Id.* ¶ 38 ("Plaintiff Goodman owns a 2011 Ford Fusion"). Plaintiff Colburn is a member of the Out-of-Pocket Class. *Id.* ¶ 53 (alleging that Plaintiff Colburn spent $990.19 to repair her vehicle's EPAS system).

Therefore, the Court finds that the dismissal of Plaintiff Philips does not require dismissal of the action, because "if [an] action is brought by . . . several representative parties, it only is necessary that one of them be a qualified member of the class as long as the other prerequisites of Rule 23(a) are satisfied." *See Aiken v. Obledo*, 442 F. Supp. 628, 658 (E.D. Cal. 1977) (quoting 7 Wright and Miller, Federal Practice and Procedure, § 1761 (1st ed. 1972)).

Case No. 14-CV-02989-LHK
ORDER DENYING MOTION FOR CLASS CERTIFICATION

1     Therefore, the Court considers each of Ford's arguments against typicality in turn. In doing

2   so, the Court does not consider Ford's arguments regarding Plaintiff Philips because Plaintiff

3   Philips has been dismissed.

4     **i. Differences in the Experiences of Plaintiffs Goodman and Colburn**

5     Ford claims that the evidence shows that Plaintiff Goodman and Plaintiff Colburn's EPAS

6   systems did not fail because of any class-wide defect, but instead each of their EPAS systems

7   failed for a different, atypical reason. Plaintiff Jaime Goodman experienced intermittent power

8   steering failures in her 2011 Fusion. Deposition of Jaime Goodman, Ex. N to Opp., at 58:4–6.

9   According to Ford's expert Dr. Ashish Arora, an inspection of Goodman's vehicle showed a

10  "relay-related" fault code (code B43), but the inspection "ruled out a faulty relay" as the cause of

11  the fault. Opp. at 7, 9, Ex B., at 48–55. Plaintiff Alison Colburn gave her 2010 Fusion to her son,

12  who experienced a power steering failure. Opp. at 9–10. According to Dr. Arora, Colburn's

13  vehicle showed an excessive friction code and also showed "one [code] related to anti-lock

14  braking, but no relay-related codes." Ex. B., at 51. Essentially, Ford claims that Plaintiff Goodman

15  and Plaintiff Colburn are atypical because Plaintiff Coburn's vehicle did not experience a "relay-

16  related" fault at all, and although Plaintiff Goodman's vehicle experienced a "relay-related" fault,

17  that fault was not due to failure of the relay.

18    In short, Ford claims that the named Plaintiffs are not typical because they did not actually

19  suffer harm from the allegedly defective EPAS systems. The Ninth Circuit addressed a similar

20  argument in *Wolin v. Jaguar Land Rover North America, LLC*, 617 F.3d 1168, 1174 (9th Cir.

21  2010). In *Wolin*, the plaintiffs argued that certain vehicles were defective because the vehicles had

22  a "defective alignment geometry" that caused the tires to wear more quickly than usual. *Id.* at

23  1170. Land Rover argued against class certification on the grounds that the named plaintiffs'

24  "claims are not typical because their tires indicate wear that is not the kind attributable to vehicle

25  alignment." *Id.* at 1175.The Ninth Circuit rejected this argument and noted that the named

26  plaintiffs alleged that they, "like all prospective class members, were injured by a defective

27  alignment geometry in the vehicles." *Id.* The Court held that even if Land Rover were correct that

28  Case No. 14-CV-02989-LHK
    ORDER DENYING MOTION FOR CLASS CERTIFICATION

1    the wear on the named plaintiffs' tires was due to a different cause than the wear on class

2    members' tires, the named plaintiffs, "like the rest of the class, may have a viable claim regardless

3    of the manifestation of the defect." *Id.* In other words, even though named plaintiffs' tires may

4    have been worn for other reasons, plaintiffs' theory was that their vehicles still suffered from the

5    same alignment defect, and this was sufficient to make the named plaintiffs' claim typical of the

6    proposed class.

7         The same is true here. As described in more detail below, Plaintiffs' theory of harm is that

8    Plaintiffs overpaid for their vehicles under the mistaken belief that the vehicles contained defect-

9    free EPAS systems. If this theory of harm is correct, then the named Plaintiffs were harmed at the

10   moment they purchased a Class Vehicle, even if their power steering ultimately failed for reasons

11   unrelated to the relays. In short, as in *Wolin*, the named Plaintiffs in the instant case, "like the rest

12   of the class, may have a viable claim regardless of the manifestation of the defect." *Id.*[4]

13        Under *Wolin*, Plaintiffs meet the typicality requirement if they allege the same claims

14   based on the same defect as the absent class members. In the instant case, Plaintiff Goodman and

15   Plaintiff Colburn, like the other prospective class members, purchased vehicles that contained

16   EPAS systems that were allegedly defective because the EPAS systems contained allegedly

17   unreliable electro-mechanical relays. Although Ford argues that Plaintiffs cannot prevail on these

18   claims, at the class certification stage, a court need not "determine whether class members could

19

20   [4] Ford cites *Sandoval v. Pharmacare US, Inc.*, 2016 WL 3554919, at *5 (S.D. Cal. June 10, 2016),
     to support its argument that the named Plaintiffs are atypical because the power steering in their

21   vehicles failed for reasons other than unreliable relays. Opp. at 24. In *Sandoval*, the court held that
     the named plaintiffs were unrepresentative partly because although the plaintiffs alleged that the

22   product at issue falsely claimed to improve sexual-health problems, the "[p]laintiffs testified at
     their depositions that they did not suffer from the sexual-health problems they claim [the product]

23   falsely claimed to improve." *Id.* at *5. Thus, the Court found that the named plaintiffs could not
     have relied on the product's allegedly false claims to improve sexual-health problems, and

24   therefore the named plaintiffs did not have claims typical of class members who were misled by
     such claims. In the instant case, on the other hand, Ford does not assert that Plaintiff Goodman and

25   Plaintiff Colburn could not have been misled by Ford's allegedly fraudulent omissions or had
     atypical expectations for the vehicles that they purchased. Instead, Ford claims that Plaintiff

26   Goodman and Plaintiff Colburn are atypical because they suffered a different manifestation of the
     defect. However, this argument is foreclosed by *Wolin*, which held that differences in

27   manifestation of defects do not defeat typicality. *Wolin*, 617 F.3d at 1175; *see also Sandoval*, 2016
     WL 3554919, at *5 (citing *Wolin* as setting out the test for typicality).

28
     18
     Case No. 14-CV-02989-LHK
     ORDER DENYING MOTION FOR CLASS CERTIFICATION

United States District Court
Northern District of California

1   actually prevail on the merits of their claims." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 983

2   n.8 (9th Cir. 2011). Instead, it is enough to know that Plaintiff Goodman and Plaintiff Colburn's

3   claims are "reasonably co-extensive with those of the absent class members." *Hanlon*, 150 F.3d at

4   1020.

5           As the Ninth Circuit has held, "[t]ypicality refers to the natures of the claim or defense of

6   the class representative, and not to the specific facts from which it arose." *Ellis v. Costco*

7   *Wholesale Corp.*, 667 F.3d 970, 984 (9th Cir. 2011) (quoting *Hanon*, 976 F.2d at 508). Thus,

8   under Ninth Circuit law the named Plaintiffs in the instant case assert the same claims as the

9   prospective class members, and this is enough to meet Rule 23(a)'s typicality requirement.

10                      **ii. Differences Between Fusion and Focus Vehicles**

11          Ford also argues that Plaintiff Goodman and Plaintiff Colburn are atypical because they

12   owned Fusion vehicles, not Focus vehicles. Ford argues that Focus vehicles are "materially

13   different" from Fusion vehicles, and the relays in Focus vehicles are "subject to different operating

14   conditions that would affect the risks involved." Opp. at 25. Thus, Ford claims, Plaintiff Goodman

15   and Plaintiff Colburn's claims are not typical of the claims of owners of Focus vehicles.

16          In ruling on Ford's motion to dismiss the Second Amended Complaint, the Court has

17   already held that Plaintiffs have standing to assert claims about Focus vehicles because Plaintiffs

18   "have adequately alleged that the supposedly defective EPAS system is substantially similar

19   across the Vehicles." ECF No. 69, at 12. Of course, at the class certification stage, unlike the

20   motion to dismiss stage, the Court does not "construe the pleadings in the light most favorable to

21   the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th

22   Cir. 2008). Nevertheless, as discussed further in analyzing predominance under Rule 23(b)(3), the

23   evidence at this stage of the litigation supports Plaintiffs' claim that the EPAS system is

24   substantially similar between Fusion and Focus vehicles. Although Ford has pointed to some

25   differences between Fusion and Focus vehicles, such as the placement of the relays within the

26   EPAS systems and the size of the power steering motor, these differences have only minor

27   relevance to Plaintiffs' claims and are unlikely to be a significant focus of litigation. *See infra* Part

28
                                                    19

1   III.B.2.iv.

2          Despite minor differences between Fusion and Focus vehicles, Plaintiffs' argument

3   remains that the EPAS systems are defective because they incorporate electro-mechanical relays.

4   Plaintiffs and their experts claim, and Ford agrees, that an EPAS system incorporating electro-

5   mechanical relays existed in both Fusion and Focus vehicles. As discussed further below, the

6   evidence and argumentation in this case will focus on whether the inclusion of electro-mechanical

7   relays rendered the EPAS systems defective. Thus, even though Plaintiff Goodman and Plaintiff

8   Colburn owned only Fusion vehicles, their claims are typical of the claims of owners of Focus

9   vehicles because the same defect is alleged to exist in both vehicles.

10          In short, the evidence at this stage of the litigation suggests that the EPAS systems in

11   Fusion and Focus vehicles are substantially similar. Therefore, the named Plaintiffs' claims are

12   "reasonably co-extensive" with the claims of Focus owners. *Hanlon*, 150 F.3d at 1020 (holding

13   that the typicality requirement is "permissive and requires only that the representative's claims are

14   reasonably co-extensive with those of the absent class members; they need not be substantially

15   identical"). Thus, differences between Fusion and Focus vehicles do not defeat typicality.

16                              **iii. Unique Defenses**

17          Finally, Ford argues that "[e]ach of the three plaintiffs may be subject to unique defenses"

18   that undermine typicality. Opp. at 25. To support this argument, Ford points to several facts that

19   could give rise to "unique defenses." First, Ford points to factual distinctions about whether or

20   how the alleged defect manifested in Plaintiff Goodman and Plaintiff Colburn's vehicles. Second,

21   Ford argues that Plaintiff Goodman is atypical because she reviewed part of the owner's manual

22   before buying her Fusion vehicle. Third, Ford argues that there are "potential issues as to the

23   extent of [Plaintiff Colburn's] damages" because Plaintiff Colburn gave her vehicle to her son and

24   because Plaintiff Colburn is a member of both the New Vehicle Class and the Out-of-Pocket

25   Class. Opp. at 26. The Court addresses these arguments in turn.

26          First, Ford's distinctions about how the defects manifested in Plaintiff Goodman and

27   Plaintiff Colburn's vehicles are irrelevant to Plaintiffs' theory of liability. As discussed above,

28
                                                            20

1    Plaintiffs' theory is that they were harmed at the point of purchase, and therefore each of the

2    named Plaintiffs may have a valid claim "regardless of the manifestation of the defect." *Wolin*,

3    671 F.3d at 1174. Thus, differences in manifestation of the defect in the instant case are not

4    enough to defeat typicality. *See Wolin*, 617 F.3d at 1173 ("[P]roof of the manifestation of a defect

5    is not a prerequisite to class certification.").

6          Second, Ford claims that Goodman may be subject to a "unique defense" because Plaintiff

7    Goodman read some portion of the owner's manual before buying her Fusion. However, in its

8    arguments against predominance under Rule 23(b)(3), Ford asserts that some class members likely

9    read the owner's manual. Opp. at 19. Thus, Ford's argument against typicality on the basis that

10   Plaintiff Goodman read some portion of the owner's manual lacks merit.

11         Finally, Ford argues that the fact that Plaintiff Colburn gave her vehicle to her son and the

12   fact that Plaintiff Colburn is a member of both the Out-of-Pocket Class and the New Vehicle Class

13   may have an impact on how her damages will be determined. Opp. at 25–26. Ford claims that

14   these unique damages calculations make Plaintiff Colburn's claims atypical. However, although as

15   discussed below, Plaintiffs must present a damages model that shows that damages can be

16   measured on a class-wide basis to meet the predominance requirement of Rule 23(b)(3), *Comcast

17   Corp.*, 133 S. Ct. at 1433, the *calculation* of damages applying such a model "is invariably an

18   individual question and does not defeat class action treatment," *Leyva v. Medline Indus. Inc.*, 716

19   F.3d 510, 513 (9th Cir. 2013) (emphasis added); *see also McCarthy v. Kleindienst*, 741 F.2d 1406,

20   1415 (D.C. Cir. 1984) ("[T]he mere fact that damages awards will ultimately require

21   individualized fact determinations is insufficient by itself to preclude class certification."). Thus,

22   the fact that Plaintiff Colburn's damages calculations may be different than the calculations for

23   some class members does not defeat typicality because Plaintiff Colburn will share with class

24   members a strong interest in proving liability.

25         In short, Plaintiff Goodman and Plaintiff Colburn do not have unique defenses that

26   "threaten to become the focus of the litigation." *Hanon*, 976 F.2d at 508. Plaintiff Goodman and

27   Plaintiff Colburn assert claims that are "reasonably co-extensive with those of absent class

28

Case No. 14-CV-02989-LHK
ORDER DENYING MOTION FOR CLASS CERTIFICATION

United States District Court
Northern District of California

1    members." *Hanlon*, 150 F.3d at 1020. Therefore, the Court finds that Rule 23(a)'s typicality

2    requirement is met.

3        **4. Adequacy**

4        In the Ninth Circuit, to test the adequacy of a class representative, a court must answer two

5    questions: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other

6    class members; and (2) will the named plaintiffs and their counsel prosecute the action vigorously

7    on behalf of the class?" *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003) (citing *Hanlon*,

8    150 F.3d at 1020).

9        Ford does not contest adequacy. As discussed above, the Court has dismissed Plaintiff

10   Philips from the instant case because Plaintiff Philips is not a member of any of the proposed

11   classes as properly defined. Nevertheless, the Court finds that Plaintiff Goodman and Plaintiff

12   Colburn are adequate class representatives. Plaintiff Goodman and Plaintiff Colburn and the

13   proposed class share the same claims and interest in obtaining relief, and Plaintiff Goodman and

14   Plaintiff Colburn are vigorously pursuing relief on behalf of the proposed class. Plaintiff Goodman

15   and Plaintiff Colburn share an interest with members of the proposed class in proving that the

16   EPAS systems were defective and that the proposed class was damaged by the defects. Ford does

17   not argue that Plaintiff Goodman and Plaintiff Colburn have any conflicts of interest with other

18   class members. Therefore, the Court finds that Plaintiff Goodman and Plaintiff Colburn meet the

19   adequacy requirement.

20       Additionally, the Court finds that Plaintiffs' counsel has experience in prosecuting

21   consumer protection actions involving claims similar to those in the instant case. *See* Pifko Decl. ¶

22   41, Ex. 40 to Mot. (firm resume of Baron & Budd, P.C.); *id.* ¶ 42, Ex. 41 to Mot. (firm resume of

23   Grant & Eisenhofer P.A.); *id.* ¶ 43, Ex. 42 to Mot. (firm resume of Spilman Thomas & Battle).

24   Plaintiffs' counsel has vigorously litigated this case from the beginning, and Ford does not contest

25   that Plaintiffs' counsel will continue to do so. Thus, the Court finds that Plaintiffs' counsel meets

26   the adequacy requirement.

27       **5. Ascertainability**

28
     Case No. 14-CV-02989-LHK
     ORDER DENYING MOTION FOR CLASS CERTIFICATION

1    In addition to the four requirements explicitly provided in Rule 23(a), courts have held that

2    Rule 23(a) also contains an "implied prerequisite" that the class be ascertainable. *Xavier v. Philip*

3    *Morris USA Inc.*, 787 F. Supp. 2d 1075, 1089 (N.D. Cal. 2011); *see also, e.g.*, *In re Yahoo Mail*

4    *Litig.*, 308 F.R.D. at 596; *Herrera*, 274 F.R.D. at 672. A class definition is sufficient if the

5    description of the class is "definite enough so that it is administratively feasible for the court to

6    ascertain whether an individual is a member." *O'Connor v. Boeing N. Am. Inc.,* 184 F.R.D. 311,

7    319 (C.D. Cal. 1998) (internal citation omitted). In addition, "the court must be able to [determine

8    that] class members are included or excluded from the class by reference to objective criteria." 5

9    Moore's Federal Practice, § 23.21[3] (3d ed. 1997). In its opposition to Plaintiffs' motion for class

10   certification, Ford does not contest ascertainability.

11   In the instant case, the proposed classes are defined by objective criteria. Specifically, the

12   classes are defined as individuals who have purchased or currently own or lease a Class Vehicle,

13   as well as individuals who have made out-of-pocket expenditures to repair an EPAS system in a

14   Class Vehicle. Plaintiffs claim that those who purchased or leased a new Class Vehicle can be

15   identified through CONCEPS, Ford's corporate database that includes the contact information for

16   everyone who purchases a new Ford vehicle from a Ford dealership. Mot. at 11; Ex. 38 to Mot. at

17   pp. 229–30. Ford does not contest that Class Vehicle purchasers can be identified in this manner.

18   Plaintiffs also claim that Ford can obtain the names and contact information for current

19   owners and lessees through the third party company that Ford uses to administer recalls. Mot. at

20   11; Ex. 38, at pp. 233–35. Again, Ford does not contest that this method is practical.

21   Finally, the Out-of-Pocket Class can be identified through affidavits and documentation

22   submitted by potential class members. "[C]ourts in this circuit ha[ve] found proposed classes

23   ascertainable even when the only way to determine class membership is with self-identification

24   through affidavits." *Melgar v. CSK Auto, Inc.*, 2015 WL 9303977, at *8 (N.D. Cal. Dec. 22, 2015)

25   (citation omitted). In the instant case, the out-of-pocket costs that potential class members incurred

26   were likely fairly large. Plaintiff Colburn, for example, spent $990.19 to replace her vehicle's

27   EPAS system. TAC ¶ 6. These are the kinds of expenditures for which class members are likely to

28

Case No. 14-CV-02989-LHK
ORDER DENYING MOTION FOR CLASS CERTIFICATION

United States District Court
Northern District of California

keep records, and therefore self-identification in this case would be practical. *Red v. Kraft Foods, Inc.*, 2012 WL 8019257, at *5 (C.D. Cal. Apr. 12, 2012) ("[S]elf-identification alone has been deemed sufficient to render a class ascertainable . . . where the relevant purchase was a memorable bigticket item."). Therefore, the Court finds that it is "administratively feasible" to identify members of the Out-of-Pocket Class and that the class is therefore ascertainable. *Newton v. Am. Debt Serv., Inc.*, 2015 WL 3614197, at *5 (N.D. Cal. June 9, 2015).

**B. Rule 23(b)(3): Predominance**

**1.  Principles Governing the Predominance Analysis**

Under Rule 23(b)(3), plaintiffs must show "that the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). "The Rule 23(b)(3) predominance inquiry" is meant to "tes[t] whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). The Ninth Circuit has held that "there is clear justification for handling the dispute on a representative rather than an individual basis" if "common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication." *Hanlon*, 150 F.3d at 1022. In ruling on a motion for class certification based on Rule 23(b)(3), a district court must conduct a rigorous analysis to determine whether the class representatives have satisfied both the predominance and superiority requirements. *See Zinser*, 253 F.3d at 1186. The predominance analysis focuses on "the legal or factual questions that qualify each class member's case as a genuine controversy" to determine "whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods.*, 521 U.S. at 623; *see also* Fed. R. Civ. P. 23(b)(3) (to certify a class, the court must find that "questions of law or fact common to class members predominate over any questions affecting only individual members").

This Court has previously identified five principles that guide the Court's predominance inquiry:

Case No. 14-CV-02989-LHK
ORDER DENYING MOTION FOR CLASS CERTIFICATION

1
2
3
4
5
6
7
8
9
10
11
12

First, and most importantly, the critical question that this Court must answer is whether common questions predominate over individual questions. *Amgen*, 133 S. Ct. at 1191. In essence, this Court must determine whether common evidence and common methodology could be used to prove the elements of the underlying cause of action. *Id.* Second, in answering this question, this Court must conduct a "rigorous" analysis. *Comcast Corp.*, 133 S. Ct. at 1432. This analysis may overlap with the merits, but the inquiry cannot require Plaintiffs to prove elements of their substantive case at the class certification stage. *Amgen*, 133 S. Ct. at 1194. Third, this Court must determine not only the admissibility of expert evidence that forms the basis of the methodology that demonstrates whether common questions predominate. *Ellis*, 657 F.3d at 982. Rather, this Court must also determine whether that expert evidence is persuasive, which may require the Court to resolve methodological disputes. *Id.*; *see also In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d [244, 255 (D.C. Cir. 2013)]. Fourth, the predominance inquiry is not a mechanical inquiry of "bean counting" to determine whether there are more individual questions than common questions. *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013)]. Instead, the inquiry contemplates a qualitative assessment, which includes a hard look at the soundness of statistical models. *Id.*; *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d at 255. Fifth, Plaintiffs are not required to show that each element of the underlying cause of action is susceptible to classwide proof. *Amgen*, 133 S. Ct. at 1196. Rather, they need only show that common questions will predominate with respect to their case as a whole. *Id.*

13
14
15
16

*In re High-Tech Empl. Antitrust Litig.*, 985 F. Supp. 2d 1167, 1186–87 (N.D. Cal. 2013). In *High-Tech*, the Ninth Circuit denied the defendants' petition under Rule 23(f) for review of the Court's order applying the foregoing framework to grant class certification. *See In re High-Tech Empl. Antitrust Litig.*, No. 13-80223, ECF No. 18 (9th Cir. Jan. 14, 2014).

17

**2. Analysis**

18
19
20
21
22

Plaintiffs argue that common issues predominate in the proposed classes for which they seek certification under Rule 23(b)(3). Specifically, Plaintiffs claim that because of the common issues about defect and liability, "one or more of the central issues in the action are common to the class and can be said to predominate." Mot. at 16 (citing *Guido v. L'Oreal USA, Inc.*, 2013 WL 3353857, at *9 (C.D. Cal. July 1, 2013)).

23
24
25
26
27

Ford argues that common issues do not predominate over individual issues for several reasons. First, Ford argues that the EPAS systems in the class vehicles do not suffer from a common defect. Second, Ford argues that Plaintiffs have not shown that materiality and reliance, which are relevant to Plaintiffs' CLRA and negligent misrepresentation claims, are susceptible to proof by common evidence. Third, Ford argues that Plaintiffs cannot prove their fraudulent

28

25

United States District Court
Northern District of California

concealment or CLRA claims using common evidence because Ford's knowledge about the alleged defect varied between class vehicles and over the class period. Fourth, Ford argues that Plaintiffs cannot show on a common basis that class vehicles were unmerchantable. Fifth, Ford argues that Plaintiffs have not presented a damages model that aligns with Plaintiffs' legal theory. Each of Ford's arguments applies to both the New Vehicle Class and the Out-of-Pocket Class. The Court addresses each of these arguments in turn.[5] Ultimately, as discussed below, the Court finds that although Plaintiffs have alleged a common defect, individual issues will predominate in determining reliance for Plaintiffs' CLRA and fraudulent concealment claims and Plaintiffs have not offered a damages model that is consistent with their theory of liability for any of the proposed classes or claims.

### i. Common Defect (CLRA, Fraudulent Concealment, and Implied Warranty Claims)

Both parties agree that existence of a defect is an element of Plaintiffs' CLRA claim, fraudulent concealment claim, and implied warranty claim. Plaintiffs argue that they can prove this element of each claim on a class-wide basis because the EPAS systems installed in Class Vehicles suffer from a common defect: the inclusion of unreliable electro-mechanical relays.[6] Ford argues that Plaintiffs' allegations do not relate to a uniform defect that is susceptible to class-

---

[5] In its opposition, Ford also argues that Plaintiffs' Song-Beverly claims do not meet Rule 23(b)(3)'s predominance requirement because the proposed classes are overbroad. Specifically, Ford argues that the proposed classes include many class members who could not assert a claim under the Song-Beverly Act, which applies to "any new product or part thereof that is used, bought, or leased" in California "for use primarily for personal, family, or household purposes." Cal. Civ. Code § 1791(a). However, as discussed above, Plaintiffs concede that the classes should be revised to avoid this overbreadth, and therefore the Court need not reach Ford's argument.

[6] In their Third Amended Complaint, Plaintiffs discuss various possible problems with the Class Vehicles' EPAS systems and allege that "[t]hese defects, individually and/or collectively, render the EPAS System prone to failure." TAC ¶ 79. However, Plaintiffs seek class certification based only on the theory that "use of the [electromechanical] relays in an EPAS system is the design defect common to all class vehicles." Opp. at 4; *see also* Mot. at 1–2 ("This case centers on . . . the "poor design" of the [EPAS] systems in all of the 2010-2012 model-year Fusion and 2012–2014 model-year Focus vehicles at issue here. . . . When developing the requirements for its EPAS system, Ford . . . ignored sound engineering judgment by incorporating unreliable electromechanical relays, which are foreseeably prone to failure, into the design."). At the December 8, 2016 hearing, Plaintiffs confirmed that their claims now allege this single design defect. Hr'g Tr. at 18–19.

Case No. 14-CV-02989-LHK
ORDER DENYING MOTION FOR CLASS CERTIFICATION

1    wide proof. Instead, Ford claims, failure of the EPAS system is due to several unrelated failures

2    that are not susceptible to common proof.

3         As discussed above, the EPAS systems in Class Vehicles include two electro-mechanical

4    relays: a "link relay" and a "star point" relay. Ex. B, at 28. These relays sometimes experience

5    "faults," meaning the circuits open and power is cut off at unexpected times. Ex. B, at 36–40.

6    These faults are indicated by "diagnostic trouble codes" to assist in diagnosis and repair. A code

7    number B43 indicates a fault in the link relay, and a code number B3A indicates a fault in the star

8    point relay. Ex. B, at 40; Ex. 2, at 8.

9         Ford argues that Plaintiffs and their expert incorrectly assume that every fault in either

10   relay indicates a failure of the relay itself. Ford claims that this is mistaken; even if the electro-

11   mechanical relays in the EPAS system often experience faults, this is not because the relays

12   themselves are defective. Instead, these faults are a normal and proper response to the relays

13   detecting a failure *elsewhere* in the EPAS system. *See* Opp. at 3 ("These relays are designed to

14   open when certain faults are detected in the EPAS system, cutting off power and returning the

15   vehicle to manual steering.") The "root causes" of the relay faults, Ford argues, include various

16   problems such as ███████████████████████████████████████████████

17   ███████████████████████████ Opp. at 5; Deposition of Matthew Surella, Ex. G to Opp., at

18   167:19–170:24. Thus, Ford argues, the question whether the EPAS system was defectively

19   designed is not susceptible to common proof because the relay faults do not have a common cause.

20        Plaintiffs' legal theory, as discussed above, is that the EPAS systems in class vehicles are

21   defective because they incorporate unreliable electro-mechanical relays. To prove this theory,

22   Plaintiffs intend to use evidence about the design of the EPAS system and the relays, which are

23   substantially the same for all class vehicles. *See* Ex. 2, at 8 ("The Class Vehicles' EPAS systems

24   use electro-mechanical relays, which are the same in all of the Class Vehicles."); Ex. B, at 10

25   ("The EPAS system in the proposed class of vehicles is designed with two electro-mechanical

26   relays.").

27        The Ninth Circuit faced a similar situation in *Wolin v. Jaguar Land Rover North America,*

28

27

United States District Court
Northern District of California

1    *LLC*, 617 F.3d 1168 (9th Cir. 2010). As discussed above, in *Wolin*, the plaintiffs argued that

2    certain vehicles were defective because the vehicles had a "defective alignment geometry" that

3    caused the tires to wear more quickly than usual. *Id.* at 1170. The defendant argued that common

4    issues did not predominate for the purposes of class certification because "the evidence w[ould]

5    demonstrate that the prospective class members' vehicles do not suffer from a common defect, but

6    rather, from tire wear due to individual factors such as driving habits and weather." *Id.* at 1173.

7         The Ninth Circuit rejected the defendant's argument and noted that the plaintiffs

8    "assert[ed] that the defect exists in the alignment geometry, not in the tires, [and] that Land Rover

9    failed to reveal material facts in violation of consumer protection laws." *Id.* The Ninth Circuit held

10   that "[a]lthough individual factors may affect premature tire wear, they do not affect whether the

11   vehicles were sold with an alignment defect" and thus "all of [the plaintiffs'] allegations are

12   susceptible to proof by generalized evidence." *Id.*

13        The same is true in the instant case. Individual factors may affect the performance of the

14   EPAS systems in different class vehicles, but these individual factors do not affect the ultimate

15   question whether the vehicles were sold with a defective EPAS system. Like the defendant in

16   *Wolin*, what Ford argues in the instant case "is whether class members can win on the merits." *Id.*

17   Plaintiffs argue that the EPAS systems are defective because they incorporate electro-mechanical

18   relays that are unreliable because they are subject to thermal expansion, mechanical fatigue, and

19   vibration, and are "very sensitive to manufacturing variability." Mot. at 4; Pifko Decl. at ¶ 16, Ex.

20   15 to Mot. at p. 114. Ford, on the other hand, contends that "there is no basis for the contention

21   that simply using [electro-mechanical] relays . . . was a 'design defect.'" Opp. at 13.

22        The Court need not decide at this stage which party is correct. *See Amgen Inc. v.*

23   *Connecticut Retirement Plans and Trust Funds*, 133 S. Ct. 1184, 1194–95 (2013) ("Merits

24   questions may be considered to the extent—but only to the extent—that they are relevant to

25   determining whether the Rule 23 prerequisites for class certification are satisfied."). In order to

26   determine whether Rule 23(b)(3)'s predominance requirement is met, the Court needs only to

27   consider Plaintiffs' theory of the case and the type of evidence that Plaintiffs will use to prove this

28

Case No. 14-CV-02989-LHK
ORDER DENYING MOTION FOR CLASS CERTIFICATION

1   theory. Plaintiffs' allegations are that Class Vehicles suffered from a single design defect, and as

2   in *Wolin*, whether this allegation is true can be proven on a common basis. Thus, Ford's argument

3   that there was no common defect does not defeat predominance for Plaintiffs' CLRA, fraudulent

4   concealment, and implied warranty claims under Rule 23(b)(3).

**ii. Materiality and Reliance (CLRA and Fraudulent Concealment Claims)**

6           Next, the Court addresses Ford's argument that Plaintiffs have not shown that materiality

7   and reliance, which both parties agree are elements of Plaintiffs' CLRA and fraudulent

8   concealment claims, are susceptible to common evidence. Specifically, Ford argues that extensive

9   individual inquiries will be necessary to decide whether the alleged omissions were material to

10   class members and whether class members "took action" based on these omissions or "would have

11   acted differently had a required disclosure been made." Opp. at 18.

12           Plaintiffs argue that materiality and reliance are subject to common proof based on the

13   Ninth Circuit's decision in *Daniel v. Ford Motor Co.*, 806 F.3d 1217 (9th Cir. 2015).[7] According

14   to *Daniel*, materiality can be determined on an objective standard because under the California

15   Supreme Court's decision in *Tobacco II*, "[a]n omission is material if a reasonable consumer

16   'would attach importance to its existence or nonexistence in determining his choice of action in

17   the transaction in question.'" *Daniel*, 806 F.3d at 1225 (quoting *In re Tobacco II Cases*, 46 Cal.

18   4th 298 (2009)). Thus, contrary to Ford's suggestion, in the instant case the Court will not need to

19   consider purchasing preferences on an individual basis to determine materiality. Instead,

20   materiality can be determined on a classwide basis using a "reasonable consumer" standard. *Id.*

21           Additionally, under *Daniel*, a court can often infer reliance. *Id.* at 1225 ("That one would

22   have behaved differently can be presumed, or at least inferred, when the omission is material.")

23   (citing *Tobacco II*, 46 Cal. 4th 298). However, the Ninth Circuit has also held that the presumption

24

25   [7] Ford seeks to distinguish *Daniel* on the grounds that *Daniel* involved summary judgment, not
    class certification. Opp. at 18. However, although *Daniel* was decided on summary judgment, 806

26   F.3d at 1220, *Daniel* discussed what type of proof is necessary to show materiality and reliance,
    which is directly relevant to the question of whether this proof can be shown on a common basis.

27   Therefore, the Court may properly look to *Daniel* in deciding whether class certification is
    appropriate.

28

Case No. 14-CV-02989-LHK
ORDER DENYING MOTION FOR CLASS CERTIFICATION

1    of reliance is not always appropriate. In *Mazza v. American Honda Motor Company*, 666 F.3d 581

2    (9th Cir. 2012), the Ninth Circuit held that the district court was wrong to presume that class

3    members relied on particular omissions and misleading statements by Honda regarding Honda's

4    Collision Mitigation Braking System. The Ninth Circuit held that although a presumption of

5    reliance is sometimes appropriate, such a presumption was unjustified in *Mazza* for two reasons.

6    First, "the limited scope of th[e] advertising" that was allegedly deceptive and allegedly omitted

7    pertinent information "ma[de] it unreasonable to assume that all class members viewed" the

8    advertisements. *Id.* at 596. Second, the advertisements "d[id] not deny that limitations exist" in the

9    system, and thus even class members who were exposed to the campaign were unlikely to have

10   relied on an expectation that the system would work without flaws. *Id.* at 596.

11        Plaintiffs argue that *Mazza* is inapplicable because the instant case involves Ford's

12   omissions despite a duty to disclose, rather than misleading advertising. Reply at 10 n.8. However,

13   the holding in *Mazza* cannot be so limited; *Mazza* itself involved alleged omissions as well as

14   allegedly misleading advertising. 666 F.3d at 585 ("Plaintiffs allege that certain advertisements

15   misrepresented the characteristics of the [Collision Mitigation Braking System] and omitted

16   material information on its limitations."). More generally, in the context of a case involving both

17   misleading statements and omissions, the Ninth Circuit has held that if class members "were

18   exposed to quite disparate information from various representatives of the defendant," a

19   presumption of reliance may not be justified. *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1020

20   (9th Cir. 2011).

21        In the instant case, class members were not exposed to uniform representations. Most

22   importantly, as Ford points out, a warning about sudden EPAS system failure was present in the

23   owner's manuals for all class vehicles, and it would require extensive individualized inquiries to

24   know which class members had the opportunity to read these portions of the owner's manuals

25   before purchasing their vehicles. Ex. Q to Opp., at 5–6 ("The EPS has diagnostics checks that

26   continuously monitor the EPS to ensure proper operation of the electronic system. When an

27   electronic error is detected, the message POWER STEERING ASSIST FAULT will be displayed

28
Case No. 14-CV-02989-LHK
ORDER DENYING MOTION FOR CLASS CERTIFICATION

*United States District Court*
*Northern District of California*

1    in the message center. If this happens, stop the vehicle in a safe place, and turn off the engine." . . .

2    "If your vehicle loses electrical power while you are driving . . ., you can steer the vehicle

3    manually, but it takes more effort. Extreme continuous steering may increase the effort it takes for

4    you to steer.").

5          Plaintiff argues that these disclosures were insufficient because they did not specifically

6    warn that the EPAS systems in Class Vehicles were defective for including electro-mechanical

7    relays. Reply at 9. However, as discussed below, Plaintiffs argue that they were harmed and

8    suffered damages because they paid more for EPAS systems than they would have paid if they had

9    known that the EPAS systems posed a danger because they might fail suddenly. Mot. at 22

10   ("Plaintiffs' theory of harm is that because Ford failed to disclose known defects in vehicles'

11   EPAS system to Class members, which put their safety at risk, Ford unlawfully forced Class

12   members to accept a risk they did not bargain for.") (quoting Ex. 43 at 293). Thus, even though

13   Ford did not disclose the specific cause of the defect in the owner's manual, Ford did disclose that

14   the EPAS systems might fail and pose a safety danger. A class member who read the owner's

15   manual may therefore have no damages.[8]

16         Like the class members in *Mazza*, a class member who read the warnings in Class

17   Vehicles' owner's manuals would be aware that "limitations exist" and that the EPAS system may

18   fail unexpectedly. *Mazza*, 666 F.3d at 596. Additionally, as in *Mazza*, the information to which

19   class members were exposed was not uniform because some unknown number of class members

20   was exposed to Ford's warnings in the Class Vehicles' owner's manuals. *See Darisse v. Nest

21   Labs, Inc.*, 2016 WL 4385849, at *6 (N.D. Cal. Aug. 15, 2016) (denying class certification where

22   "[t]he representations were not uniform, and not all of them were misrepresentations").

23   Furthermore, Plaintiffs have not shown whether consumers read the manuals before purchase or

24

---

25   [8] Plaintiffs' argument that Ford should have disclosed the specific cause of the defect is also
26   undercut by Plaintiffs own complaint, which asserts five different causes of the defect that
     "individually and/or collectively, render the EPAS System prone to failure, causing marked
27   difficult in steering the car." TAC ¶ 79. Only in their motion for class certification have Plaintiffs
     narrowed the cause of the defect to the existence of electro-mechanical relays in the EPAS
     systems.

28
     Case No. 14-CV-02989-LHK
     ORDER DENYING MOTION FOR CLASS CERTIFICATION

1    whether Ford dealerships discuss the contents of owner's manuals in a sufficiently uniform way

2    that the Court can determine on a classwide basis whether class members knew about the warnings

3    in the owner's manuals. *See English v. Apple Inc.*, 2016 WL 1188200 (N.D. Cal. Jan. 5, 2016)

4    ("English has not shown that the way in which Apple employees talk about the service plans is

5    sufficiently uniform to support an inference of classwide reliance or materiality."). In these

6    circumstances, the Court finds that as in *Mazza*, in the instant case class members were exposed to

7    "quite disparate information," some of which explicitly acknowledged the limitations of the EPAS

8    systems, and thus a presumption of reliance is inappropriate.

9        Therefore, in the instant case the Court finds that "the issue of . . . reliance is a matter that

10   would vary from consumer to consumer," *Webb v. Carter's Inc.*, 272 F.R.D. 489, 502 (C.D. Cal.

11   2011) (quoting *In re Vioxx Class Cases*, 180 Cal.App.4th 116 (2009)), and that individual issues

12   will predominate over common issues in determining reliance for the purposes of Plaintiffs'

13   CLRA and fraudulent concealment claims. This alone warrants the denial of class certification for

14   Plaintiffs' CLRA and fraudulent concealment claims.

15       **iii. Variations in Ford's Knowledge (CLRA and Fraudulent Concealment Claims)**

16       As part of Plaintiffs' CLRA and fraudulent concealment claims, Plaintiffs allege that Ford

17   knew as early as 2007 that Class Vehicles' EPAS systems were defective because they included

18   unreliable electro-mechanical relays and that Ford unlawfully failed to disclose this fact. However,

19   Ford argues that its knowledge cannot be proven using common evidence because Ford's

20   knowledge varied over the class period. Specifically, Ford claims that "when loss-of-assist

21   complaints began to increase, Ford had to investigate many possible causes, and this took time."

22   Opp. at 17. Ford continued its investigation throughout the class period, and thus what Ford knew

23   about the EPAS system changed over time. Therefore, Ford claims, the "date of purchase will

24   create an individualized issue" and the Court will inevitably be overwhelmed deciding what Ford

25   knew at different points in time between 2010 and 2014. Opp. at 17.

26       Plaintiffs allege and have produced evidence that well before the beginning of the class

Case No. 14-CV-02989-LHK
ORDER DENYING MOTION FOR CLASS CERTIFICATION

United States District Court
Northern District of California

period, Ford knew that the EPAS systems were defective because they included unreliable relays. *See* Ex. 44 to Mot. (providing a timeline of Ford emails and internal documents discussing Ford's knowledge of problems with the relays). In Dr. van Schoor's expert report, Dr. van Schoor refers to several internal Ford emails from as early as 2008 and 2009 stating that Ford "may eliminate this relay" in the future, concluding that "this relay is a poor design" that should "not [be] allow[ed] . . . in our products," and suggesting that "the thousands of hours chasing relays so far justifies us taking a hard look" at "alternative designs that delete the motor and link relay." Ex. 2, at 15–16 (discussing emails dated March 28, 2008, September 4, 2009, and September 25, 2009); *see also* Ex. 2, at 13 ("It is clear from my review of the documents and deposition testimony that Ford believe[d] that safer, more reliable alternatives were available at least as early as 2007 and throughout the time period when the Class Vehicles were sold to the public."). Additionally, as this Court has held, it is reasonable to infer that these emails "were pr[ec]eded by an accretion of knowledge by Ford."[9] ECF No. 69, at 18 (quoting *In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 958 (N.D. Cal. 2014)).

In short, Plaintiffs' allegation is that Ford knew that the EPAS systems were defective for including unreliable electro-mechanical relays well before the first consumer purchased a class vehicle sometime in late 2009. *See* Opp. at 3 ("Production of a particular 'model year' begins during the previous year, usually in June."). The facts relevant to this allegation, and Ford's knowledge of these facts, did not change over time. *See* Ex. B, at 10 ("The EPAS system in the proposed class of vehicles is designed with two electro-mechanical relays.").

Here again, Ford's argument is essentially that Plaintiffs cannot succeed on the merits of their claims. Ford argues that "Ford's knowledge varied over time . . . because there was never a single common 'defect' at issue, but rather a series of engineering challenges and responses." Opp. at 1. However, as discussed above and as the Ninth Circuit held in *Wolin*, at the class certification stage the Court should decide only whether Plaintiffs' allegations are susceptible to generalized

---

[9] This inference is particularly appropriate in this case because one of the emails discussed the "thousands of hours chasing relays so far." Ex. 2 to Mot., at 16.

proof. Plaintiffs allege that the EPAS systems were defective because they included

electromechanical relays, and Ford's knowledge about the appropriateness of using

electromechanical relays did not change substantially over the class period. Additionally, Ford's

argument that its knowledge varied over time is undercut by its argument that it consistently

disclosed the risk of EPAS system failure in the owner's manuals of each of the Class Vehicles.[10]

Opp. at 5–6, 17. Thus, the Court finds that Plaintiffs' "allegations are susceptible to proof by

generalized evidence" with respect to the knowledge element of Plaintiffs' CLRA and fraudulent

concealment claims. *Id.*

### iv. Unmerchantability (Implied Warranty Claim)

Ford also argues that Plaintiffs' claims for breach of the implied warranty of

merchantability under the Song-Beverly Act and the Magnuson-Moss Act are not susceptible to

common proof because whether Class Vehicles were unmerchantable is an individual issue. Opp.

at 15–16. Ford argues that under California law, a product is unmerchantable only if the alleged

defect is "substantially certain to result in malfunction during the useful life of the product," *Am.*

*Honda Motor Co. v. Superior Court*, 199 Cal. App. 4th 1367, 1375 (2011). As discussed above,

Ford claims that several features of the EPAS system varied throughout the class period. Ford

argues that this variation in features may affect the likelihood that a defect will manifest. Opp. at

16. Ford also claims, without elaboration, that manifestation of the alleged defect may differ

between the Focus and Fusion. *Id.*

Under *Wolin*, "proof of the manifestation of a defect is not a prerequisite to class

certification." 617 F.3d at 1173; *see also Keegan v. Am. Honda Motor Co.*, 284 F.R.D. 504, 536

_____

[10] Ford argues that the warnings in the owner's manual are relevant to Ford's knowledge because a class member who read the owner's manual could not establish that Ford's knowledge of the defect was "superior" to the consumer's knowledge, which Ford claims is necessary to establish a duty to disclose. Opp. at 17. However, as in *Mazza*, Ford's argument is more properly considered in the context of Plaintiffs' reliance than Ford's knowledge. *See Mazza*, 666 F.3d at 596 (considering the defendant's disclosures as part of the reliance inquiry). Therefore, as discussed above, the Court considers Ford's argument in the context of the reliance inquiry.

34

United States District Court
Northern District of California

1  (C.D. Cal. 2012) ("Applying *Wolin*, and having considered the analysis in . . . *American Honda*

2  *Motor Co.*, the court cannot discern why, at the class certification stage, plaintiffs must adduce

3  evidence that a defect is substantially certain to arise in all class vehicles during the vehicles'

4  useful life."). However, as Plaintiffs agree, even under *Wolin*, the Court must still decide whether

5  the "substantial certainty" question "c[an] be shown with common proof, which is the correct

6  focus of Rule 23." Reply at 8 n.6.

7       Plaintiffs have produced evidence showing that "substantial certainty" will be a common

8  question. For example, Dr. van Schoor's expert report states that "the EPAS systems used in the

9  Class Vehicles are essentially the same. . . . Specifically, the electromechanical Link Relays in the

10  Class Vehicles' EPAS system[s] are identical and the electromechanical Motor Relays (Star Point

11  Relays) in the Class Vehicles' EPAS systems are identical." Ex. 2, at 9–10. Additionally, Ford's

12  own engineer has admitted that the relays are essentially the same throughout the Class Vehicles,

13  and that any differences between them are not material. *See* Deposition of Matthew Surrella, Ex. G

14  to Opp., at 180 ("Q: . . . [F]or purposes of this relay issue, to the extent there are differences,

15  they're not material to the issue, correct? MR. KELLY: Object to the form. THE WITNESS: The

16  relays are the same, right? The relays, I've said multiple times, the relays are the same.").

17  Furthermore, Ford has argued that the Class Vehicles' owner's manuals contained consistent

18  warnings about the risk of a sudden failure in the Class Vehicles' EPAS systems. Opp. at 5–6, 17.

19  Thus, the evidence suggests that the relays and the EPAS systems are likely to function and fail in

20  the same way, and thus the "substantial certainty" of manifestation of a defect is an issue

21  susceptible to common proof.

22       Ford seeks to undermine this evidence by suggesting that even if the "part numbers of the

23  relays" are the same for all Class Vehicles, variations in the specifications of the EPAS systems in

24  class vehicles and changes in procedure over time will present numerous individual issues in

25  determining "the life of the relays and the probability of their failures in the field." Ex. B to Opp.,

26  at 60, 64. However, most of the variations and changes in procedure would have only a minor

27  effect on manifestation. For example, Ford argues that the EPAS systems in the Focus and Fusion

28

Case No. 14-CV-02989-LHK
ORDER DENYING MOTION FOR CLASS CERTIFICATION

United States District Court
Northern District of California

United States District Court
Northern District of California

are aligned slightly differently and have different sized motors. However, Ford has not explained how these differences might affect the probability of manifestation of a defect, and Ford's supplier's Rule 30(b)(6) representative described these differences between Fusion and Focus vehicles as "minor." TRW 30(b)(6) Deposition, Ex. 3 to Mot., at 54. Similarly, changes in procedure—such as the use of gloves to prevent contamination and spot inspections for cracks in certain relay parts—may slightly affect defect manifestation, but the effect is likely to be small. Ex. 2, at 24–25.

Ford points to only one difference between Class Vehicles that may be significant. Specifically, Ford states that in 2012, Ford's supplier began using solid silver contacts instead of silver-plated contacts in the relays to reduce failures due to corrosion. *Id.* at 25. According to Ford's documents, and as Plaintiffs' expert agrees, short-term warranty returns for steering issues in Focus Vehicles were somewhat reduced after this change. *Id.* However, Plaintiffs' expert states that these measures were "inadequate" and Ford's Electric Power Steering Supervisor admitted that there was never a time during the class period "when the relay issues went away." Mrozek Depo. at 152. Thus, even if the issue of solid silver contacts does make a difference in whether there was a "substantial certainty" or defect manifestation, this one issue is unlikely to predominate over common issues, such as the function of the relays, which were "the same" for all Class vehicles. Ex. G to Opp., at 180.

In short, the variations that Ford points out, either individually or taken together, may have some effect on the likelihood that a defect would manifest in the Class Vehicles. However, it appears based on the evidence produced at this stage of the litigation that the most important issue regarding manifestation is the basic function of both link relays and motor relays, which is a common issue. *See Keegan*, 284 F.R.D. at 537 (certifying a class asserting a claim under the Song-Beverly Act because although the vehicles at issue had somewhat different specifications, these differences "did not necessarily lead to tremendous variation in the way in which class vehicles manifested the alleged defect"). Indeed, one of Ford's own engineers conceded that the differences between the EPAS systems in Class Vehicles are "not material" for "the purposes of this relay

36

1    issue." Ex. G to Opp. at 180. Thus, it appears that although individual issues will exist in

2    determining merchantability, common issues will predominate.

3                   **v. Damages Model (CLRA, Fraudulent Concealment, and Implied Warranty**

                   **Claims)**

4

5        Finally, Ford argues that although Plaintiffs seek damages as part of all three of their

6    CLRA, fraudulent concealment, and implied warranty claims, Plaintiffs have failed to "offer a

7    damages model capable of measuring, on a common basis, only the economic harm actually

8    caused to class members by alleged misconduct." Opp. at 20. Specifically, Ford claims that the

9    damages model offered by Plaintiffs' expert Dr. Arnold does not provide a model of damages that

10    conforms to Plaintiffs' legal theory. For the reasons discussed below, the Court agrees with Ford's

    argument.

11        Although individual damages calculations alone do not make class certification

12    inappropriate, *see Leyva v. Medline Indus., Inc.*, 716 F.3d 510, 514 (9th Cir. 2013) ("[T]he amount

13    of damages is invariably an individual question and does not defeat class action treatment."),

14    the United States Supreme Court has held that Plaintiffs have the burden to offer a damages model

15    showing that "damages are susceptible of measurement across the entire class for purposes of Rule

16    23(b)(3)." *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013). Such a damages model "must

17    measure only those damages attributable to" Plaintiffs' theory of liability. *Id.* If Plaintiffs do not

18    offer a plausible damages model that matches their theory of liability, "the problem is not just that

19    the court will have to look into individual situations to determine the appropriate measure of

20    damages; it is that Plaintiffs have not even told the Court what data it should look for." *In re*

21    *MyFord Touch Consumer Litig.*, Case No. 3:13-cv-03072-EMC, Dkt. 279 (N.D. Cal. Sept. 14,

22    2016). Thus, the Court can certify the proposed classes only if Plaintiffs offer a model of damages

23    for each class that matches Plaintiffs' legal theory of liability.[11]

24        The theory of damages that Plaintiffs offer is the theory described by their expert witness

25

26

27    [11] The Court need not address the Current Owner/Lessee Class, because for the class Plaintiffs

    seek only injunctive relief and certification under Rule 23(b)(2).

28    

    Case No. 14-CV-02989-LHK

    ORDER DENYING MOTION FOR CLASS CERTIFICATION

1    Dr. Arnold. As Dr. Arnold explains, and as Plaintiffs state explicitly in their motion for class

2    certification, "Plaintiffs' theory of harm is that because Ford failed to disclose known defects in

3    the vehicles' EPAS system to Class members, which put their safety at risk, Ford unlawfully

4    forced Class members to accept a risk they did not bargain for." Ex. 43 to Mot., at 297. Dr. Arnold

5    states that "[f]rom an economics perspective, [members of the New Vehicle Class] were injured at

6    the time of purchase because they were not informed about the known defects in the accused

7    EPAS system," and therefore are entitled to "the amount they paid for a defective EPAS system,

8    as a component of the overall price of a Class vehicle." *Id.* at 293.

9        Because Plaintiffs' theory of harm is that Ford forced class members to accept a risk they

10   did not bargain for, Dr. Arnold states that an "expected utility" framework is the proper model for

11   class members' damages. *Id.* at p. 294. In explaining this framework, Dr. Arnold states that

12   consumers discount the amount they are willing to pay for a product based on their perception of

13   how likely the product is to be defective. *Id.* at 294. For example, if consumers know that a

14   product is 60% likely to fail, then consumers will discount the amount they would be willing to

15   pay for the product if it were certain not to fail by 60%. *Id.* at 294–95. An "expected utility"

16   framework measures consumers' perceptions of the risk of failure and calculates consumers'

17   willingness to pay based on these measurements.

18       Thus, Dr. Arnold concludes, class members would not have agreed to pay full price for an

19   EPAS system in their vehicles if class members had known that there was a likelihood that the

20   EPAS systems would fail. *Id.* at 293. Instead, class members would have discounted the price they

21   were willing to pay by the probability that the EPAS systems would fail and paid only for the

22   "expected utility" of the EPAS systems. *Id.* at 294.

23       Dr. Arnold then goes further and states that class members would likely have been willing

24   to pay less than this "expected utility" for two reasons. First, Dr. Arnold points out that if an EPAS

25   system fails, a consumer suffers "more than simply the failure to receive the value the consumer

26   places on the product." *Id.* at 296. Instead, the consumer also faces added "disutility" because

27   when an EPAS system fails, it may endanger the consumer's safety. *Id.* Second, Dr. Arnold states

Case No. 14-CV-02989-LHK
ORDER DENYING MOTION FOR CLASS CERTIFICATION

United States District Court
Northern District of California

United States District Court
Northern District of California

that because most consumers are "risk averse," consumers would pay less than the "expected utility" because they are forced to take on risk. *Id.* ("[A] risk-averse customer would prefer to obtain $40 with certainty instead of assuming a risk that may yield $100 with 40 percent chance and $0 with 60 percent chance.").

Ford agrees that calculating damages based on expected utility and disutility because of safety concerns and risk aversion is economically sound. However, as Ford points out, although Dr. Arnold states that expected utility is the correct model to apply, Dr. Arnold does not apply the expected utility model at all. Indeed, in his deposition testimony, Dr. Arnold explicitly stated, "I'm not calculating the expected value." Deposition of Dr. Jonathan Arnold, Ex. R to Opp., at 75. Instead, Dr. Arnold's report "quantif[ies] damages in this case based on the amount Ford charged its dealers for the EPAS systems." Ex. 43 to Mot., at p. 298. In other words, Dr. Arnold's report offers the total price of a new EPAS system as the only measure of damages.

As Plaintiffs concede, this conclusion assumes that "the average reasonable consumer would ascribe $0 value to the defective [EPAS] system." Reply at 13. Plaintiffs attempt to defend this conclusion by arguing that, "as Dr. Arnold explains in his report," valuing the EPAS system at $0 is reasonable "given the 'disutility' associated with the risk of a dangerous, sudden failure of the EPAS system." *Id.*

However, contrary to Plaintiffs' assertion, Dr. Arnold's report never states that an average consumer would value the EPAS system at $0. Instead, Dr. Arnold states only that an average consumer would discount the price for an EPAS system by some unspecified amount because of the risk of a failure and the disutility associated with safety concerns and risk aversion. Dr. Arnold never attempts to quantify any of those factors—the risk of failure or the disutility associated with safety concerns—and never concludes that discounting the price of an EPAS system for all of those reasons yields a value of $0. *See Caldera v J.M Smucker Co.*, 2014 WL 1477400, at *4 (C.D. Cal. Apr. 15, 2014) ("[A] full refund would only be appropriate if not a single class member received any benefit from the products.").

Moreover, Ford has produced evidence showing that the expected failure rate for the Class

39

1   Vehicles due to the use of electro-mechanical relays was at most "approximately 1 percent" and

2   that when accidents did occur due to EPAS system failures, "[n]one of the injury claims indicated

3   medical attention was required." National Highway Transportation Safety Administration, ODI

4   Closing Resume, Ex. J to Opp., at 2. In these circumstances, it is unlikely that "not a single class

5   member received any benefit from" the EPAS systems. *Caldera*, 2014 WL 1477400, at *4.

6       The Court faced a similar situation in *Brazil v. Dole Packaged Foods, LLC*, 2014 WL

7   2466559 (N.D. Cal. May 30, 2014). In *Brazil*, the plaintiffs argued that Dole had made false and

8   misleading statements on food labels. In support of their motion for class certification, the

9   plaintiffs submitted an expert damages report that concluded that the plaintiffs should receive a

10  full refund for the "entire purchase . . . price of the challenged product." *Id.* at *15. The Court

11  rejected this model, finding that the proper measure of damages was "[t]he difference between

12  what the plaintiff paid and the value of what the plaintiff received." *Id.* The Court concluded that

13  the "full refund model is deficient because it is based on the assumption that consumers receive no

14  benefit whatsoever from purchasing the identified products." *Id.* The plaintiffs in *Brazil* had given

15  no reason to believe that this assumption was correct, and therefore the Court determined that a

16  damages model based on that assumption could not carry the plaintiffs' burden to show that

17  damages could be measured on a class-wide basis. *Id.* The Ninth Circuit affirmed this aspect of the

18  Court's decision and held that because damages are properly measured as "the difference between

19  the prices customers paid and the value of the fruit they bought . . . , a plaintiff cannot be awarded

20  a full refund unless the product she purchased was worthless." *Brazil v. Dole Packaged Foods*,

21  2016 WL 5539863, at *2 (9th Cir. Sept. 30, 2016). Therefore, the Ninth Circuit found that

22  "[b]ecause Brazil did not explain how this [price] premium could be calculated with proof

23  common to the class, the district court did not abuse its discretion by granting Dole's motion to

24  decertify." *Id.* at *3.

25      The same is true in the instant case. As Plaintiffs recognize, Dr. Arnold's calculation of

26  damages relies on the assumption that the true value of the EPAS systems was $0. However, Dr.

27  Arnold never even states, let alone justifies, the conclusion that this assumption is correct.

28

Case No. 14-CV-02989-LHK
ORDER DENYING MOTION FOR CLASS CERTIFICATION

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Plaintiffs have stated that at trial, they "will show that each class member was injured at the point

2    of sale upon paying a premium price." Reply at 13. However, neither Plaintiffs nor their expert

3    make any attempt to demonstrate what this "premium" is, or how the "premium" could be

4    determined on a class-wide basis. *See also Vaccarino v. Midland Nat. Life Ins. Co.*, 2014 WL

5    572365, at *10 (C.D. Cal. Feb. 3, 2014) (denying class certification on a Unfair Competition Law

6    claim because "plaintiffs' damages model . . . does not compare what the [products at issue] were

7    worth to what plaintiffs paid.").

8          Plaintiffs argue that another court recently accepted this same damages methodology in

9    another report by Dr. Arnold. *In re MyFord Touch Consumer Litig.*, Case No. 3:13-cv-03072-

10   EMC, Dkt. 279 at 8 (N.D. Cal. Sept. 14, 2016). However, the *MyFord Touch* court only accepted

11   Dr. Arnold's report in conjunction with a second report by another expert that faithfully measured

12   class members' expected utility. In the instant case, in contrast, Plaintiffs have not submitted any

13   damages report that even attempts to measure consumers' expected utility, which is the basis of

14   Plaintiffs' theory of liability. Additionally, *MyFord Touch* involved an alleged defect that caused

15   the onboard computer system to freeze and crash. *Id.* at 3. This is the type of defect that is visible

16   to consumers and about which consumers are likely to have preferences. In the instant case, in

17   contrast, consumers are probably not aware of the use of electro-mechanical relays in their

18   vehicles' EPAS systems, and thus expected utility will be significantly more difficult to measure.

19   Thus, the Court finds that *MyFord Touch* is not persuasive precedent showing that damages can be

20   measured on a class-wide basis using only Dr. Arnold's unstated and unexplained assumption that

21   the EPAS systems are worth $0.

22         Thus, Plaintiffs have failed to produce a damages model that is "consistent with [their]

23   liability case." *Comcast*, 133 S. Ct. at 1433. Ironically, Dr. Arnold's report itself accurately

24   describes what such a theory might look like. As Dr. Arnold states, a damages model consistent

25   with Plaintiffs' theory of harm in the instant case would attempt to measure the expected utility of

26   a defective EPAS system, as well as the disutility that an average consumer attributes to safety

27   issues and risk aversion. As in *MyFord Touch*, Plaintiffs could have used survey data and other

28

41

1  empirical studies to show how consumers value the EPAS systems with and without the alleged

2  defect. *See* Case No. 3:13-cv-03072-EMC, Dkt. 279 at 8. ("Dr. Boedeker conducted a survey and

3  employed a conjoint analysis to infer the value customers placed on the [computer system] at the

4  time of purchase, how this value would have changed had customers known of the [computer

5  system]'s defects, and how this value would have changed if customers knew these defects may

6  affect their ability to safely operate their vehicles."). However, Dr. Arnold offers no such data.

7  Instead, after stating what a proper damages model would look like, Dr. Arnold then offers an

8  entirely different model that does not attempt to measure expected utility, but instead assumes

9  without even explicitly stating that the expected utility is $0.

10      Plaintiffs have only produced one damages model in support of class certification, and that

11  model "falls far short of establishing that damages are capable of measurement on a classwide

12  basis." *Id.* Therefore, plaintiffs "cannot show Rule 23(b)(3) predominance: Questions of

13  individual damage calculations will inevitably overwhelm questions common to the class."

14  *Comcast*, 133 S. Ct. at 1433. For this reason, the Court finds that Plaintiffs' New Vehicle Class

15  does not meet Rule 23(b)(3)'s predominance requirement.

16      Similarly, the Out-of-Pocket Class seeks reimbursement of the full amount paid for

17  replacement or repair of Class Vehicles' EPAS systems. Reply at 11; Hr'g Tr. at 30:11–12 ("The

18  damages model is, what you pay is what you get."). However, as with the New Vehicle Class, a

19  damages model based on full reimbursement assumes that the replacement EPAS systems or the

20  repairs were completely valueless. Hr'g Tr. at 32:1 (explaining that Plaintiffs' theory of harm for

21  the Out-of-Pocket Class is essentially "the same thing" as Plaintiffs' theory of harm for the New

22  Vehicle Class). Recovering the full amount of replacement and repair costs would be justified only

23  "if not a single class member received any benefit" from those replacements or repairs. *Caldera*,

24  2014 WL 1477400, at *4. Plaintiffs provide no support, either in Dr. Arnold's report or elsewhere,

25  for the unstated assumption that no class member received any benefit from the replacements or

26  repairs.

27      Similarly, Plaintiffs stated at the December 8, 2016 hearing that the theory of liability for

28

United States District Court
Northern District of California

1   the Out-of-Pocket Class is "the same thing" as Plaintiffs' theory of liability for the New Vehicle

2   Class, which was based on consumers' expected utility. Hr'g Tr. at 32:1.  As explained above, a

3   damages model based on full reimbursement does not match a theory of liability based on

4   expected utility. Therefore, as with the New Vehicle Class, Plaintiffs have not offered a model for

5   the Out-of-Pocket Class that "even attempts" to "measure only those damages attributable to

6   [Plaintiffs'] theory" of liability. *Comcast*, 133 S. Ct. at 1433. The failure of Plaintiffs' damages

7   model alone warrants denial of Rule 23(b)(3) class certification.

### vi. Summary

9   Under *Mazza* a presumption of reliance is inappropriate because an unknown number of

10  class members saw warnings regarding EPAS system failure in the owner's manual for Class

11  Vehicles. Thus, the Court would be forced to conduct individual inquiries to discover which class

12  members read the owner's manual and which did not. Moreover, Plaintiffs' damages model is

13  inconsistent with their theory of liability and thus Plaintiffs "cannot possibly establish that

14  damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)."

15  *Comcast*, 133 S. Ct. at 1433. Because Plaintiffs' proposed New Vehicle Class and proposed Out-

16  of-Pocket Class do not meet Rule 23(b)(3)'s predominance requirement, the Court DENIES

17  Plaintiffs' motion for class certification under Rule 23(b)(3).[12]

### C. Rule 23(b)(2)

19  Plaintiffs also move for class certification under Rule 23(b)(2). Plaintiffs seek to certify

20  under (b)(2) only the "Current Owner/Lessee Class," which consists of California residents who

21  currently own or lease a 2010-2012 Ford Fusion or 2012-2014 Ford Focus Vehicle that the

22  individual purchased new in California for personal, family, or household purposes. *See supra* at

23  10; Mot. at 35. Moreover, Plaintiff asserts that they only move to certify this class's claims for

24  injunctive relief. Reply at 21. Specifically, "Plaintiffs seek a mandatory injunction requiring Ford

25  to uniformly repair and/or replace the defective EPAS system in each of the Class Vehicles of the

---

[12] Because Plaintiffs have not met the predominance requirement under Rule 23(b)(3), the Court need not consider whether Plaintiffs have met Rule 23(b)(3)'s superiority requirement.

Case No. 14-CV-02989-LHK
ORDER DENYING MOTION FOR CLASS CERTIFICATION

1  Current Owner/Lessee Class." Mot. at 35.

2  **1. Standard for Class Certification Under Rule 23(b)(2)**

3      "Rule 23(b)(2) allows class treatment when 'the party opposing the class has acted or

4  refused to act on grounds that apply generally to the class, so that final injunctive relief or

5  corresponding declaratory relief is appropriate respecting the class as a whole." *Dukes*, 564 U.S. at

6  360 (quoting Fed. R. Civ. P. 23(b)(2)). "[U]nlike Rule 23(b)(3), a plaintiff does not need to show

7  predominance of common issues or superiority of class adjudication to certify a Rule 23(b)(2)

8  class." *In re Yahoo Mail Lit.*, 308 F.R.D. 577, 587 (N.D. Cal. 2015). Rather, "[i]n contrast to Rule

9  23(b)(3) classes, the focus [in a Rule 23(b)(2) class] is not on the claims of the individual class

10  members, but rather whether [Defendant] has engaged in a 'common policy.'" *Id.* at 599.

11      **2. Analysis**

12      Ford's primary argument in response to Plaintiffs' motion to certify a Rule 23(b)(2) class

13  is that class certification is inappropriate under Rule 23(b)(2) because this Court has already

14  dismissed Plaintiffs' claims for equitable and injunctive relief based on the fact that Plaintiffs have

15  an "adequate remedy at law." Opp. at 33; ECF No. 48, at 10. In their Reply, Plaintiffs admit that

16  the Court previously dismissed all of Plaintiffs' UCL, FAL, CLRA, and unjust enrichment claims

17  for equitable relief because Plaintiffs had an "adequate remedy at law." However, Plaintiffs assert

18  that this is not fatal to their motion for class certification because Plaintiffs are now seeking

19  injunctive relief under the Magnusson-Moss Act and the Song-Berly Act, as alleged in

20  Plaintiffs' TAC, and the Court has not ruled yet on whether Plaintiffs have an adequate remedy at

21  law for these Magnusson-Moss Act and Song-Berly Act claims. Reply at 21; *see* TAC ¶¶ 140–

22  170.

23      However, the Magnusson-Moss Act claim in Plaintiffs' TAC contains no allegations

24  regarding injunctive or equitable relief. *See generally* TAC ¶¶ 140–153. Instead, Plaintiffs allege

25  in their Magnusson-Moss Act claim only that "California Plaintiffs, individually and on behalf of

26  the members of the California Class, seek all damages permitted by law, including diminution in

27  value of their vehicles." TAC ¶ 153. Accordingly, the Court finds that Plaintiffs have not asserted

28

Case No. 14-CV-02989-LHK
ORDER DENYING MOTION FOR CLASS CERTIFICATION

United States District Court
Northern District of California

1    under the Magnusson-Moss Act any entitlement to injunctive relief, but have rather alleged only

2    Plaintiffs' entitlement to monetary relief. *See id.* Plaintiffs thus cannot rely on the Magnusson-

3    Moss Act thus in seeking class certification for injunctive claims.

4         In contrast, the Song-Beverly Act claim in Plaintiffs' TAC does mention "legal and

5    equitable relief." *Id.* ¶ 169. At the December 8, 2016 hearing on Plaintiffs' motion for class

6    certification, Plaintiffs stated that this portion of the TAC was the ground for Plaintiffs' request for

7    an injunction requiring Ford to "institute a recall or free replacement program and/or otherwise

8    repair the Defective Vehicles." TAC at 39; Hr'g Tr. at 25–27. However, for the reasons discussed

9    below, the Court finds that Plaintiffs have not met their burden to show that Rule 23(b)(2)

10   certification is warranted for the Current Owner/Lessee Class's Song-Beverly Act claim.

11        Most importantly, as the Court held with regards to Plaintiffs' other equitable and

12   injunctive claims, Plaintiffs have an "adequate remedy at law" for Ford's alleged violation of the

13   Song-Beverly Act.  *See* ECF No. 48, at 10.  This is shown by Plaintiffs' own complaint, which

14   seeks damages as a remedy for the same Song-Beverly Act violations for which Plaintiffs' seek an

15   injunction.

16        Specifically, the Song-Beverly Act claim in Plaintiffs' TAC alleges that Defendant

17   "breached the implied warranty of merchantability" and that this has caused "California Plaintiffs

18   and members of the California Class to not receive the benefit of their bargain."  TAC ¶ 165.

19   Plaintiffs further allege that "members of the California Class received goods whose dangerous

20   condition substantially impairs their value."  TAC ¶ 167.  In order to remedy these alleged

21   violations, Plaintiffs allege that "members of the California Class are entitled to damages . . . ."

22   TAC ¶ 169. However, in their class certification briefing, Plaintiffs argue that in addition to

23   damages, they are also entitled to an injunction granting them replacement EPAS systems because

24   they did not receive the "benefit of their bargain" when they purchased vehicles with defective

25   EPAS systems. This is the same theory and cause of action as Plaintiffs' request for damages.

26   Thus, as these allegations show, Plaintiffs have an obvious "adequate remedy at law" for

27   Defendant's breach of implied warranty:  "benefit-of-the-bargain" damages as requested in the

28

Case No. 14-CV-02989-LHK
ORDER DENYING MOTION FOR CLASS CERTIFICATION

United States District Court
Northern District of California

1    TAC.

2          Indeed, not only do Plaintiffs *have* an adequate remedy at law, Plaintiffs are seeking to

3    certify a class *asserting* that adequate remedy at law. As discussed above, Plaintiffs are seeking to

4    certify under Rule 23(b)(3) the "New Vehicle" Class's Song-Berverly Act claim for "benefit of the

5    bargain" monetary damages.  As Plaintiffs conceded at the hearing on Plaintiffs' class certification

6    motion, the "Current Owner/Lessee Class" is a subclass of the "New Vehicle" class.  Hr'g Tr. at

7    13:8–11. Thus, Plaintiffs contend that the same individuals who are entitled to a "mandatory

8    injunction requiring Ford to uniformly repair and/or replace the defective EPAS system" are

9    simultaneously entitled to monetary damages that remedy Plaintiffs' claimed harm of "not

10   receiv[ing] the benefit of their bargain." TAC ¶ 165.  In fact, Plaintiffs have admitted that the

11   damages that they seek and the injunction that they seek are "alternative forms of relief." Hr'g Tr.

12   at 25:14–15. Thus, Plaintiffs' own arguments demonstrate that the "Current Owner/Lessee" Class

13   has an "adequate remedy at law," just as the Court held in dismissing Plaintiffs' other claims for

14   injunctive and equitable relief. *See* ECF No. 69, at 30.

15         At the class certification hearing, the only authority that Plaintiffs offered in support of the

16   proposition that they can receive a mandatory injunction requiring repair or replacement, despite

17   having an adequate remedy at law, is the Song-Berverly Act's language that "[a]ny buyer of

18   consumer goods who is damaged by a failure to comply with any obligation under this chapter . . .

19   may bring an action for the recovery of damages *and* other legal and equitable relief." Cal. Civ.

20   Code § 1794 (emphasis added); Hr'g Tr. at 28. However, Plaintiffs point to no caselaw, and the

21   Court is aware of none, granting an injunction for a recall under similar circumstances. *See also*

22   *McManus v. Fleetwood Enterpr., Inc.*, 320 F.3d 545, 554 (5th Cir. 2003) (noting, where a

23   proposed Rule 23(b)(2) class sought an injunction for supplemental braking equipment as a

24   remedy for breach of an implied warranty, that the court "could find no case where injunctive

25   relief was awarded under comparable circumstances"). To the contrary, California caselaw

26   suggests that, because Plaintiffs' allege only breach of an implied warranty, Plaintiffs are *not*

27   entitled under the Song-Berverly Act to have Ford replace their EPAS systems.  Specifically, the

28

Case No. 14-CV-02989-LHK
ORDER DENYING MOTION FOR CLASS CERTIFICATION

United States District Court
Northern District of California

1   California Supreme Court has explained that a buyer's "right to replacement or restitution is

2   qualified [in § 1794 of the Song-Beverly Act] by the phrase 'as set forth in subdivision (d) of

3   section 1793.2" of the Song-Beverly Act, which states that "replacement/restitution remedy is

4   available only for breach of an *express* warranty." *Gavaldon v. DaimlerChrysler Corp.*, 90 P.3d

5   752, 804 (Cal. 2004) (emphasis added).

6        Class certification under Rule 23(b)(2) is inappropriate where, as here, "the ordinary relief

7   for [plaintiff's] lawsuit would be money damages, not injunctive relief." *McManus*, 320 F.3d at

8   554; *see also Walsh v. Ford Motor Co.*, 130 F.R.D. 260, 266 (D.D.C. 1990) (refusing to certify a

9   (b)(2) class for a "recall and retrofit" of Ford vehicles because "monetary damages are more

10  suitable in this litigation, particularly in view of the practical limitations which the proposed

11  equitable relief presents"). As discussed above, Plaintiffs' TAC and class certification motions

12  demonstrate that "the ordinary" and more appropriate relief for Plaintiffs' Song-Beverly Act claim

13  is monetary damages, not a mandatory injunction requiring "Ford to uniformly repair and/or

14  replace the defective EPAS system in each of the Class Vehicles." Mot. at 35; *see also McManus*,

15  320 F.3d at 554 ("[O]therwise inappropriate injunctive relief does not become appropriate for

16  class treatment merely because the more permissive Rule 23(b)(2), as opposed to (b)(3),

17  contemplates injunctive relief."); *Walsh*, 130 F.R.D. at 266.

18       Indeed, it is also unclear why Plaintiffs ask Ford to "uniformly repair and/or replace the

19  defective EPAS system in each of the Class Vehicles," Mot. at 35, when Ford has already

20  conducted a safety recall. In fact, Plaintiff Philips and Plaintiff Goodman both had their EPAS

21  systems replaced as part of Ford's recall.  ECF No. 97-5 at 192; ECF No. 95-4 at 2. Plaintiffs

22  contend that Ford's recall is insufficient because "the recall simply replaces the defective relays"

23  with "updated" electromechanical relays "which are equally defective."  Reply at 16.

24  Accordingly, Plaintiffs state that Ford should place "next generation systems" into their Class

25  Vehicles. *Id.* However, Plaintiffs do not define "next generation systems." *Id.* Additionally,

26  Plaintiffs provide no indication that their request that Ford place undefined "next generation"

27  power-steering systems into older model vehicles is feasible. Thus, the Court finds that Plaintiffs

28

47

1   have not met their burden to establish that certification of an injunctive class under Rule 23(b)(2)

2   is appropriate. Therefore, the Court DENIES Plaintiffs' motion for class certification under Rule

3   23(b)(2).

4   **IV.   *DAUBERT* MOTIONS**

5   Defendants move to exclude the expert report and testimony of Dr. Arnold and the expert

6   report and testimony of Dr. van Schoor in support of Plaintiff's Motion for Class Certification for

7   failing to meet the standards required by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S.

8   579 (1993), and Rule 702 of the Federal Rules of Evidence. ECF Nos. 196–97. The Court

9   GRANTS Ford's motion to exclude the expert report and testimony of Dr. Arnold and DENIES

10  Ford's motion to exclude the expert report and testimony of Dr. van Schoor.

11  When considering expert testimony offered pursuant to Rule 702, the trial court acts as a

12  "gatekeeper" by "making a preliminary determination of whether the expert's testimony is

13  reliable." *Elsayed Mukhtar v. Cal. State Univ., Hayward*, 299 F.3d 1053, 1063 (9th Cir. 2002)

14  (*overruled on other grounds by Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 467 (9th

15  Cir. 2014)); *see Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999); *Daubert*, 509 U.S. at

16  597. Expert testimony is admissible if: (1) "the expert's scientific, technical, or other specialized

17  knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;" (2)

18  "the testimony is based on sufficient facts or data;" (3) "the testimony is the product of reliable

19  principles and methods;" and (4) "the expert has reliably applied the principles and methods to the

20  facts of the case." Fed. R. Evid. 702. "Shaky but admissible evidence is to be attacked by cross

21  examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano v.

22  Cook*, 598 F.3d 558, 564 (9th Cir. 2010) (citing *Daubert*, 509 U.S. at 594, 596). The Ninth Circuit

23  has approved of the application of the standard in *Daubert* to expert reports in support of or in

24  opposition to motions for class certification. *See Ellis v. Costco Wholesale Corp.*, 657 F.3d 970,

25  982 (9th Cir. 2011) ("In its analysis of Costco's motions to strike, the district court correctly

26  applied the evidentiary standard set forth in *Daubert*.").

27

28

Case No. 14-CV-02989-LHK
ORDER DENYING MOTION FOR CLASS CERTIFICATION

United States District Court
Northern District of California

1    Ford does not argue that Dr. Arnold is unqualified to offer an expert opinion.[13] Instead,

2    Ford moves to exclude the expert report of testimony of Dr. Arnold because Dr. Arnold has failed

3    to apply valid economic methodology in calculating damages. As discussed above, the Court finds

4    that the "expected utility" model that Dr. Arnold describes is economically sound. Nevertheless,

5    the Court agrees with Ford that after describing an economically sound "expected utility" model,

6    Dr. Arnold offers an analysis that does not apply this model. As Dr. Arnold stated in his

7    deposition, he was "not calculating the expected value" of the allegedly defective EPAS systems,

8    but instead was merely calculating "the amount that consumers paid for the EPAS." Deposition of

9    Dr. Jonathan Arnold, Ex. 1 to ECF No. 196, at 74. As discussed above, the Court finds that this

10   calculation does not follow the model that Dr. Arnold describes and therefore does not offer a

11   theory of damages consistent with Plaintiffs' theory of liability in the case. Therefore, the Court

12   GRANTS Ford's motion to exclude the expert report and testimony of Dr. Arnold. As a practical

13   matter, however, the Court has already considered Dr. Arnold's report. [14]

14   Ford does not argue that Dr. van Schoor is unqualified to offer an expert opinion.[15] Ford

15   moves to exclude the expert report and testimony of Dr. van Schoor for two reasons. First, Ford

16   argues that Dr. van Schoor's opinions are not based on "scientific, technical, or otherwise

17   specialized knowledge" as required by Rule 702, because Dr. van Schoor has relied solely on his

18   interpretations of statements in documents produced by Ford. ECF No. 197, at 1. However, at this

19   stage of the litigation, the Court needs only to understand Plaintiffs' theory of the case and the

20   evidence Plaintiffs intend to use to prove that theory.  As Ford concedes, Dr. van Schoor has

21   examined electro-mechanical relays and understands their basic function. *Id.* at 2. The Court finds

---

[13] Dr. Arnold's expert report contains a list of his qualifications, which include a Ph.D, M.B.A., and B.A. from the University of Chicago, as well as a long career in economic analysis. Ex. 43, at 288.
[14] Excluding the report at this stage means that Plaintiffs may not rely on it for the remainder of the litigation.
[15] Dr. van Schoor's expert report contains a list of his qualifications, which include a Ph.D and Master's degree from the Massachusetts Institute of Technology, extensive work in mechanical engineering, and a patent in the field of electro-mechanical hydraulic power assist steering. Ex. 2, at 7.

49

United States District Court
Northern District of California

that Dr. van Schoor's technical expertise is helpful in explaining how the relays function and why a power steering system incorporating those relays may be defective. In other words, Dr. van Schoor helps to explain the technical details of Plaintiffs' theory of the case and what evidence Plaintiffs might use to prove that theory; this is all that the Court needs to decide at the class certification inquiry. Second, Ford states that "[t]o the extent Dr. van Schoor does rely on data," he has analyzed the data incorrectly and his conclusions are therefore unreliable. *Id.* at 4. Ford's arguments on this point refute Dr. van Schoor's diagnosis of certain fault codes. The Court has reviewed Ford's objections to Dr. van Schoor's methodology and finds that they are not so serious as to warrant exclusion, but instead should be "attacked by cross examination, contrary evidence, and attention to the burden of proof." *Primiano*, 598 F.3d at 564. Thus, the Court DENIES Ford's Motion to Exclude the Report and Testimony of Dr. van Schoor.

## V.     CONCLUSION

For the foregoing reasons, the Court finds that although Plaintiffs have satisfied all of the requirements of Rule 23(a), Plaintiffs have not satisfied the requirements of Rule 23(b)(2) with respect to the proposed Current Owner/Lessee Class and have not satisfied the requirements of Rule 23(b)(3) with respect to the proposed New Vehicle Class or the proposed Out-of-Pocket Class. Accordingly, the Court DENIES Plaintiffs' Motion for Class Certification.

**IT IS SO ORDERED.**

Dated: December 22, 2016

*Lucy H. Koh*
_____
LUCY H. KOH
United States District Judge

Case No. 14-CV-02989-LHK
ORDER DENYING MOTION FOR CLASS CERTIFICATION

United States District Court
Northern District of California